[No. S005707. July 14, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
BILL BRADFORD, Defendant and Appellant.

**COUNSEL**

David A. Nickerson, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter, Susan Lee Frierson and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—Following the guilt and special circumstance phase of a capital trial, a jury found defendant Bill Bradford guilty of the first degree murders of Shari Miller and Tracey Campbell (Pen. Code, §§ 187, 189).[1] The jury also found true the special circumstance that defendant had committed multiple murder. (§ 190.2, subd. (a)(3).)

Following the penalty phase of the trial, the jury imposed the death penalty. After denying defendant's motion for modification of the verdict imposing the death penalty, the court sentenced defendant to death for the murders of Shari Miller and Tracey Campbell. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

The evidence at trial established that between July 4 and July 6, 1984, defendant killed Shari Miller in a remote desert area, stored her body in the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

trunk of his vehicle for a number of hours, and then deposited her body in a parking lot in West Los Angeles, where it was discovered on the morning of July 6, 1984. The evidence also established that on July 12, 1984, defendant drove Tracey Campbell to the same remote desert area, where he killed her that day or the following day. On this occasion defendant left the body at the desert site, where it was discovered on August 11, 1984.

## A. *Guilt Phase Evidence*

### 1. *Disappearance of Shari Miller*

Defendant became acquainted with Nicholas (Nick) Klos in 1982. Klos often camped in a horseshoe-shaped "bowl area" in an isolated part of the desert near Lancaster, south of Edwards Air Force Base, and on two weekends in April 1983, Klos and defendant, accompanied by others, had driven their motorhomes to that site. Approximately one week prior to July 4, 1984, defendant contacted Klos and inquired whether he intended to go to the bowl area on July 4, 1984. Approximately one week later, defendant again contacted Klos and asked for directions to the bowl area.

Shari Miller, who was 21 years of age, lately had been residing in her automobile. She was acquainted with Marcia Peltier and Michael Faddis. In late June 1984, Faddis, who sometimes recovered used but undamaged clothing from trash containers, had given Shari a blouse with a snail print on it. During June, Shari had given Faddis a double-bladed knife in a double sheath that she desired to sell. Near the end of June, Faddis returned the knife to her because he had been unable to sell it for her.

In late June 1984, Shari had shown her mother, Mara Lyn Miller, a ring decorated with a carved head of an "Indian chief." At that time Shari wore her hair long. On June 29, Shari telephoned her mother from Daniel Freeman Memorial Hospital, telling her that, while in the shower, she had received a bad cut requiring five stitches on her left arm just below the elbow. Shari, wearing a bandage on her arm, arrived at her mother's residence that night, remaining overnight.

At approximately 2:20 p.m. on Saturday, June 30, Mrs. Miller overheard Shari place a telephone call and address someone as "Bill," telling him she was sorry she had missed him the week before and inquiring whether the job still was available. Afterward, Shari informed her mother that she was going to have a job posing for a photographer, modeling leather jackets and boots for In The Wind magazine. Telephone records subsequently confirmed that a telephone call had been made from the Miller residence to defendant's

residence at 2:22 p.m. on June 30. Mrs. Miller saw her daughter for the last time when Mrs. Miller left the residence at approximately 3:00 p.m. on the afternoon of June 30.

On the afternoon of July 1, Shari met her friend Carolyn Bury and told her that she was looking forward to the opportunity within the next week to model leather outfits for a photographer who "had a lot of money," lived on a boat in the marina, and owned a motorcycle. The photographer would provide the clothing, and Shari "made it very clear that there wouldn't be any nude shots." Bury previously had observed that Shari had three tattoos: Harley-Davidson motorcycle "wings" on her left ankle, Winnie the Pooh on her abdomen close to her pubic hair, and an "S" on the bottom of her foot. Shari wore her hair long. Bury had noticed Shari wearing a silver ring made from a spoon.

On the night of July 1 or early on the morning of July 2, Shari, wearing cutoff jeans and a sleeveless top, arrived at a residence where Marcia Peltier was staying. Between 9:00 a.m. and 11:00 a.m. on July 2, the two women made lists of things they planned to do that day. Shari's list included the notation: "Bill Bradford, Meat Market, 6:00 p.m." Shari mentioned an upcoming modeling job. At approximately 11:00 a.m., Kurt Androsky, a house painter who recently had become acquainted with Shari, arrived. Androsky, who did not have transportation that day and who knew Shari wanted a job, inquired whether she would assist in the completion of a house-painting job at a residence in the San Fernando Valley. She accepted and, driving her vehicle, left with Kurt to go to the jobsite.

During their drive to that location, Androsky, a narcotics user, injected methamphetamine, and Shari attempted to do so but was unsuccessful. Androsky and Shari arrived between 11:00 a.m. and noon and painted the building for six or seven hours, using yellow paint. Beverly Holst, the owner of the residence, recalled that on a date within several days of July 4, when Holst returned from work, she noticed that Androsky was employing a female assistant dressed in a tank top and cutoff jeans. Holst observed in the driveway a brown or blue vehicle similar in size to a Dodge Dart. The backseat of the vehicle was filled with miscellaneous items.

Androsky and Shari departed at approximately 6:30 p.m. and proceeded to the Meat Market, a bar in West Los Angeles. Shari mentioned to Androsky that she had an offer to model for a photographer, using motorcycles as props, on the following day. After Shari made a telephone call, the photographer arrived at the bar. Shari introduced the man but Androsky was unable to identify defendant as the man he had met. Shari dropped off Androsky in Venice at approximately 9:00 p.m. that evening.

Schylee O'Hare, a bartender at the Meat Market bar, was acquainted both with defendant and Shari, a former employee at that bar. At approximately noon on July 3, Schylee waited on the sidewalk for the bar to open. Shari drove up, exited from her vehicle, and asked Schylee for a dime, stating she was going to telephone defendant, who had arranged to take photographs of her. Schylee observed that Shari was wearing a tank top, jeans, and leather moccasins that laced up to the knee.[2]

Evans Haas had become acquainted with defendant at the Meat Market bar in early June, and also previously had met Shari. Just before noon on Tuesday, July 3 or Wednesday, July 4 (he was not certain which date), Haas visited defendant's apartment on Midvale Avenue in Los Angeles to inspect a motorcycle that defendant had offered for sale. Approximately one hour later, Shari, wearing long jeans, arrived at defendant's apartment.

Defendant's motorcycle was not functioning properly, and at approximately 2:00 p.m., Haas and defendant took one of the motorcycle parts to Bartels Harley-Davidson shop in Culver City. The shop was open, and defendant had a conversation with an employee concerning the part, which purportedly had been repaired.[3] When defendant and Haas returned to the apartment, Shari was asleep inside defendant's automobile. Defendant asked Haas to stand holding a bottle of liquor next to Shari and took a Polaroid photograph of them. Approximately 45 minutes later, at 2:30 p.m., Haas departed.

Gary Williams, who together with his mother, Olga Talbot, shared the apartment on Midvale Avenue with defendant, was introduced to Shari on that day. Williams recalled driving in and out of the garage as Haas and defendant worked on the motorcycle. Although Williams testified at trial that the date was July 1, relying upon the circumstance that he had not gone to work that day, he was impeached with his preliminary hearing testimony indicating that the date was July 3 and with his employment records demonstrating that he had not worked on July 3.

At approximately 5:00 p.m. on July 3 or 4 (he was uncertain which date), Todd Heidrick, a cousin of Tracey Campbell, who had become acquainted

---

[2]Schylee also testified that she had seen defendant at the bar at approximately 5:00 p.m. on the same afternoon she saw Shari. When Schylee asked whether defendant had seen Shari, he replied "Yes," and then took a photograph of Schylee, giving it to her several days later. Other testimony established, however, that this photograph was taken subsequent to certain photographs defendant had taken at a photographic show on July 8, and Todd Heidrick, who spent time with defendant on July 9, noticed that he took a photograph of a waitress at the Meat Market bar on that date.

[3]According to Ron Bartels, who worked at the motorcycle shop, the store had not been open on July 4, although it was possible a salesman was in the showroom on that date. According to William Bartels, owner of the shop, it was not open on July 4, and store records indicated no sales of motorcycles or parts on July 4.

with defendant, was walking along Midvale Avenue in Los Angeles on his way to West Hollywood. Defendant drove up in his automobile and agreed to give Todd a ride. Defendant was accompanied by someone whom he introduced at the time as "Shari," whom Todd later identified from photographs.

At approximately 6:00 p.m. on July 3, Shari arrived at the residence of Oliver De La Torre, with whom she had become romantically involved the previous month. She spent the evening but departed at 1:00 a.m. on July 4. Appearing to be apprehensive, Shari told De La Torre that she had agreed to meet someone at a bar but did not want to go to the meeting. She asked De La Torre to leave the door unlocked, because she would return during the night, but she failed to return.

Olga Talbot later told the police that, on July 4, she awoke at 4:30 a.m., as was her custom. On her way to the store, she walked past the living room sofa where defendant slept, noticing he was not present. Talbot soon returned, remaining inside the apartment except for a period of several hours in the afternoon. Defendant did not return until late that evening.[4]

As discussed below in greater detail, photographs of Shari later were found in defendant's possession. The photographs depicted Shari wearing various outfits such as a dress or cutoff jeans and a blouse, posing before distinctive rock formations in the desert. The bandage on her arm was visible. One photograph, taken while Shari was lying down, depicted her bare breasts close up, with her shirt pushed back under her arms, which were held against her body. A police forensic photographer later determined, by taking photographs at the same desert sites during the same time of year and attempting to duplicate the shadows, that one of the photographs of Shari had been taken at approximately 11:05 a.m. and another had been taken at approximately 2:00 p.m., indicating Shari was alive at least until the early afternoon of July 4.

2. *Discovery of the body of Shari Miller*

At 6:00 a.m. on July 6, Steven Craig, who had an office near the corner of Elm Street and West Pico Boulevard in West Los Angeles, arrived at work

---

[4]Olga Talbot testified as a hostile witness for the prosecution. She testified, contrary to her statement to the police, that when she got up at approximately 4:30 a.m. on July 4 to have coffee, defendant was sleeping on the sofa in the living room, and was still in that location at 8:00 a.m. when Talbot went to the store. Talbot further testified that when she returned to the apartment for several minutes at 10:00 a.m., defendant was not at the apartment, but that when Talbot returned at 2:30 p.m., he was present. Talbot also testified that defendant left in the early evening and that when she awoke at 4:30 a.m. on July 5, defendant was asleep on the couch.

and parked his automobile in an alley near Elm Street. As he walked toward the front of the building, he noticed a large bundle in the parking lot. At 9:50 a.m. that morning, Los Angeles Police Department (LAPD) Officer Edwin Souza was dispatched to the parking lot. He observed a bundle covered by a quilt that was stained with blood. A strong odor emanated from the quilt and a human hand was visible.

LAPD homicide detectives, including John Rockwood and John St. John, observed the body at the scene and were present at the time the coroner's investigators unwrapped the quilt. The body, initially identified as Jane Doe No. 60, was that of a partially decomposed Caucasian female, five feet nine inches tall, and one hundred twenty pounds. The body was nude and was bound by a single long leather thong ligature that encircled and tied the ankles together, wrapped around the left thigh, and tied together the wrists in front of the abdomen. The neck had ligature marks. The nipples had been entirely removed, and skin tissue had been removed from areas on the lower abdomen and left ankle. The body had an S-shaped tattoo on the bottom of the right foot. Yellowish matter was found under the fingernails. The hair was approximately six inches in length.

A medical examiner for Los Angeles County, Dr. Wegner, performed the autopsy. Death occurred by ligature strangulation, causing discoloration of the head and neck. The nipples and sections of skin had been removed after death by means of a sharp cutting instrument. The back of the left forearm below the elbow had a cut that had been closed with five blue sutures, but no bandage was present. An Indian head silver ring was found on one of the fingers.

The medical examiner estimated that death had occurred between 20 hours to 3 days prior to the time the body first was examined on July 6, or between 3:30 p.m. on July 3 and 7:30 p.m. on July 5. The medical examiner calculated that the time of death would be nearer to the evening of July 5, assuming 110 degree heat at the time of death, storage in the trunk of a vehicle during a period of time prior to the body's discovery at 6:00 a.m. on July 6, and additional exposure prior to the body's cold storage at 3:30 p.m. that day.

On July 8, a locked automobile, later determined to be Shari's, was discovered in the parking lot of Sarno's Bar, located two blocks from defendant's apartment in Los Angeles. Within several weeks, the police matched a fingerprint taken from an arrest record for Shari with that of Jane Doe No. 60. On August 1, Shari's mother was informed of her daughter's death.

On August 7, the police located and searched Shari's vehicle in the towing yard where it had been stored since July 8. Although Shari customarily had stored many of her belongings inside her automobile, neatly arranged and covered with the quilt that later was found wrapped around her body, at the time the police located the vehicle, the articles inside were in disarray. The several outfits Shari wore in the photographs taken by defendant were not recovered from the vehicle, nor from several friends' residences where she had stored clothing. The yellow substance on a pair of cutoff jeans recovered from Shari's automobile and on a wristwatch subsequently recovered from defendant's residence, as well as scrapings from the fingernails of Shari's body, were analyzed and found to have the same composition as the yellow paint at Mrs. Holst's residence.

### 3. *Disappearance of Tracey Campbell*

In the spring of 1984, Tracey Campbell, 15 years of age, moved from Montana, joining her mother, Lida Jane McCabe, who recently had rented a small studio apartment (that did not have a telephone), located on Midvale Avenue in Los Angeles. Tracey attended junior high school during the remainder of the school year. During the first part of June 1984, they were joined by Tracey's brother Derrill, sister Tanya, and cousin Todd Heidrick, all of whom soon located jobs. Tracey remained in the apartment alone during the day, putting away the bedding and cleaning the apartment after the others had gone to work, but she declined to do the dishes. It was Tracey's habit to leave the apartment door open during the day. Tracey, who smoked approximately one-half pack of cigarettes per day, always purchased them at the Arco Station located on Overland Avenue and Venice Boulevard, several blocks from the apartment. Tracey did not drive or hitchhike. At the time of her disappearance, she had no money.

In early June, Tanya, Todd, and Tracey, sunbathing at the front of the apartment, met defendant, who lived upstairs in the adjacent apartment complex and was washing his motorcycle nearby. At the time, defendant told them that he was a photographer. Later in June, Todd and Tanya had drinks with defendant at Sarno's Bar. On July 1, Todd and Tanya attended the Los Angeles Gay Pride Festival, and two or three days after the festival, on the afternoon of July 3 or July 4, defendant, accompanied by Shari Miller, agreed to drive Todd to West Hollywood.

On the morning of July 9, defendant saw Todd as the latter left the apartment to purchase a newspaper and cigarettes. Defendant offered to drive Todd and purchased the cigarettes for him. They drove to the One Hour Moto-Photo store on Venice Boulevard to drop off film and pick up

developed photographs. Todd indicated his interest in preparing a photographic modeling portfolio. At some point, defendant and Todd returned to defendant's apartment, where, from the hall closet, defendant retrieved a number of developed photographs. He showed Todd the photographs, which depicted female models, including several photographs that proved to be of Shari Miller. Defendant and Todd had drinks at the Meat Market bar, where defendant took a photograph of a blonde woman, later identified as Schylee O'Hare.

Late that afternoon, Todd agreed to have defendant photograph him at a construction site next to their apartment complex, and Todd mentioned the plan to Tracey when he returned to the apartment in order to change clothing. After shooting the photographs, Todd and defendant had them developed at the one-hour photography store and, upon returning to the apartment, showed the photographs to Tracey and other family members. Defendant and Todd spent the remainder of the night together, at one point driving to the "Tennessee" bar.

On July 11, upon arriving home from work, Todd visited defendant at his apartment. Tracey appeared at the door to inform Todd that it was time for dinner, and in the ensuing conversation, Tracey mentioned that she wanted to become a professional model. Defendant showed her a copy of Faces International, a magazine featuring photographs of people who desired to become models, and advised Tracey to obtain a good photograph of herself and submit it to the magazine. Tracey asked if defendant would prepare a photographic portfolio of her, but he declined, stating that he did not photograph minors. Later that evening, Derrill and Tracey went to a sandwich shop, where Tracey purchased a "subway" sandwich and brought one-half of the sandwich home, mentioning that she would eat it for lunch the following day.

On the morning of July 12, 1984, Tracey was dressed in a blue and white two-piece bathing suit, completely covered by a black, floral-patterned top and shorts outfit, and also wore an ankle bracelet with an amethyst stone and a "pinkie" ring that had the initial "T" on it. At approximately 8:00 a.m., after Todd, Tanya, and their mother left the apartment to go to work, Derrill heard a knock on the apartment door. Defendant spoke with Tracey at the door for several minutes, and Derrill heard defendant mention having a job for Tracey, and possible jobs for Todd and Derrill. Derrill approached and spoke briefly with defendant about the job, disclosing that he was about to leave for work.

Approximately 15 minutes later, at 8:25 a.m., Derrill departed for his job, leaving a pack of Camel cigarettes for Tracey. At approximately 9:00 a.m.,

Bill Scognamillo, a neighbor in the same building who knew the family and had observed that Tracey usually left the apartment door open while she cleaned inside, walked by and noticed that the apartment door was closed.

At 4:30 that afternoon, Todd returned from work to find the front door to the apartment locked and the curtains closed. At approximately 5:00 p.m., Mrs. McCabe arrived, but because she had given her keys to Tanya that morning, she and Todd had to pry open the window screen in order to gain entrance. Inside, they discovered that the mattresses were still on the floor, and the cat was inside, but there were no dirty dishes in the sink. Tracey's half-eaten sandwich still was in the refrigerator, and her purse was in the apartment. .

That evening, when Tracey did not return, Mrs. McCabe, Tanya, Todd, and Derrill began to ask neighbors in the apartment complex, including Bill Scognamillo, whether they had seen Tracey. Todd went to defendant's apartment, but he was not at home and his vehicle was not in the garage. Olga Talbot informed Todd that defendant was in Orange County. Todd later returned to defendant's apartment and found a note that Olga had addressed to defendant and placed on the door, indicating defendant still had not returned. Todd checked the garage several times that evening, but defendant's vehicle was not present.[5]

On the morning of July 13, Mrs. McCabe filed a missing person report at the police department on Tracey's disappearance. That morning and afternoon, Todd checked again and found that defendant's automobile still was not present in the garage.

At approximately 8:30 that morning, Steven Marshall, a private investigator who was an acquaintance of defendant, telephoned defendant's apartment and spoke to Olga Talbot. Talbot told him she was worried that defendant had "taken the little girl next door the previous day and was not yet home." Marshall proceeded to defendant's apartment, and he observed Mrs. McCabe walking nearby. Marshall inquired whether she had seen defendant. Mrs. McCabe said she had not but was looking for him because the previous day defendant and Tracey had left together, and defendant "had her daughter." Marshall offered to assist in the search and proceeded to the apartment

---

[5]According to Olga Talbot, testifying as a hostile witness, on July 12, 1984, Talbot prepared and placed inside Talbot's and defendant's apartment, a note to defendant that referred to Tracey and to Talbot's missing vacuum cleaner. According to Talbot's testimony, defendant had returned to their apartment sometime after nightfall, and the following morning, July 13, she and defendant proceeded to Tracey's apartment to ascertain whether Tracey had returned, but were told by Tracey's family that she had not returned. No other witnesses verified that Talbot and defendant had visited Tracey's apartment at that time.

garage, where he noticed that defendant's automobile was not present. At least five times that day Marshall telephoned defendant's apartment, and each time Talbot told him defendant had not returned. At approximately 4:00 p.m., defendant personally answered the telephone and agreed to meet with Marshall at another location. At that meeting, when Marshall inquired whether defendant had seen Tracey, he stated that he had driven her to purchase cigarettes and had dropped her off at Venice Boulevard because she wanted to hitchhike to the beach.

On the same date, Bill Scognamillo observed defendant, who carried a small or medium-sized briefcase, unlocking the front door of his apartment. Scognamillo approached and asked whether defendant had seen Tracey. Defendant did not respond and entered the apartment, and Scognamillo followed him inside. Defendant, who appeared nervous, dropped the briefcase on a coffee table, grabbed a pornographic magazine, and told Scognamillo to look at some photographs. Defendant moved the briefcase first to the front door and then to the hallway. When Scognamillo again asked whether defendant had seen Tracey, he responded that he had been in the desert taking photographs and had not seen her. When Scognamillo inquired whether defendant had seen Tracey in the last two days, defendant replied that the previous day Tracey had visited his apartment to make a telephone call and then had departed. Scognamillo proceeded to the apartment's parking garage to discover whether defendant's vehicle had dust on it, but it was clean. Scognamillo then went to Tracey's apartment to inform her family of what he had learned.

At approximately 5:00 on the afternoon of July 13, defendant visited Mrs. McCabe's apartment, where she, Tanya, Derrill, Todd, and Scognamillo were present. Defendant, who was trembling, appeared highly agitated, did not make eye contact, and stood in the doorway of the apartment. When asked in a nonconfrontational manner whether he had seen Tracey and where he had been, defendant stated he did not know where she was and that he had gone to Orange County. Defendant stated that Tracey, wearing a black shorts and top outfit over a blue bathing suit, had stopped by his apartment at approximately 2:30 the previous afternoon to telephone a girlfriend. Defendant subsequently had given Tracey a ride to the corner of Midvale Avenue and Venice Boulevard to purchase cigarettes at a liquor store. Tracey had told him that she was going to the beach.

Following this conversation with defendant, Tanya and Todd proceeded to the parking garage. They noticed that defendant's automobile was clean and that there were water spots on the windows. When Todd saw defendant near his apartment later that evening, Todd asked why the vehicle was so clean.

Defendant responded that he had had to clean the interior and exterior of the automobile because a fire had ignited in the heater or carburetor.

On July 14, LAPD Officer Michael Taylor interviewed defendant at his apartment concerning the missing person report that Tracey's family had filed. Defendant informed Officer Taylor that at approximately 2:30 p.m. on July 12, Tracey, who wore a bikini covered with a wrap, had visited his apartment to use the telephone, and defendant subsequently had given her a ride to the corner of Midvale Avenue and Venice Boulevard.

On July 16, LAPD Officer James Gillespie interviewed defendant at his apartment. Defendant gave a nearly identical account, this time remarking that while in the apartment, Tracey had mentioned her desire to become a model, and defendant, who had informed her that he was a photographer, had agreed to prepare a photographic portfolio for her. Following the interview, defendant consented to a search of his apartment. The police briefly looked over items on the tables in the living room and kitchen and opened a hall closet, but did not locate anything that appeared to relate to the case. After defendant executed a consent form authorizing the police to search his automobile, the police briefly examined the inside and trunk of the vehicle without finding anything significant, but they noticed that the floorboard was damp. Defendant stated he had washed the vehicle that day. The interview and searches were completed within one-half hour.

### 4. Defendant's initial arrest

On July 31, LAPD officers obtained warrants to arrest defendant in connection with the presumed death of Tracey Campbell, and to conduct a search of his apartment and vehicle. At approximately 6:00 p.m., Detectives Charles Worthen, Robert Rooney, and John Rockwood arrested defendant at the Meat Market bar and seized his automobile, transporting it to the police station.

Detective Donald Ravens participated in the police search of defendant's apartment. Inside a box located in a hall closet, the officers found a silver chain, a bracelet with a rainbow design, one pair of earrings having purple stones, and one pair of earrings having stones resembling diamonds. On a coffee table, the officers found a key chain with four keys attached to multiple other key chains.

At approximately 6:30 p.m., Detective Robert Rooney and other officers searched defendant's vehicle, discovering a knife and an address book in the trunk. Inside the vehicle, the officers discovered two Polaroid photographs

and a number of photographic negatives, as well as a camera bag containing photographs, negatives, and camera equipment. Under the floorboard, the officers found a key chain with several keys and three rings attached. One of these keys subsequently was discovered to fit the locks and ignition both of Shari's vehicle and Olga Talbot's vehicle.

Detective Rooney removed the items and placed them on the "homicide desk" inside the police station. The Polaroid photographs depicted a young woman asleep in a vehicle. Several negatives and photographs inside the camera bag depicted the same young woman posing, with a bandage clearly visible on her arm, at various locations in the desert. Upon observing the photographs, Detective Rockwood noticed and commented to Detective St. John, who was investigating the death of Jane Doe No. 60, that the woman in the photographs had an ankle tattoo in the same area of the body where the skin had been removed from the body of Jane Doe No. 60, and that there might be a connection between the two cases. Thereafter, an LAPD forensic expert matched the fingerprints of Jane Doe No. 60 with those of Shari Miller, taken from a record of her arrest in 1980.

Following defendant's arrest on the evening of July 31, Detectives Worthen and Rockwood interviewed him for four to five hours, and on the following day for an additional seven to ten hours. The police asked defendant about the identity of a young woman depicted in several photographs he had taken. Defendant told them that her name was Shari Miller. He had known her two years, having met her when she was a barmaid at the Meat Market bar. She was in the process of obtaining a divorce, had been a restaurant manager, currently was working as a house painter (he had noticed she had flecks of paint on her clothing), and intended to major in graphic arts at college.

Defendant stated that Shari had wanted recent photographs of herself to give to her mother. Defendant had taken the photographs during the last part of June at Castle Rock in Topanga Canyon. Defendant had dropped off some of the prints for Shari at the Meat Market bar, retaining other prints that he thought were very good, to show to her in person. He last had seen Shari on June 30 or July 1, when she stopped by his apartment and he took the Polaroid photographs. On the fourth of July, he had gone to the Huntington Beach area to watch the tall ships, but did not take photographs.

Defendant identified his address book, which contained telephone numbers for Shari's mother's residence, addresses for several of her friends, and a map she had drawn for defendant indicating where she then was staying. When asked about the bracelet, two pairs of earrings (with white stones and

purple stones), and a chain seized from his apartment, defendant stated that approximately two months earlier, Shari had given them to him, asking him to have the bracelet re-plated, the earrings remounted, and a medallion added to the chain. He stated that the key chain with three rings attached belonged to him, and the rings had belonged to several of his ex-wives, including Cindy and Susie, who had returned them.

When asked about Tracey Campbell, defendant provided the following account to the detectives. Defendant first met Tracey on July 9, when he took photographs of Todd at the construction site. He denied having had a conversation with Tracey on July 11 concerning her plans to become a model. On the morning of July 12, he had cleaned and vacuumed at Culver City Camera Shop. At approximately 2:30 p.m., as he returned to his apartment, Tracey appeared, wearing floral-patterned blue gym shorts with a matching tie top and a bikini swimsuit top, and asked to use his telephone to contact a girlfriend. Defendant then gave Tracey a ride to the corner of Midvale Avenue and Venice Boulevard, but did not learn where she intended to go after that. Defendant proceeded to drive a circuitous route to Santa Monica airport, Marina Del Rey, Century City, back to Santa Monica airport, the Mormon Temple, Loyola University, El Segundo, Los Angeles International Airport, King Harbor, Malibu, Leo Carillo State Beach, and Culver City Camera, and then returned to his apartment.

The officers previously had learned that in April 1983, defendant and Nick Klos had driven to the bowl area in the desert near Lancaster, and they asked defendant whether he had gone to that part of the desert with a group of individuals that included Klos. Defendant stated that he had gone to the desert with those persons at that time, but denied that he had gone to the desert with anyone else. Defendant was released from custody on August 3.

On August 7, the police questioned Juanita Farren, an employee of the One Hour Moto-Photo shop on Venice Boulevard, where defendant was a regular customer. The police subsequently obtained store records establishing that defendant had brought in film for developing on July 6, 9, 18, 24, and August 9. Among the negatives submitted during that period were those depicting Shari.

On August 9, defendant arrived at the photography shop and asked to speak with Farren, who stepped outside the store. He told her that he knew the police were following him and drew her attention to a particular vehicle across the street, stating that it was a police vehicle. Defendant inquired as to what Farren had told the police. Defendant and Farren then went inside the store. Defendant had brought in a stack of negatives and reviewed them to

determine which ones he wished to have reprinted, eventually requesting that 50 to 60 be reprinted. As defendant examined one strip of negatives, he cut off one of the negatives with a pair of scissors, placed the negative in his mouth and chewed it, scraping off the emulsion with his teeth. Defendant had the remainder of that strip reprinted.

### 5. Discovery of the body of Tracey Campbell

On August 11, Nick Klos directed the police to the bowl area in the desert near Lancaster, and approximately 75 law enforcement officers, assisted by Klos, conducted a search of the area. There they discovered a severely decomposed and partly skeletonized body, identified on August 16 through her dental records as that of Tracey Campbell. Bloodstains near some boulders marked the original location of the body, which had been moved approximately 15 feet, probably by the activity of coyotes. Both hands, as well as bones from all of the limbs, were missing. Other bones, including leg bones, had been separated from the body by animals and were located some distance from the body. There was no significant amount of skin remaining on the body from the waist down, and the skin that did remain was completely mummified. The genital organs were completely decomposed and the sex of the body no longer was ascertainable. The body was nude, but a blouse with a snail print on it was wrapped around the face.

On August 12, Dr. Wegner, the Los Angeles County medical examiner, performed an autopsy, determining that the cause of death was ligature strangulation. There were deep ligature imprints along the midline of the upper back, splitting into two imprint lines extending around the neck, consistent with the use of a rope to cause death. A similar V-shaped imprint on the chest indicated that the victim had been tied up, probably prior to death. Dr. Wegner was unable to establish the exact date of death, but testified that the condition of the body was consistent with death having occurred on July 12.

### 6. Defendant's second arrest

On August 16, defendant was re-arrested and transported to Parker Center in downtown Los Angeles. At approximately 6:45 p.m., Detectives St. John and Melleker attempted to interview defendant. The interrogation room was equipped with a hidden tape recorder, and Detective St. John also carried a briefcase that contained another tape recorder. Defendant was advised of his

rights pursuant to *Miranda*,[6] and defendant informed the detectives that he wished to have his attorney present. The detectives escorted him to a telephone, and he attempted to contact his lawyer. The detectives switched off the recording devices.

Defendant was unable to contact the attorney and was returned to the interrogation room. Meanwhile, Detective Worthen, who had just returned to the police station, was informed that defendant did not wish to waive his right to an attorney. Five to ten minutes later, Detective Worthen informed Detective St. John that defendant now was willing to answer questions without the presence of his attorney.

At approximately 7:30 p.m., Detectives St. John and Melleker, reactivating the recording devices, reentered the interrogation room and inquired whether defendant now wished to speak to them. Defendant, responding affirmatively, was re-advised of and waived his rights pursuant to *Miranda*. Defendant told the officers that he had known Shari Miller approximately two years. Asked when he last had seen Shari and whether he ever had taken her photograph, defendant gave the following account. In June, defendant had agreed to photograph Shari. She missed their scheduled meeting and had telephoned him from her mother's residence in San Pedro to apologize for canceling. Approximately one week later, during the last part of June, possibly on June 28, defendant had taken one and one-half rolls of film of Shari in Topanga Canyon, and later that evening they had gone to see the film, THE SURVIVORS, at a drive-in theater. Defendant then dropped Shari off at the Meat Market bar.

The following day, Shari had appeared at defendant's apartment while defendant and Evans Haas were working on defendant's motorcycle. Defendant and Haas drove to Bartels Harley-Davidson in Culver City. They returned to discover Shari asleep in defendant's automobile, and he recorded the scene with his Polaroid camera. Shari departed to collect her payment for house painting work she had performed in the San Fernando Valley, arranging to meet defendant that evening at the Meat Market bar to obtain the photographs that defendant had taken. Shari did not appear at that time, and defendant never saw her again, except several weeks later to wave to her as she drove by in her vehicle.

Defendant told the detectives that he had photographed Shari only in Topanga Canyon, inside the Meat Market bar, and inside his vehicle in the garage of his apartment. Defendant told the detectives that the photographs

---

[6]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

of Shari standing in front of the desert rock formations were taken in Topanga Canyon. Confronted with the fact that the photographs had been taken in the Lancaster desert area, defendant replied that the photographs were "taken up in the Chatsworth area" near Castle Rock.

When asked about Tracey, defendant explained that he had met Tracey's family while he was cleaning his motorcycle in front of his apartment building, and had met Tracey the day he took photographs of Todd at the construction site. Defendant saw Tracey again one morning when he visited her family's apartment. That afternoon, she visited defendant's apartment to use the telephone, and later he dropped her off at a coffee shop on Venice Boulevard.

The detectives informed defendant that Tracey's body had been discovered approximately 150 yards from the same desert location as that depicted in defendant's photographs of Shari. Defendant stated that he was unfamiliar with that location. When the police told defendant that they could "place" defendant and Shari in the same desert location where Tracey's body had been discovered, defendant responded, "I can't explain it to you." Asked if he had killed Shari or Tracey, defendant replied, "No sir." He asked to "try the attorney again," and the interview concluded.

The same day, August 16, LAPD officers and Lancaster sheriff's deputies obtained a second search warrant for defendant's apartment. In the hall closet, they discovered a wristwatch with a dark band flecked with yellow paint, similar to the watch Shari wore in the photographs taken in the desert. The police found approximately 50 documents in defendant's name, as well as a pair of beach thongs similar to thongs found in Shari's automobile. In the bedroom of Olga Talbot's son, Gary Williams, the police found, inside a box, a section of white rope that Williams denied owning. The police recovered a number of photographs from the hall closet and the storage area located in the apartment garage. From the same storage locker, the police recovered a leather shoelace-type thong and a double-bladed knife.

On August 17, pursuant to a search warrant, defendant's vehicle was searched. Luminol and phenolphthalein tests indicated the possible presence of blood on the floor mat in the trunk. Because these tests also may produce positive results if the chemicals utilized have contact with other substances, such as meat or vegetables, a human precipitant test was conducted. The result was not positive, indicating either that no human blood was present or that the sample used was too minute to produce a reaction.

The white rope recovered from the box in a bedroom at defendant's apartment proved to make an impression identical to the ligature impressions

discovered on Tracey's body. During trial, the jury was transported to view the bowl site. The jury was shown that the location where Tracey's body was discovered was approximately 400 feet from the location of Shari in one of defendant's photographs, identifiable because of the distinctive rock formations in the background.

The defense rested without presenting any evidence.

After hearing the evidence described above, the jury found defendant guilty of two counts of first degree murder. The jury also found true the special circumstance that defendant had committed multiple murder.

## B. *Penalty Phase Evidence*

### 1. *Prosecution case*

The prosecution called seven witnesses who testified concerning a prior rape for which defendant was charged and eventually convicted, as well as a number of prior uncharged criminal activities. During this phase of the trial, prior to the prosecution's presentation of its final three witnesses, Ellen F., Cindy F., and Cheryl V., defendant successfully moved to relieve his appointed attorneys and proceeded to represent himself. Defendant, stating that "no defense" would be presented, declined to cross-examine two of those witnesses.

#### a. *Julianne P.*

In August 1982, Julianne P., who had spent several nights in her automobile, met defendant, who invited her to move into his motorhome. They commenced a sexual relationship in October of that year. Julianne moved out in February 1983, but they had sexual intercourse two or three times in March 1983. On the weekend of April 9, 1983, defendant and Julianne drove in defendant's motorhome to the desert near Lancaster, in order to watch the landing of the NASA Space Shuttle. They were joined by Nick Klos and five other individuals who arrived in Klos's motorhome. The group then drove the motorhomes to a bowl-shaped area in the desert to spend the night. At approximately 3:00 on the afternoon of April 10, Klos and defendant drove their respective motorhomes away from the bowl site. When the motorhomes reached the highway, Klos turned in the direction of Los Angeles, but defendant turned in the other direction, stopping at a market. Defendant then drove the motorhome back to the bowl site, telling Julianne that he wanted to make certain that the campfire had been extinguished.

At approximately 4:00 p.m., when they arrived at that location, defendant told Julianne to check the campfire. She did so, reentered the motorhome,

reported that the fire was extinguished, and reminded defendant that they needed to return to Los Angeles. Defendant turned off the ignition, opened a can of beer, and stated that he needed to relax and that they might stay in the desert until Wednesday. Defendant pulled out a knife from the side of the driver's seat and told Julianne that he was going to get a "piece of ass" one way or another and that she must strip. He made a twisting motion with the knife, telling Julianne that her clothes were going to come off one way or another and that he would cut them off if she did not remove them. Julianne removed her clothing.

Defendant told her to go to the back of the motorhome. He told her to masturbate, and she complied. Defendant moved to the back of the motor-home, opened a drawer, and retrieved various oils and gels, telling her to use them. Defendant began to masturbate, then poured an oil over Julianne. Defendant had her insert a dildo into her vagina and move the dildo in and out while simultaneously orally copulating him. Defendant produced a bag with various lingerie garments and had Julianne put on a garter belt, half-bra, and g-string, telling her that he wanted her to look like a "whore." He began to strike her in the face while calling her a whore. While the dildo still was inside her vagina, defendant gave her a pair of scissors and told her to cut off her pubic hair, so that she would have "a teenage look," and told her to place the hair in a bottle. Defendant filmed this activity.

Defendant then ordered Julianne to drink a liquid that had the appearance and taste of diluted milk, apparently containing a substance that caused her to lose "full awareness." Her cognizance of the sequence of subsequent events was uncertain. At some point, defendant had Julianne pull the dildo out of her vagina and place it in her anus. When she refused his subsequent order to lick the dildo, defendant stuck his finger into her anus, removed it with excrement on it, and forced her to lick his finger and the dildo. Defendant produced some rope and threatened to tie up Julianne and use the knife on her if she made any attempt to run. Defendant beat her with a belt and belt buckle on her buttocks, lower back, and thighs, producing bruising that was observable for several weeks.

At another point, after initially asking Julianne whether she wanted a beer and then refusing to give her one, defendant eventually poured into a beer bottle a substance that he said was cocaine and would make her body numb, and told her to drink it. She initially refused. Defendant picked up an ice pick, made a stab at her breast and knee and attempted to stab her hand, and pulled her hair back, threatening to stab the back of her head if she did not drink the liquid. She drank it.

When Julianne told defendant that she had to go to the bathroom, he told her that he did not want her to "dirty up his bathroom" in the motorhome and

ordered her go outside, where it had become very cold, and urinate in a douche bottle. Defendant filmed this activity and then ordered her to drink the urine. She began to drink it but lost consciousness. When she regained consciousness, defendant, who had an erection, was standing in the doorway of the motorhome. Defendant forced Julianne's head onto his penis, and she orally copulated him. Defendant urinated in her mouth and urinated all over her, laughing at her reaction.

Defendant had Julianne get on the bed in the back of the motorhome, and twisted, sucked, and bit her nipples very painfully and placed clothespins on them. Defendant had her orally copulate him again while lying on her stomach, so that the clothespins were painful. Defendant then told her to sit on top of him and had sexual intercourse with her. Defendant, with his penis still inside Julianne's vagina, fell asleep. Julianne fell asleep, and when she awoke, defendant was on top of her, having sexual intercourse. She again fell asleep.

Eventually, Julianne awoke to find that defendant had dressed. Defendant drove the motorhome to Los Angeles. After Julianne departed in her own vehicle, she told Nick Klos what had happened. Pursuant to Klos's advice, Julianne reported the incident and went to the hospital. Several days after his arrest on August 16, 1984, for the present offenses, defendant pleaded no contest to one count of rape.

b. *Tamara H. and Mark W.*

In the summer of 1982, Mark W. met defendant while both were residing at a trailer park in the Marina Del Rey area. Mark W. lived in a recreational vehicle together with Steve Marshall, his former personal manager during Mark's earlier career as a musician, and Marshall's girlfriend. Later that year, Marshall departed, taking Mark's personal belongings. Mark moved to Phoenix, Arizona, where in March 1984, he met Tamara H., then 21 years of age, and together they moved to Venice, California. Learning through a mutual friend that defendant needed assistance in a rape case involving "Julieanne P[]," to whom Mark previously had been introduced, Mark met with Marshall and defendant. Mark agreed to testify truthfully on defendant's behalf. As a loan, defendant paid for Mark and Tamara's motel room, food, and other necessities.

During this time, defendant attempted to arrange to have Tamara work as a model for him. Tamara refused to do so without Mark being present. Defendant eventually agreed that both Mark and Tamara would be present during the modeling session. At approximately 4:00 one afternoon in June

1984, defendant picked them up in his vehicle and proceeded to an airport, where he took photographs, and then drove them to several bars, including the "Tennessee" bar. There, defendant told Mark that he had to do a "drug run." They had several drinks, which seemed to have a strong effect, and left the last bar at approximately 11:00 p.m. Defendant drove until Mark and Tamara fell asleep. Tamara awoke when it was still dark outside, and discovered they were in the desert. Defendant tapped Tamara on the knee and told her to get out of the automobile. He was carrying a light and a rifle or shotgun that he pointed at Tamara, ordering her to remove her clothing and put on an outfit consisting of shorts and a top. Defendant fired a shot, and Tamara complied. Defendant, who had his pants down and had an erection, attempted to force Tamara to orally copulate him. Her mouth touched his penis for "half a second."

Meanwhile, Mark awoke and realized that they were in the desert and that he was the only person inside the vehicle. He got out, heard a gunshot, saw a light in the direction of the sound of the gunshot, and yelled for Tamara, who yelled in return. The light moved toward the vehicle, and Mark was able to see defendant, carrying a fluorescent light and what appeared to be a .22-caliber rifle, walking 20 feet behind Tamara, who was dressed in lingerie and was crying. When they approached the vehicle, defendant placed the light on top of the vehicle, removed several dirty mats from the trunk, and placed them on the ground behind the vehicle. He ordered Mark and Tamara to remove all their clothing, firing two shots toward the ground as they did so. He directed them to lie on the mats, and told Tamara to tie Mark with ropes that were attached to the vehicle's bumper and to orally copulate him. When Mark failed to become aroused, defendant placed the gun so that the barrel touched Mark's testicles and said he was going to "blow his balls off" if Mark did not get an erection. Defendant forced Tamara to orally copulate defendant, which she did for less than a minute, and then ordered Tamara to again orally copulate Mark. She did so for approximately one-half hour, but he did not respond.

Eventually, defendant told Mark and Tamara that he was being paid $1,800 to detain them, and that they were waiting for others to arrive, including the person who had hired defendant. Defendant said that when the others soon arrived, Mark and Tamara were "going to get it." Mark was nude the entire time, while Tamara was forced to change into sexually suggestive clothing that defendant retrieved from the trunk of the vehicle. At one point, while Tamara was nude, defendant tied her arms and legs with a long rope, took Polaroid photographs of her, and asked her what kind of "kinky" things she had done with men.

As the sky became light, defendant stated that it appeared "this person was not going to show up." Defendant untied Mark, and saying, "this is it,"

pointed the rifle at him and forced him to walk into a ravine. Tamara began to cry. Mark turned toward defendant and said, "you are shooting me in the back." Mark told defendant to face him and shoot him while Mark looked at his eyes. Defendant began to cry and put down the rifle. Defendant gathered the photographs he had taken throughout the night, doused them with lighter fluid, and set them on fire.

When they returned to the automobile, defendant told them that Steve Marshall had taken out a "contract" on Mark and Tamara, and that they must leave Los Angeles or Marshall would learn the job had not been performed and kill them all. Defendant drove them back to Los Angeles, and after Mark and Tamara retrieved their belongings from the motel room, defendant drove them to San Diego. Mark and Tamara checked into a motel room. When defendant refused to leave immediately, Tamara went to the lobby and asked the manager to telephone the room after a few minutes to inform them that all the guests had to leave. This ploy was successful, and defendant departed. Mark and Tamara asked for a different room and returned to Phoenix the following day. They had no subsequent contact with defendant and did not contact the police. Mark believed that Marshall truly had arranged a "contract" on him.

c. *Ellen F.*

In June or July 1980, Leslie Carlson and his wife Ellen F. (then 21 years of age), met defendant while living in a trailer court in Niceville, Florida. In August 1980, at Carlson's invitation, defendant began to live with the couple. During the first week of September 1980, Carlson and Ellen F. separated and Carlson departed. Defendant continued to live with Ellen in a platonic relationship, helping out with the rent and expenses.

At approximately 2:00 a.m. on September 20, 1980, Ellen, awakened by noise, discovered defendant, who was intoxicated, beating her dog with a stick that had nails in it. Ellen told defendant to "please quit." Defendant then entered the trailer, told Ellen to remove her clothing, and began to beat her with a closed fist, striking her in the throat, neck, and legs. Ellen refused to remove her clothing. Defendant then began "shoving things inside" her. Defendant shoved the handle of a dog brush into her vagina and rectum, and then down her throat. Defendant opened a bottle of Tabasco sauce, shoved it in Ellen's vagina and rectum, then poured the sauce down her throat. Defendant also shoved a coat hanger into Ellen's vagina and rectum, and then down her throat. Defendant, grabbing and opening a pair of scissors, threatened to cut off her nipples, but she knocked the scissors out of his hand. Defendant choked Ellen and attempted to penetrate her vagina with his

penis. He continued to beat her during the ordeal. Ellen was crying and pleaded with defendant to stop, but he told her to shut up and said he was doing what he wanted to do. The incident lasted three to four hours until defendant fell asleep.

When defendant awoke after a few minutes, Ellen asked him to take her to the hospital. When he failed to do so, Ellen crossed the street and, spitting up blood, appeared at the residence of a girlfriend, who telephoned for an ambulance. Ellen was taken to the police station and then to a hospital, where she was hospitalized for two weeks. Her primary source of pain was in her throat. One night, when she began to choke, a nurse pulled a piece of a coat hanger from inside her throat. A month later Ellen moved from Florida, and she did not file charges against defendant.

### d. Cindy F.

Cindy F., who was living in Culver City at the time, met defendant in 1974 or 1975 when she was 15 or 16 years of age, fell in love with him, and within several weeks commenced living with him. Approximately six months later, defendant began to beat Cindy on a weekly basis. Often he forced her to have intercourse after these beatings. Cindy became pregnant, and at one point defendant attempted to slam Cindy's stomach into a door. She was able to move out of the way, but her finger caught in the door and was almost entirely severed. Their son, named after his father and known as B., was born on September 2, 1976.

Defendant continued to beat Cindy, and twice threw the infant B. against the wall. On one occasion between Christmas Day in December 1976 and January 1, 1977, defendant appeared at Cindy's workplace. Defendant gave Cindy a box, telling her, "here's your Christmas present," and departed. Cindy unwrapped the box and found B., whom defendant had placed in an infant holder, underneath a windbreaker with the hood covering his face and tied in back. Cindy returned to their apartment that evening to find that everything in it had been demolished, including all of the baby's presents, which had been torn or cut in pieces. Cindy departed with B. that evening.

In early 1977, Cindy moved in with another man and became pregnant by him. Defendant asked Cindy to return to him, agreeing to take her back although she told him she then was pregnant by the other man. In the summer of 1977, defendant and Cindy commenced living together again, moved to a motorhome in Michigan near Cindy's parents, and got married. Defendant began to beat Cindy on a daily basis. Cindy gave birth to her second son, A., on December 15, 1977. Two days later, defendant said he

would kill A. because defendant was not the father. Cindy hid A. in a pile of dirty clothing, and defendant attacked B., throwing him against a wall. Cindy telephoned her parents, and although defendant grabbed the telephone and threw it across the room, Cindy's parents could hear her screams, proceeded to the motorhome, and prevented defendant from committing any further violence. During this period, Cindy's parents came to the motorhome 20 to 30 times to stop defendant from fighting with Cindy.

Cindy continued to live with defendant until June 1978, and during this period defendant beat her on a daily basis, also striking both children. On one occasion, defendant threw a rock into a body of water so that B., who was approximately one year of age and could not swim, would enter the water. On another occasion, defendant locked the children in the motorhome and turned on the gas, stating that he was going to "blow them up." Defendant also attempted to strangle Cindy with his bare hands. Soon after the latter two incidents, Cindy, telling defendant that she was going to the laundry, put the children in the automobile and drove to California.

Later in 1978, while in California, Cindy received a message at her workplace that defendant had deposited for her at the residence of a mutual friend some of the children's baby books and her personal belongings that she had left behind in Michigan. Cindy drove to the friend's residence, and, leaving the children in the automobile, knocked on the front door. When no one appeared, Cindy proceeded to the back door, which was open. As Cindy entered the back door, defendant closed the door behind her. He asked her to return to him, but she declined. Defendant, stating that he should lock up the residence, asked her to extinguish the lights. When Cindy turned her back to do so, defendant placed a piece of clothing around her neck, attempted to strangle her, and beat her in the face. Defendant walked outside to the automobile and retrieved A., then approximately one year of age, while Cindy picked up B., then approximately two years of age.

Once they had returned to the residence, defendant found a shotgun and told Cindy that if she did not do everything he told her to, they "were going to die." Defendant proceeded to beat up Cindy, also repeatedly attempting to force her to orally copulate him. Defendant gave B. a black eye, and repeatedly pointed the shotgun at A., saying that he was going to kill him. Defendant said that he was going to make Cindy love him or no one else would ever love them. Defendant swallowed a handful of Codeine tablets and said that after they took effect he would kill Cindy and the children. He continued to beat and kick Cindy. Approximately two hours later, their mutual friend returned to the residence and stopped defendant from proceeding further.

Cindy suffered bleeding from the temple near the right eye, the nose, and the mouth from this episode, as well as temporary blindness. She incurred permanent partial hearing loss from several incidents in which defendant kicked her in the side of the head.

### e. *Cheryl V.*

In 1972, defendant became acquainted with Cheryl V. through his then girlfriend, Theresa, when Cheryl stayed in their apartment in California for three months before obtaining her own apartment. On May 9, 1972, Cheryl, then 17 years of age, lived with her infant daughter in her apartment in Mar Vista. At approximately 3:00 a.m., defendant appeared at Cheryl's apartment. Defendant was limping and reported that he had been in a motorcycle accident and was locked out of his apartment. Cheryl told him that he could sleep on the waterbed in the living room. Cheryl returned to sleep in her bedroom.

From the living room, defendant began calling out to Cheryl for various reasons, at one point telling her that her boyfriend was at the front door. She returned to the living room, opened the front door, and found no one present. As she started toward her bedroom, defendant grabbed her, threw her down on the waterbed, and began to remove her robe. Cheryl began biting, scratching, kicking, pushing, and screaming. Defendant sat on top of Cheryl and attempted to place his penis in her mouth, but she would not let him. He then masturbated on her chest until he ejaculated. Defendant told her that "he always wanted to do it so he did." Cheryl told him to leave, and eventually he departed. Cheryl contacted the police and later filed charges against defendant for attempted rape.

### 2. *Defense case*

After defendant eventually was granted permission to act as his own attorney, he rested without calling any witnesses to testify and without presenting any evidence in mitigation.[7] Subsequent to the prosecutor's closing argument, defendant made the following closing argument to the jury: "Think of how many you don't even know about. You're so right. That's it."

At the conclusion of the penalty phase, the jury fixed the penalty at death.

---

[7]Prior defense counsel had contacted several witnesses, served subpoenas to compel their appearances, served a subpoena to produce records concerning defendant's conduct during his stay in county jail, and requested that judicial notice be taken of the juvenile dependency files pertaining to defendant's two sons. Defendant's mother arrived at court and waited to be called to testify as a witness but was not called by defendant.

## II. Discussion

### A. *Guilt Phase*

#### 1. *Issues pertaining to searches and arrests*

##### a. *Motions to quash and traverse the July 31, 1984, search warrant and to suppress evidence*

Defendant contends that the trial court erred in denying in part his motions to quash and traverse the search warrant and to suppress the evidence seized in the search conducted on July 31. Following several hearings on the motion to suppress evidence, the trial court ultimately permitted the prosecutor to introduce into evidence several photographs and negatives depicting Shari Miller, as well as a knife seized in the course of that search. We set forth the relevant procedural facts below.

Detective Worthen, assigned to investigate the disappearance of Tracey Campbell, and Detective Ravens, assigned to investigate the murder of one Mischa Stewart, believed to have been murdered by defendant, decided to conduct their respective searches simultaneously on July 31. Detective Worthen subsequently assumed responsibility for both investigations.

Mischa Stewart, an African-American homosexual male, 23 years of age, last was seen alive near closing time on the night of October 8, 1982, departing from the Pink Elephant, a gay bar located in Santa Monica. Stewart left in the company of a man who earlier in the evening had informed the doorman that his name was "Bill" and that he was trying to sell his truck or motorhome. The following morning, Stewart's nude body was discovered in an alleyway across the street from the Tennessee Savings & Beer Co., a bar frequented by defendant. A woman's bra, used as a ligature to strangle Stewart, was wrapped around his neck, and a pair of women's panties bearing the logo, "Genuine Harley Ass," covered his face. Semen was discovered on his upper leg. The doorman at the Pink Elephant subsequently identified defendant from a photographic lineup as the man who left with Stewart.

On July 31, Detective Worthen prepared an affidavit of probable cause in support of a warrant to search defendant's person, apartment, and vehicle. The affidavit did not refer to Jane Doe No. 60, who had not yet been identified as Shari Miller nor connected to defendant, but did refer to Tracey Campbell, as well as to Mischa Stewart. The affidavit included extensive information as to the circumstances surrounding the disappearance of Campbell and the death of Stewart, describing defendant's connection to both

cases, including the circumstance that he appeared to be the last person to have been seen with each victim. The affidavit also described the incident in the desert involving Julianne P. for which charges then were pending against defendant.

The affidavit explained defendant's considerable involvement in photography and stated that it appeared, as part of defendant's modus operandi, that he "takes photographs [of] or films his victims." The affidavit referred to numerous attachments, including the following: the police reports of the investigations in the Campbell and Stewart cases; the police and medical reports of the Julianne P. incident, noting that she had been threatened with a knife and ice pick, "forced to submit to various sexual atrocities," and that "part of these acts were filmed by the suspect"; a report of a police interview with Tracey's cousin Todd Heidrick, noting that defendant had photographed him prior to engaging in sexual activity with him;[8] and defendant's three-page "rap sheet" indicating other incidents of sexual or violent assaults.

The search warrant authorized the seizure from defendant's person of samples of blood, semen, saliva, and head and pubic hair. With regard to Tracey Campbell, the warrant authorized the search and seizure of any blood, head and pubic hair, and particular items of clothing and jewelry and, with regard to Mischa Stewart, a particular jacket. The warrant also authorized the seizure of "any and all photographs and negatives," camera equipment, sexual devices, items of "underclothing" such as bras, panties, novelty items, and negligées, defendant's bank books, credit cards, gasoline purchase receipts, mail order catalogs, and "receipts for such items purchased." Pursuant to the warrant, the police seized among other items 189 photographs (including those of Shari Miller), a knife, and a rifle.

Defendant, asserting that the warrant was overbroad and not supported by probable cause and that the search itself was general and exploratory, moved to quash and traverse the warrant and to suppress numerous items seized. Following argument by counsel, the trial court ruled that the warrant was overbroad to the extent it permitted the seizure of "any and all photographs" and deemed the warrant amended so that, in effect, the references to any and all photographs were limited to those "pertaining to" Campbell or Stewart or to certain lingerie.

The prosecution then urged that, despite the warrant's overbreadth, it was unnecessary to suppress any of the evidence seized, because the "good faith"

---

[8]That detail of defendant's relationship with Heidrick was excluded from the evidence presented at trial.

exception to the rule requiring suppression of evidence seized pursuant to an invalid warrant was applicable, and that any evidence seized beyond the proper scope of the warrant was admissible pursuant to the "nexus rule." To determine whether the good faith exception and nexus rule applied, and whether a general, exploratory search had been conducted, the trial court ordered an evidentiary hearing.

At that hearing, Detective Worthen testified that he provided Detectives Ravens and Rooney with copies of the search warrant and explained the contents of the warrant and affidavit to these detectives, as well as to Detective Rockwood and other officers. The officers discussed the warrant over the course of several days, and Detective Worthen held a meeting on the morning of the search. Detective Worthen instructed the officers to search for photographs of Stewart, Campbell, and other males and females, particularly young females (due to his suspicion that items of Campbell's clothing might be worn by other subjects in certain of the photographs), and for photographs depicting desert scenes. Detective Worthen told the officers to search for anything having evidentiary value, including the items specified in the warrant and the attachments to the affidavit, such as an ice pick, knife, or rifle.

Detective Worthen testified that he had given these instructions based in part upon information he had received concerning defendant's previous criminal activities. Detective Worthen had been informed by the San Fernando Valley district attorney's office of the incident that had occurred several weeks prior to the disappearance of Tracey, in which defendant had taken Mark W. and Tamara H. out to the desert. Detective Worthen had learned, and informed the investigating officers, that defendant had threatened Mark W. with a rifle, may have forced Tamara H. to perform oral copulation, and had taken photographs of one or both victims.

Detective Worthen also relied upon information he had concerning the circumstances of the alleged attack on Julianne P. Although the police previously had searched defendant's motorhome in connection with that case, Detective Worthen believed additional items might be located in defendant's apartment.

Detective Worthen also had learned from defendant's former wife, Cindy, that many years previously, defendant sometimes had awakened screaming due to "nightmares of a girl that he murdered and buried," and that defendant once had threatened Cindy with a rifle. A number of interviewees had informed Detective Worthen that for a period of several years, defendant had photographed various young women and girls, often having them dress in

outfits selected by defendant. Detective Worthen learned of at least one other unreported possible criminal incident occurring in 1972 or 1974, in which defendant purportedly had driven a female 15 years of age to Malibu Canyon, where he attempted to give her narcotics and take her photograph. Based upon his review of defendant's criminal history and his knowledge of the facts of the present cases, Detective Worthen suspected that defendant might be responsible for the deaths of persons in addition to Stewart and Campbell.

Detective Worthen testified that he also relied upon defendant's "rap sheet." Defendant's prior record included a 1972 charge of assault with intent to commit rape, reduced to battery pursuant to defendant's guilty plea, several charges of indecent exposure in 1971 that had been dismissed, and several earlier charges of automobile theft.

Detective Worthen testified that he believed he had probable cause to seize each of the photographs on the basis of the warrant and affidavit. Detective Worthen had informed the police officers assigned to search the apartment that they were not limited to the items described in the warrant, but were to seize any item that might have relevance to anything mentioned in the affidavit. Detective Worthen did not recall whether he had a photograph of Campbell or Stewart with him at the time he and the officers executed the search warrant.

Detective Ravens, who was in charge of the search of defendant's apartment, testified that prior to the search, he had read the affidavit of probable cause but not its numerous attachments. He believed that the police were to seize an item not listed in the warrant if, once the police were inside the apartment, there appeared evidence related to other possible murder victims that might be used in future investigations.

The police seized many of the contents of the hall closet in defendant's apartment. Detective Ravens seized a .22-caliber rifle not described in the warrant, because it was common police practice to seize all firearms in a homicide case. Pursuant to the warrant's direction to seize all photographs, Detective Ravens seized a photo album in the belief that photographs might be relevant to another criminal investigation. Detective Ravens had not been informed specifically what jewelry Tracey was wearing when she disappeared, and therefore seized numerous pieces of jewelry that he believed might belong to her.

After 6:00 p.m. on July 31, Detective Rooney conducted a search of defendant's automobile. The detective had investigated the death of Mischa

Stewart, had seen his photograph and observed his body at the murder scene, and also had received a photograph and description of Tracey. Rooney previously had examined and had with him a copy of the search warrant, but did not recall reading the affidavit. Rooney searched for those items listed in the warrant and also for items having evidentiary value with regard to defendant's criminal activities.

Detective Rooney testified that he seized various items, including a bag that contained numerous photographs and negatives, pursuant to the search warrant's directive to seize "all photographs." Due to the difficulty in examining the items with a flashlight inside the vehicle, and because he believed that Detective Worthen would be better able to determine their relevancy, Detective Rooney removed the items and placed them on a desk inside the police station. Upon briefly examining the photographs—including those that proved to be of Shari Miller—Detective Rooney believed it possible they might be of Tracey Campbell, or that they might relate either to the case involving the sexual assault and torture of defendant's girlfriend occurring in the desert, or the case involving the man and woman who were tied and threatened with a "knife" in the desert. Because he believed a knife was involved in that case, Detective Rooney also seized a knife found inside the trunk.

That same evening, Detective Rockwood, who had observed the body of Jane Doe No. 60, reviewed the photographs that Detective Rooney had placed on the desk. Detective Rockwood noticed that a woman in the photographs appeared to have tattoos in the same area of the left ankle as the area in which skin had been removed from the body of Jane Doe No. 60 and concluded there was some connection between the two women.

The trial court denied the defense motion to suppress evidence. The court ruled that the police officers had not conducted an exploratory search, but rather had seized items described in the warrant or closely resembling such items, or that were so interconnected with specifically described items that it would be impossible or impracticable to separate the items prior to their seizure.

Prior to the trial court's ruling, our court had held that items not named in a search warrant may be seized if the officer is " ' "presently aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred." ' " (*People* v. *Easley* (1983) 34 Cal.3d 858, 872 [196 Cal.Rptr. 309, 671 P.2d 813]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 573-574 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67, 73-74 [157 Cal.Rptr. 716, 598

P.2d 877]; *People* v. *Hill* (1974) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872].) Thereafter, the United States Supreme Court in *Arizona* v. *Hicks* (1987) 480 U.S. 321, 326 [107 S.Ct. 1149, 1153, 94 L.Ed.2d 347], held that, when the initial intrusion that brought officers within plain view of an item is supported by one of the recognized exceptions to the warrant requirement, such as exigent circumstances, the seizure of items not listed in a warrant is legal only if the police have probable cause to believe (rather than merely a reasonable suspicion) that the items are related to a crime.

Based upon that ruling, defendant moved for reconsideration of the motion. Upon reconsideration, the trial court granted the motion in part, suppressing the rifle seized from defendant's apartment, but declining to suppress the several photographs depicting Shari Miller or the knife. The trial court determined that despite the warrant's overbreadth, the photographs seized from defendant's vehicle were admissible because the officers executed the search in a "good faith" belief the warrant was valid, and because Detective Rockwood's testimony concerning the connection he perceived between the woman in the photographs and Jane Doe No. 60 established a nexus between those photographs and the items whose seizure was authorized by the warrant. The court found that a nexus was established between the knife and "two acts of criminal behavior where a knife had been used."

(1) *Restriction of scope of inquiry*

■ Defendant asserts that the trial court improperly limited the scope of the hearing by declining to permit defendant to introduce all of the items, including 189 photographs, that the police had seized. The record reflects that defendant's motion catalogued each item seized. The police officers who testified were examined extensively by the defense, not only concerning the knife and several photographs that the prosecutors sought to have admitted, but also concerning numerous other photographs and items seized.

The trial court did not err in declining to permit the introduction into evidence and examination of the police officers as to every single item seized. The reporter's transcript and related minute orders recording the lengthy proceedings involved in the suppression motion demonstrate that the trial court, in ruling on the motion, was well aware of the nature and number of items seized that did not directly pertain to the subject investigations, and therefore properly could evaluate, for example, whether the search was exploratory in nature.

### (2) *Consideration of applicability of the good faith exception*

Defendant asserts that the warrant was so facially deficient that no reasonable police officer could have relied upon it to conduct the search, and that therefore the trial court erred in even considering whether to apply the "good faith" exception to the rule otherwise requiring the suppression of evidence seized pursuant to a facially valid warrant subsequently determined to be invalid. As noted above, in the present case the trial court determined that the reference in the search warrant to all photographs was overbroad, thus finding the warrant partially invalid.

Pursuant to California Constitution, article I, section 28, subdivision (d), our review of issues related to the suppression of evidence derived from police searches and seizures is governed by federal constitutional standards. (*People* v. *Camarella* (1991) 54 Cal.3d 592, 595-596 [286 Cal.Rptr. 780, 818 P.2d 63]; see *People* v. *Glaser* (1995) 11 Cal.4th 354, 363 [45 Cal.Rptr.2d 425, 902 P.2d 729]; *People* v. *Banks* (1993) 6 Cal.4th 926, 934 [25 Cal.Rptr.2d 524, 863 P.2d 769]; *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1171 [9 Cal.Rptr.2d 834, 832 P.2d 146].) The warrant clause of the Fourth Amendment expressly provides that no warrant may issue except those "particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.; *Walter* v. *United States* (1980) 447 U.S. 649, 656-657, fn. 8 [100 S.Ct. 2395, 2402, 65 L.Ed.2d 410].) "General warrants, of course, are prohibited by the Fourth Amendment. '(T)he problem (posed by the general warrant) is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings . . . . (The Fourth Amendment addresses the problem) by requiring a "particular description" of the things to be seized.' (*Coolidge* v. *New Hampshire*, 403 U.S. 443, 467 . . . (1971)." (*Andresen* v. *Maryland* (1976) 427 U.S. 463, 480 [96 S.Ct. 2737, 2748, 49 L.Ed.2d 627].) The high court also has recognized, however, that in a complex case resting upon the piecing together of "many bits of evidence," the warrant properly may be more generalized than would be the case in a more simplified case resting upon more direct evidence. (*Id.* at p. 481, fn. 10 [96 S.Ct. at p. 2749].)

In *United States* v. *Leon* (1984) 468 U.S. 897 [104 S.Ct. 3405, 82 L.Ed.2d 677], the high court held that evidence obtained pursuant to a facially valid search warrant subsequently determined to be invalid is admissible if the officers executed the search in objectively reasonable reliance upon the validity of a search warrant issued by a neutral magistrate. (*Id.* at pp. 922-923 [104 S.Ct. at pp. 3420-3421]; *People* v. *Camarella, supra,* 54 Cal.3d 592, 602-603; see *People* v. *Machupa* (1994) 7 Cal.4th 614, 618, fn. 1 [29 Cal.Rptr.2d 775, 872 P.2d 114].) The court in *Leon* noted several

exceptions to the admissibility of evidence seized under these circumstances, however, including the situation in which the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or things to be seized—that the executing officers cannot reasonably presume it to be valid." (*United States* v. *Leon, supra,* 468 U.S. 897, 923 [104 S.Ct. 3405, 3421].)

A police officer may not shift all of the responsibility for the protection of an accused's Fourth Amendment rights to the magistrate by executing a warrant no matter how deficient it may be in describing the places to be searched and the items to be seized. An officer applying for a warrant is required to exercise reasonable professional judgment. (*People* v. *Camarella, supra,* 54 Cal.3d 592, 604; *Bailey* v. *Superior Court* (1992) 11 Cal.App.4th 1107, 1114 [15 Cal.Rptr.2d 17] [lack of probable cause was so apparent that reliance upon warrant was unreasonable]; see *People* v. *Maestas* (1988) 204 Cal.App.3d 1208, 1218-1221 [252 Cal.Rptr. 739].)

 Defendant relies upon several cases from the federal courts of appeals. Such decisions, as we often have observed, provide persuasive rather than binding authority. (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Burton* (1989) 48 Cal.3d 843, 854, fn. 2 [258 Cal.Rptr. 184, 771 P.2d 1270].) The cases cited by defendant are distinguishable in any event. In *U.S.* v. *Stubbs* (9th Cir. 1989) 873 F.2d 210, 212, a search warrant, held to be so facially invalid that a reasonable officer could not have presumed it to be valid, permitted the seizure of all accounts and business records that had been created during a seven-year period and that contained references to a number of individuals. In *Center Art Galleries - Hawaii, Inc.* v. *U. S.* (9th Cir. 1989) 875 F.2d 747, the warrant held to be facially invalid (*id.* at pp. 752-753) permitted the seizure of all " 'documents, books, ledgers, records and objects which are evidence of violations of federal criminal law.' " (*Id.* at p. 749.) In *U.S.* v. *Dozier* (9th Cir. 1988) 844 F.2d 701, 707-708, the warrant held to be facially invalid authorized the seizure of " 'written records, financial statements, address books, . . . telephone books, and bills.' " In *United States* v. *Washington* (9th Cir. 1986) 782 F.2d 807, 819-820, the court held to be facially invalid a warrant authorizing the seizure of evidence of the suspect's association with several named persons as well as any unnamed persons.

In the present case, by contrast, the only portion of the warrant that the trial court deemed to be overbroad was the reference to "any and all

photographs."[9] Assuming arguendo that the trial court was correct in finding that part of the warrant to be overbroad, the reference to photographs encompassed only one category of items, and the warrant otherwise specified the items to be seized. The warrant's failure to particularize items within this category of articles to be seized did not render it so facially deficient that no reasonable officer could presume it to be valid.

### ■ Finding that the police officers' conduct was objectively reasonable

Defendant contends that, even assuming the warrant's facial validity justified a reasonable officer in presuming it valid and performing the search pursuant to its authorization, the prosecutor failed to demonstrate that the officers acted in an objectively reasonable manner. First, according to defendant, few of the officers involved in the execution of the warrant actually had read the warrant, the affidavit in support of probable cause, or the attached exhibits. To the contrary, the record of the evidentiary hearing establishes that Detective Ravens, who executed the warrant to search the apartment, had read the affidavit in support of the search warrant, and that Detective Rooney, who executed the warrant to search the vehicle, had the warrant in his possession and seized items within the scope of the warrant. In addition, Detective Worthen, who had investigated the Campbell and Stewart cases and had learned of defendant's prior criminal activity, had discussed with the officers, including Ravens and Rooney, the contents of the affidavit and warrant and the acts presently under investigation, as well as the previously charged and uncharged criminal acts.

Second, defendant asserts that the officers' lack of good faith is demonstrated by the testimony of Detective Worthen and Officer Ravens, which indicated either their personal belief, or their communication to other officers, that the investigators were not limited to the items named in the warrant and could seize anything possibly relating to a crime, once having gained access to the apartment and automobile. In view of the entire testimony of these officers, we do not believe that their isolated comments, to the effect that they could seize items not listed in the warrant, demonstrates failure on their part to act in an objectively reasonable manner.

■ The plain-view doctrine permits, in the course of a search authorized by a search warrant, the seizure of an item not listed in the warrant, if the police lawfully are in a position from which they view the item, if its incriminating character is immediately apparent, and if the officers have a

---

[9] The trial court also deemed omitted from the search warrant application the reference to defendant's bank accounts, credit card receipts, and gasoline purchase receipts.

lawful right of access to the object. (*Horton* v. *California* (1990) 496 U.S. 128, 135-137 [110 S.Ct. 2301, 2307-2308, 110 L.Ed.2d 112]; *Texas* v. *Brown* (1983) 460 U.S. 730, 739 [103 S.Ct. 1535, 1541-1542, 75 L.Ed.2d 502] (plur. opn.); see *Minnesota* v. *Dickerson* (1993) 508 U.S. 366, 374-375 [113 S.Ct. 2130, 2136-2137, 124 L.Ed.2d 334].) In such circumstances, the warrantless seizure of evidence of crime in plain view is not prohibited by the Fourth Amendment, even if the discovery of the evidence is *not* inadvertent. (*Horton* v. *California, supra,* 496 U.S. 128, 130 [110 S.Ct. 2301, 2304].) Where an officer has a valid warrant to search for one item but merely a suspicion, not amounting to probable cause, concerning a second item, that second item is not immunized from seizure if found during a lawful search for the first item. (*Id.* at pp. 138-139 [110 S.Ct. at pp. 2308-2309].) This rule was stated by the high court in *Horton* in the context of a search conducted pursuant to a warrant, notwithstanding the circumstance that in other cases applying the plain view doctrine in various contexts, the determination that the incriminating nature of an item was "immediately apparent" was based upon whether the officers had probable cause to believe that the item was either evidence of a crime or contraband. (E.g., *Minnesota* v. *Dickerson, supra,* 508 U.S. 366, 375 [113 S.Ct. 2130, 2136-2137]; *Arizona* v. *Hicks, supra,* 480 U.S. 321, 326-327 [107 S.Ct. 1149, 1153-1154].)

 In the present case, the testimony of the officers involved in the search indicated their belief that they could search for items not listed in the warrant. This testimony, read in context and considered in light of the information in their possession concerning not only the Campbell and Stewart matters but the other incidents, simply reflected their entirely appropriate understanding that such items lawfully might be seized if reasonably believed to be related to criminal activity. Absent any indication to the contrary, this testimony does not demonstrate that the officers' conduct was objectively unreasonable.

(4) *Finding of a nexus between authorized and nonauthorized items seized*

Defendant contends that the trial court erred in determining that a nexus existed between items named in the search warrant and the photographs of Shari Miller and the knife found in defendant's vehicle (items not described in the warrant), thereby improperly justifying the seizure of those items. He urges that probable cause did not exist to seize those items.

 As discussed above, in the course of a search authorized by a warrant, the seizure of an item not listed in the warrant may be authorized by

the plain view doctrine. The plain view doctrine does not create an independent "exception" to the warrant clause, but simply is an extension of whatever may be the prior justification for the officers' "access to an object." (*Texas* v. *Brown, supra,* 460 U.S. 730, 738-739 [103 S.Ct. 1535, 1541].) The officers lawfully must be in a position from which they can view a particular area; it must be immediately apparent to them that the items they are observing may be evidence of a crime, contraband, or otherwise subject to lawful seizure, and the officers must have a lawful right of access to the object. (*Horton* v. *California, supra,* 496 U.S. 128, 136-139 [110 S.Ct. 2301, 2307-2309]; see *Minnesota* v. *Dickerson, supra,* 508 U.S. 366, 374-375 [113 S.Ct. 2130, 2136-2137]; *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 465-468 [91 S.Ct. 2022, 2037-2039, 29 L.Ed.2d 564].) If, however, the incriminating character of an object in plain view is not immediately apparent, the plain view doctrine cannot justify its seizure. (*Horton* v. *California, supra,* 496 U.S. 128, 135-137 [110 S.Ct. 2301, 2307-2308]; see *Minnesota* v. *Dickerson, supra,* 508 U.S. 366, 375 [113 S.Ct. 2130, 2136-2137].)

■ As we previously have explained, the photographs were seized pursuant to a warrant, later determined by the trial court to be overbroad to the extent it authorized the officers to seize "any and all photographs," a determination we assume, for the sake of argument, to be correct. Detective Rooney, acting in the objectively reasonable belief that the warrant was valid, seized the photographs pursuant to that warrant. Therefore, no basis has been presented upon which to suppress this evidence.

In addition, even were the good faith exception not available to justify the seizure of the photographs, the elements of the nexus rule were satisfied. Officer Rooney expressly was authorized to search the vehicle and to seize, at a minimum, photographs relating to Tracey Campbell and Mischa Stewart. As night fell, Rooney transported the bag of photographs and negatives 100 feet to a desk inside the police station in order to examine them. Within a short time, Detective Rockwood, also assigned to the investigation of the Campbell and Stewart cases, observed the photographs that bore a resemblance to Jane Doe No. 60. Therefore, the officer made this discovery during the course of the search for photographs authorized by the warrant. (See *Horton* v. *California, supra,* 496 U.S. 128, 140-142 [110 S.Ct. 2301, 2309-2311] [weapons that were discovered prior to locating the proceeds of the robbery named in the warrant were lawfully seized].) Detective Rockwood, without further investigation, merely examined the photographs and realized their similarity to Jane Doe No. 60—thus, it was "immediately apparent" to him that the items he observed might be evidence of a crime or otherwise subject to seizure without conducting any further search of the object. (*Id.* at p. 136 [110 S.Ct. at p. 2307]; *Minnesota* v. *Dickerson, supra,* 508 U.S. 366, 375 [113 S.Ct. 2130, 2136-2137].)

The elements of the nexus rule also were established with regard to the seizure of the knife. Detective Rooney lawfully was in a position to view the contents of the vehicle trunk, and it immediately was apparent to him that the knife might be evidence relating to a criminal incident. (*Horton* v. *California, supra,* 496 U.S. 128, 136 [110 S.Ct. 2301, 2307-2308]; *Minnesota* v. *Dickerson, supra,* 508 U.S. 366, 374-375 [113 S.Ct. 2130, 2136-2137].) The trial court did not err in determining that the nexus rule applied.

### (5) *Finding that the search was not general or exploratory*

Defendant contends that the police improperly utilized the warrant to conduct a general, exploratory search of his apartment and vehicle. ██ The purpose of the "particularity" requirement of the Fourth Amendment is to avoid general and exploratory searches by requiring a particular description of the items to be seized. (*Coolidge* v. *New Hampshire, supra,* 403 U.S. 443, 467 [91 S.Ct. 2022, 2038-2039]; *Stanford* v. *Texas* (1965) 379 U.S. 476, 485 [85 S.Ct. 506, 511-512, 13 L.Ed.2d 431].) The high court has rejected, however, the contention that police action disregarding the authorized scope of a warrant transforms the warrant into an impermissible general warrant, requiring suppression of the entire fruit of the search, rather than merely those items as to which there was no probable cause to support seizure—where the officers have not exceeded the scope of the warrant in the *places* searched, but only in seizing items unconnected to the investigation or prosecution of the crime. In such circumstances, when all items unlawfully seized are suppressed, "there is certainly no requirement that lawfully seized evidence be suppressed as well. [Citations.]" (*Waller* v. *Georgia* (1984) 467 U.S. 39, 43-44, fn. 3 [104 S.Ct. 2210, 2214, 81 L.Ed.2d 31]; *Andresen* v. *Maryland, supra,* 427 U.S. 463, 482, fn. 11 [96 S.Ct. 2737, 2749].) In the present case, the officers searched for and seized items— including some that the trial court considered unlawfully seized and ordered suppressed—only from the "places" designated in the warrant.

In asserting that the search was general and exploratory, defendant relies upon the contention made and rejected earlier—that the executing officers had not read the contents of the warrant or the affidavit of probable cause. Defendant also asserts that because the officers seized more items not named in the warrant than items named, this circumstance establishes the exploratory nature of the search. In view of the information possessed by the officers in charge, the contents of the affidavit of probable cause, and the information contained in the attachments, that circumstance did not by itself establish that the search was exploratory.

b. *Motions to quash and traverse the August 16, 1984, search warrant and to suppress evidence*

(1) *Finding that the affidavit of probable cause supported issuance of the search warrant*

 Defendant contends that the trial court erred in denying his motions to quash and traverse the search warrant issued on August 16. Defendant contends that several of the statements in the affidavit were false and misleading and that, if such statements were considered excised or corrected, the remaining contents of the affidavit were insufficient to justify a finding of probable cause to support issuance of the warrant.

 In *Franks* v. *Delaware* (1978) 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667], the United States Supreme Court held that a defendant may challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. When presented with such a challenge, the lower courts must conduct an evidentiary hearing if a defendant makes a substantial showing that: (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to justify a finding of probable cause. At the evidentiary hearing, if the statements are proved by a preponderance of the evidence to be false or reckless, they must be considered excised. If the remaining contents of the affidavit are insufficient to establish probable cause, the warrant must be voided and any evidence seized pursuant to that warrant must be suppressed. (*Id.* at pp. 155-156 [98 S.Ct. at pp. 2676-2677].)

A defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause. (See *People* v. *Luttenberger* (1990) 50 Cal.3d 1, 14-15 & fn. 4 [265 Cal.Rptr. 690, 784 P.2d 633].) "Pursuant to [California Constitution, article I,] section 28[, subdivision] (d), materiality is evaluated by the test of *Illinois* v. *Gates* (1983) 462 U.S. 213 . . . , which looks to the totality of the circumstances in determining whether a warrant affidavit establishes good cause for a search. [Citation.]" (*People* v. *Luttenberger, supra,* 50 Cal.3d 1, 23.)

 In moving to quash and traverse the August 16 search warrant, defendant contended that the affiant, Detective St. John, made statements in the affidavit that were false and misleading. The prosecution eventually conceded that an evidentiary hearing was necessary. Following the hearing, at which Detective St. John testified at length, the trial court denied the

motion, ultimately permitting the prosecution to introduce into evidence items seized pursuant to the warrant, including the double-bladed knife and sheath, the wristwatch flecked with yellow paint, the leather shoelace-type thong, and the section of white rope.

(a) *Omission of information that Shari was seen after June 30*

Detective St. John stated in the affidavit that the last person whom Shari was known to have intended to visit was a photographer, identified as defendant through the telephone calls that Shari had made from her mother's residence on June 30. Detective St. John also stated in the affidavit that he had interviewed Danny Collins, who "informed me that he had last seen Ms. Miller on July 1st . . . and that she was going to meet a photographer."

At the evidentiary hearing, Detective St. John testified as follows. He had intended the magistrate to infer that it was possible that Shari Miller had not been seen after June 30th. Prior to August 16, however, Detective St. John had interviewed four of Shari's associates, who indicated they believed that they had seen Shari between July 1 and July 4, and Detective St. John knew that Shari had not been killed prior to July 4. Detective St. John also had learned that employees of a camera store had seen defendant and Shari in the store approximately on July 1. In addition, Detective St. John had observed a drawing of a rose, bearing Shari's signature and dated July 1, discovered during the search of Shari Miller's vehicle. Detective St. John did not include this information in the affidavit.

The trial court determined that Detective St. John had been selective in providing information to the magistrate, with the intention of conveying a particular impression regarding defendant's role in Shari's death. The court found that Detective St. John demonstrated an intentional or reckless disregard of the truth in failing to mention his interviews with Shari's associates, who had told him they had seen her after July 1. The court also found, however, that the affidavit, considered as amended to include this information, was sufficient to establish probable cause supporting issuance of the warrant. The court observed that, even in light of this information, Detective St. John remained "justified in making a conclusion to the magistrate that after June 30, 1984, that Shari Miller intended to see a photographer named Bill, that she saw Mr. Bradford during this time—during the time between June 30 and the point at which she died, and that she met with foul play."

It does not appear that the magistrate would have been misled by the affidavit. Although defendant has not acknowledged the fact in his brief, the affidavit itself, after indicating there had been contact between defendant

and Shari on June 30, stated that Danny Collins had seen Shari on July 1, suggesting that the time frame of Shari's disappearance was not exact. As the Attorney General has observed, the affidavit described the discovery of Jane Doe No. 60 on July 6 and noted the coroner's estimate of her death as having occurred between 36 to 48 hours previously—information that also suggested Shari had been alive for a day or so after June 30.

Moreover, even assuming the omitted statements did mislead the magistrate to believe Shari last had been seen alive on June 30, those omissions clearly were not material in light of the totality of the circumstances. The affidavit stated that the police had discovered through the photographs recovered in the previous search and through fingerprint records that Shari was Jane Doe No. 60, and also had discovered through defendant's own statements that he was acquainted with Shari and had taken photographs of her within several days of her disappearance. The affidavit explained that the police had determined that defendant had lied about the date and location at which the photographs were taken, that Shari's photographs had been taken at approximately the same location in the Mojave desert where Julianne P. had been raped and where Tracey's body had been discovered, and that both murder victims were killed in a similar manner. The trial court did not err in finding that, considered as amended to include the above described information, the affidavit established probable cause.

### (b) *Request to search for items already in police custody*

On August 7, Detective St. John led a search of Shari's automobile, containing her clothing and other personal belongings. The police removed and inventoried the items, which included a silver spoon ring, five pierced earrings, two silver bracelets, two pairs of cutoff jeans, a black wrist strap, and a pair of brown thongs.

Despite the prior recovery of similar items, Detective St. John sought authorization in the warrant to search for a "silver spoon ring," "women's pierced earrings," a "gold bracelet," "blue cut off shorts," a "female watch with black band," and any "female clothing as shown in [a] series of 9 photographs of Shari Miller" attached as exhibits to the affidavit, depicting her wearing a pair of cutoff blue jeans, a pair of brown thongs, a wrist band, and jewelry. The affidavit of probable cause did not state that Shari's vehicle earlier had been inventoried, nor that similar articles already were in police custody.

The trial court determined that Detective St. John failed to exercise due care in seeking authorization to search for the silver spoon ring that already

was in police custody. The court also found Detective St. John negligent in "not more fully and explicitly revealing which items were already in police custody and for expressing his reasons for requesting permission to search for additional sets of those items."

Defendant contends that Detective St. John knew or should have known that the silver spoon ring already was in police custody, and that his request to search for this article demonstrated an intentional or reckless disregard of the truth. Detective St. John testified that on August 7, he personally directed the taking of the inventory and photographs of the articles, as well as the preparation of the property report. The silver spoon ring and many of Shari's belongings were included within one item, "one red duffle bag containing miscellaneous objects," the contents of which Detective St. John did not examine or record. The evidence does not establish that at the time he prepared the affidavit of probable cause, Detective St. John had personal knowledge of the prior seizure of the spoon ring.

Defendant further contends that even if Detective St. John personally did not know the spoon ring was in police custody, other police officers investigating Shari's death had personal knowledge that this item had been seized, and should have so informed Detective St. John. ▮▮▮ Although it is the rule that the "police [cannot] insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity" (*Franks* v. *Delaware, supra,* 438 U.S. 154, 163-164, fn. 6 [98 S.Ct. 2674, 2680]; *U.S.* v. *DeLeon* (9th Cir. 1992) 979 F.2d 761, 764), nothing in the record indicates that the police officers who searched Shari's vehicle deliberately withheld from Detective St. John information that the spoon ring had been seized earlier. The trial court did not err in determining that Detective St. John merely was negligent.

Defendant also contends that additional items sought by Detective St. John—pierced earrings, a gold bracelet, cutoff jeans, a woman's watch with black band, and a pair of brown thongs—already were in police custody, and the inclusion of them in the affidavit demonstrated an intentional or reckless disregard of the truth. Detective St. John testified he had observed that Shari had pierced ears, and he knew she occasionally wore pierced earrings. Although Detective St. John was aware that pierced earrings had been recovered from Shari's vehicle, he certainly was not unreasonable in seeking their seizure based upon the surmise that she owned additional pierced earrings. The gold bracelet appearing in the photographs and listed in the affidavit clearly was distinct from the two silver bracelets that the police already held in custody.

Detective St. John testified that Doreen Music, a criminalist working with Detective St. John, compared the pair of cutoff jeans in the photographs with

the two pairs of cutoff jeans recovered from Shari's vehicle, and was unable positively to identify either pair as those Shari wore in the photographs. Detective St. John observed that the pair of thongs depicted in the photographs was the same color as the pair already in police custody, and he did not know whether Shari owned any additional pairs. Detective St. John was unable to determine from an examination of the photographs whether the black wrist strap worn by Shari included a watch, or whether it matched the black wrist strap found inside her vehicle.

We have reviewed this evidence, and it does not appear that the items recovered from the vehicle matched those in the photographs. Although the pair of thongs depicted in the photographs resembled the pair already in police custody, the thongs were fungible in nature and it was not unreasonable to conclude that Shari may have owned additional pairs. In addition, the officer who seized the watch with yellow paint flecks was aware of Shari's recent activity as a painter, a circumstance that supplied independent probable cause for seizure of that item. Accordingly, we conclude that the trial court did not err in finding that although Detective St. John should have disclosed in his affidavit that items similar to those in the photographs already were in police custody, his failure to do so merely was negligent and was not intentional or reckless.

(c) *Omission of information relating to prior searches*

Detective St. John did not describe in the affidavit the two prior searches that had been conducted of defendant's apartment and vehicle on July 16 and July 31. These searches consisted of a consensual and cursory search conducted by a single police officer on July 16, and the more extensive search (discussed, *ante*, pp. 1285-1297) conducted pursuant to a warrant by several officers on July 31. The trial court found that the August 16 affidavit referred several times to the July 31 search, that the attachments to the later affidavit included a copy of the earlier warrant and the related property return, and that the magistrate had sufficient time to read the contents of the August 16 affidavit as well as portions of the attachments, including the prior warrant and return, and reasonably would have understood there had been a prior search on July 31 before issuing the August 16 warrant.[10]

Defendant contends that pursuant to *U.S.* v. *Whitworth* (9th Cir. 1988) 856 F.2d 1268, 1281-1282 (*Whitworth*), it was not "proper for law enforcement

---

[10]In his appellate brief, defendant contends that the August 16 affidavit of probable cause did not refer expressly either to the July 16 or July 31 searches, or to the circumstance that following the latter search, defendant was arrested and released, with no charges filed. Defendant further suggests that the warrant and affidavit of probable cause for the July 31 search may not have been attached as exhibits to the August 16 affidavit of probable cause.

The August 16 affidavit itself does not refer expressly to the July 16 search, nor does it specify the date of the July 31 search. Nonetheless, the August 16 affidavit, referencing a

officials to withhold information regarding prior searches of the same premises for magistrates considering warrant applications." That decision and others have observed that prior case authority has declined to establish a per se rule against consecutive searches, presuming, " 'in the absence of some showing to the contrary, that officers perform their duties and properly execute the processes placed in their hands.' " (*Id.* at p. 1282; *Filippelli* v. *United States* (9th Cir. 1925) 6 F.2d 121, 125.)

In *Whitworth*, a warrantless but consensual search was conducted of the defendant's residence, and a second search pursuant to a warrant was conducted 11 days later. (856 F.2d 1268, 1278-1279.) The court found the government's intentional failure to mention the initial search in the subsequent affidavit to be "problematic." It concluded, however, that the consent-based search had not been performed as thoroughly as a warrant-based search would have been, and that probable cause still existed for the subsequent search. (*Id.* at p. 1282.) In the present case, similarly, the July 16 consensual search of defendant's apartment and vehicle was extremely cursory in nature and did not negate probable cause to believe that incriminating evidence would be found during a subsequent search based upon a warrant.

Moreover, with regard to the subsequent warrant-based searches, the present case is factually distinct from *Whitworth* in two important respects. First, the August 16 affidavit expressly referred to a previous search conducted pursuant to a warrant; the affidavit's attachments specified that it occurred on July 31 and provided documentation of the objects of that search as well as its results. Second, the issuance of the second search warrant was based upon a showing of additional criminal activity.

The probable cause supporting the July 31 search warrant was predicated upon defendant's connection with two incidents arising in the "westside" of Los Angeles—the disappearance of Tracey Campbell on July 12 and the

---

particular exhibit, clearly does refer to Detective Worthen's search and to defendant's arrest for murder, specifying that at that time defendant had informed the detective that he last had seen Shari on June 30. In addition, we have reviewed the original August 16 warrant, affidavit, and all attached exhibits, which include a copy of the July 31 search warrant and affidavit of probable cause (the latter document itself referring to the July 16 search) as well as the return to that search warrant.

Accordingly, even considering the August 16 affidavit by itself, the magistrate would have ascertained that defendant previously had been arrested and a prior search had been conducted sometime during the six weeks prior to August 16. Moreover, it appears the magistrate was presented with virtually the entire record of the July 31 search, including a description of the items seized in that search. Nothing in the trial court motions to quash and traverse the August 16 warrant and the related motions to suppress evidence, or in the oppositions filed by the prosecutor, suggest that this information somehow was not before the issuing magistrate.

murder of Mischa Stewart in October 1982. Following the July 31 search of defendant's apartment and vehicle, but prior to the application for a search warrant made on August 16, the police had made several major discoveries. Tracey's body, found in the desert area near Lancaster, provided specifics as to the location and manner of her death. Shari's body had been identified in part through defendant's possession of her photographs, and he had admitted his personal acquaintance and contacts with her just prior to her disappearance—circumstances that, combined with information provided by others, connected defendant with her death as well. Further, as Detective St. John testified, during the period following defendant's release from police custody on August 3 until his re-arrest on August 16, defendant had the opportunity to conceal small items on his person—jewelry or human parts— and transfer them to his apartment. Even had it been emphasized in the affidavit of August 16 that two prior separate searches had been conducted within a one-month period, the magistrate reasonably could have concluded that additional probable cause existed to conduct a third search.

### (2) *Finding that the search was not general and exploratory*

■■■ Defendant contends that the trial court erred in denying his motion to suppress all evidence seized in the August 16 search on the ground that the search was general and exploratory. The search warrant issued on that date authorized the police to search defendant's apartment and "all facilities within the structure, garages or storage units, basements, attics, and all containers located either inside the premises or on the grounds of premises designated for their use," a 1965 Dodge, a 1984 Dodge Daytona, a 1977 Datsun, and a Marina Del Rey storage area rented to Olga Talbot. The warrant specified numerous items of property, the majority of which consisted of clothing and jewelry worn by Tracey or Shari, camera equipment and film, cigarettes, maps of Los Angeles, human specimens, such as hair, blood, and body fluids, defendant's bank books, credit cards and receipts, mail order catalogues, as well as knives and sharp cutting instruments. The return to the search warrant reveals that a number of additional items, including an additional vehicle, medicines, toiletries, magazines, and miscellaneous papers, were seized.

A hearing was conducted at which the officers conducting the search testified for the prosecution and Olga Talbot testified for the defense. The trial court determined that the search exceeded the scope authorized by the warrant and encompassed the search of a vehicle and several storage lockers not named in the warrant. Accordingly, it ruled that evidence seized during the unauthorized portions of the search could not be introduced at trial and ordered suppressed numerous items, including a belt buckle with a motorcycle logo that the prosecution had sought to admit at trial. The trial court

rejected, however, defendant's motion to suppress all evidence seized during the search, including that lawfully seized—a motion premised upon the theory that the conduct of the police was in "flagrant disregard" of the authorized scope of the search and must be punished by a total suppression of evidence. Although remarking that "portions of the search did possess exploratory qualities, and that the seizure of numerous items of property was overly broad," the trial court found that "the officers had not acted in bad faith," and that "the majority of the items seized" were seized lawfully. The court concluded that "whatever criticism may be directed toward the conduct of this particular search it does not appear to rise to the level of the egregious misconduct which justifies the imposition of the ultimate sanction of total suppression of items seized during the course of this search."

### (a) *Restriction of scope of inquiry*

Defendant contends, as he did with respect to the July 31 search, that the trial court improperly limited the scope of the hearing by declining to permit defendant to introduce all of the individual items seized by the police. The record reflects that defendant's motion catalogued each item seized. The police officers who testified were examined extensively concerning numerous items seized. The defense motion as well as the return to the warrant recorded the number and variety of items seized and the areas searched. The entire record of the proceedings reflects that the trial court, in ruling on the motion, was cognizant of the areas searched that were not clearly designated in the warrant and the nature and number of items seized that did not pertain directly to the subject investigations, and therefore could evaluate properly whether the search was exploratory in nature. The trial court did not err in declining to permit the introduction into evidence of every single item seized.

### (b) *Finding that the police were not in "flagrant disregard" of the authorized scope of the search*

Defendant contends that the executing officers' failure to peruse the contents of the warrant prior to or during the search, their failure to limit the area of the search to those areas described in the warrant, and their failure to confine their seizures to those items designated in the warrant demonstrate that the officers' conduct was in "flagrant disregard" of the scope of their prior authorization. According to defendant, the improper police conduct necessitated total suppression of the fruits of the seizure, including those items seized within the scope of the warrant.

As noted above, in a footnote, the high court in *Waller* v. *Georgia, supra,* 467 U.S. 39, discussed and rejected the defendants' contention that the

police so "flagrant[ly] disregard[ed]" the scope of the warrants in conducting the seizures that they turned the warrants into impermissible general warrants, requiring suppression of the entire fruit of the search, rather than merely suppression of those items as to which there was no probable cause to support seizure. (*Id.* at pp. 43-44, fn. 3 [104 S.Ct. at p. 2214].) The court noted that the defendants did not assert that the officers exceeded the scope of the warrant in the *places* searched but only that the police unlawfully seized and took away items unconnected to the prosecution. Because all items that were unlawfully seized were suppressed, "[i]n these circumstances, there is certainly no requirement that lawfully seized evidence be suppressed as well. [Citations.]" (*Ibid.*; *Andresen* v. *Maryland, supra,* 427 U.S. 463, 482, fn. 11 [96 S.Ct. 2737, 2749].)

Subsequent to *Waller* v. *Georgia, supra,* 467 U.S. 39, a number of decisions of the lower federal courts—decisions that, as earlier observed, provide persuasive rather than binding authority (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 120, fn. 3)—have addressed the foregoing issue. The Ninth Circuit has interpreted the footnote in *Waller* to mean that when the police seize items in flagrant disregard of the limitations imposed by a search warrant, a blanket suppression both of items seized pursuant to the warrant and those seized outside the scope of the warrant is mandated. (*U.S.* v. *Mittelman* (9th Cir. 1993) 999 F.2d 440, 444; *U.S.* v. *Chen* (9th Cir. 1992) 979 F.2d 714, 716-720; *United States* v. *Crozier* (9th Cir. 1985) 777 F.2d 1376, 1381; see *United States* v. *Tamura* (9th Cir. 1982) 694 F.2d 591, 597; *United States* v. *Rettig* (9th Cir. 1978) 589 F.2d 418, 423.) The majority of other circuits also have concluded that police conduct in flagrant disregard of the scope of the warrant may justify total suppression of the evidence seized. (*U.S.* v. *Young* (1st Cir. 1989) 877 F.2d 1099, 1105; *U.S.* v. *Matias* (2d Cir. 1988) 836 F.2d 744, 747-748; *U.S.* v. *Jones* (4th Cir. 1994) 31 F.3d 1304, 1314; *U.S.* v. *Henson* (6th Cir. 1988) 848 F.2d 1374, 1383-1384; *U.S.* v. *Decker* (8th Cir. 1992) 956 F.2d 773, 779; *Marvin* v. *United States* (8th Cir. 1984) 732 F.2d 669, 674-675; *United States* v. *Medlin* (10th Cir. 1986) 798 F.2d 407, 410-411; *U.S.* v. *$149,442.43 in U.S. Currency* (10th Cir. 1992) 965 F.2d 868, 875; *U.S.* v. *Lambert* (11th Cir. 1989) 887 F.2d 1568, 1572-1573; *United States* v. *Wuagneux* (11th Cir. 1982) 683 F.2d 1343, 1354; *U.S.* v. *Nicely* (D.C. Cir. 1991) 922 F.2d 850, 858 [287 App.D.C. 322]; *United States* v. *Heldt* (D.C. Cir. 1981) 668 F.2d 1238, 1259-1260 [215 App.D.C. 206].) Only one circuit expressly has declined to adopt the "flagrant disregard" standard requiring blanket suppression. (*U.S.* v. *Willey* (5th Cir. 1995) 57 F.3d 1374, 1390.)

In *U.S.* v. *Chen, supra,* 979 F.2d 714, the United States Court of Appeals for the Ninth Circuit explained that the suppression of all evidence is an

extraordinary remedy, used only when the violations of the warrant's requirements are so extreme that the search essentially is transformed into an impermissible general search. (*Id.* at p. 717.) The courts rarely have actually concluded that police conduct was so extreme as to warrant total suppression. The remedy has been justified when the police exceeded the "scope of the warrant in the places searched" (*Waller* v. *Georgia, supra*, 467 U.S. 39, 44, fn. 3 [104 S.Ct. 2210, 2214]; *U.S.* v. *Decker, supra*, 956 F.2d 773, 779), the police used the warrant as a pretext to search for evidence of unrelated crimes (*United States* v. *Rettig, supra*, 589 F.2d 418, 423), or the police were motivated " 'by a desire to engage in indiscriminate "fishing" ' " rather than by "considerations of practicality" (*U.S.* v. *Chen, supra*, 979 F.2d 714, 717; *U.S.* v. *Medlin* (10th Cir. 1988) 842 F.2d 1194, 1199).[11] The mere magnitude of the seizures does not establish a violation of the federal Constitution. (*U.S.* v. *Lambert, supra*, 887 F.2d 1568, 1572-1573; *United States* v. *Wuagneux, supra*, 683 F.2d 1343, 1352.)

Assuming that the remedy of total suppression is required when police conduct is in flagrant disregard of the limits of the warrant, we conclude that in the present case the trial court properly found that the application of that extreme remedy was not warranted and suppressed only items not covered by the warrant. Although the record indicates that the officers searched a vehicle and several storage locker areas that were not clearly named in the warrant, it also establishes that defendant had no reasonable expectation of privacy with regard to the vehicle and certain of the locker areas. It is also apparent that other locker areas in which he had such a reasonable expectation of privacy were within close proximity to the vehicles as well as to the lockers identified at the scene as being used by the inhabitants of defendant's residence.

Although the officers seized a number of items that clearly fell outside the scope of the warrant, the record reveals that the bulk of these items might have had some bearing upon the current offenses. (*United States* v. *Tamura, supra*, 694 F.2d 591, 597.) The several remarks by police witnesses indicative of a broader purpose do not establish a flagrant disregard of the limits of the warrant when considered in the context of the total testimony. The officers may have entertained the hope that evidence pertaining to unrelated crimes also would be discovered, but it is very apparent that the search was not simply a pretext for a general search for evidence of unrelated crimes. The record does not demonstrate that the officers had not been briefed or

---

[11] In other search-related contexts, the Supreme Court has commented that subjective intent by itself, " 'does not make otherwise lawful conduct illegal or unconstitutional.' " (*Whren* v. *United States* (1996) __ U.S. __ [116 S.Ct. 1769, 1774, 135 L.Ed.2d 89]; *Scott* v. *United States* (1978) 436 U.S. 128, 138 [98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168].)

prepared as to the objects of the search (see *United States* v. *Heldt, supra,* 668 F.2d 1238, 1259-1262), or that their search amounted to a "fishing expedition." (Cf. *U.S.* v. *Medlin, supra,* 842 F.2d 1194, 1199-1200.) Nor was the behavior of the officers so unconscionable as to amount to a due process violation. (*United States* v. *Tamura, supra,* 694 F.2d 591, 597.) Under these circumstances, the trial court did not err in declining to order the "extraordinary remedy" of total suppression of all items seized.

c. *Motion to suppress defendant's August 16, 1984, statements to the police*

During the trial, defendant moved to suppress the evidence of statements he made during an interrogation by the police conducted on August 16. Out of the presence of the jury, the trial court held a hearing on defendant's motion to suppress the evidence, at which the following testimony was presented.

Upon defendant's arrest on August 16, at approximately 6:45 p.m., Detectives St. John and Melleker attempted to interview him in an interrogation room at Parker Center in downtown Los Angeles. The conversation secretly was taped by the scientific investigation division (hereafter, SID), and was taped by an additional recording device inside a briefcase that Detective St. John brought to the interrogation room. The detectives informed defendant that they were part of the robbery-homicide division and wanted to speak to him about Shari Miller and Tracey Campbell. After they provided him with the advisements required by *Miranda,* defendant informed the detectives that he wished to have his attorney present during questioning. Detective St. John switched off the recording device in his briefcase, and defendant was escorted from the room to telephone his attorney. The detectives left the room and instructed SID to cease recording.

At approximately 6:50 p.m., following several unsuccessful attempts to contact his attorney, defendant was escorted back to the interrogation room, where he was handcuffed to a chair and left alone. Detective Worthen, who earlier that day had informed Tracey's mother that Tracey's body had been discovered in the desert, and who recently had arrived at the squad room, was informed that defendant had invoked his constitutional rights. Several minutes later, Detective Worthen entered the interrogation room and had a brief conversation with defendant. Detective Worthen returned to the squad room and informed Detective St. John that defendant had called out to Detective Worthen and indicated that he now was willing to answer questions without the presence of his attorney. At approximately 7:25 p.m., Detective St. John advised SID to recommence taping, and the detectives,

having repeated the advisements pursuant to *Miranda* and received a waiver of rights from defendant, began to question him. At times during the interview, defendant, who did not appear to be injured, laughed and engaged in friendly conversation with the detectives. The interview continued for approximately two hours until defendant requested an attorney and the questioning ceased.

At the hearing, the parties presented two contrasting accounts of the conversation between Detective Worthen and defendant that preceded the interview. Detective Worthen testified that, as he was walking past the interrogation room, defendant said, "Detective Worthen, can I talk to you?" After Detective Worthen entered the room, defendant stated he "did not understand what was going on." Detective Worthen informed him that, just as in the earlier session when Detective Worthen had questioned defendant about Tracey Campbell, Detectives St. John and Melleker now wanted to ask him about Shari Miller and some photographs, and about the last time that defendant had seen Tracey Campbell. Defendant said he understood and now would be willing to answer the questions of the detectives. This conversation with Detective Worthen continued for approximately one minute, following which Worthen left the interrogation room.

Defendant testified initially that Detective Worthen entered the interrogation room prior to the time defendant was escorted outside to contact his attorney. During the course of his testimony, defendant indicated that after he was returned to the interrogation room and handcuffed to the chair, the door was closed and, within three minutes Detective Worthen, whom defendant knew from the interrogation following his previous arrest, entered the room and initiated a conversation with defendant. Detective Worthen informed defendant that he would find himself "in great bodily injury" if he did not cooperate with Detective St. John, that Detective Worthen had just returned from the desert where Tracey's body had been found, and that if defendant did not speak to Detective St. John, Worthen would take defendant to the desert and leave him in the same condition as Tracey.

Following this testimony, the hearing was interrupted. When it was resumed five days later, defendant testified that the door to the interview room had been only partially closed. After Detective Worthen entered the room, in addition to making threatening comments, he had grabbed defendant's shirt with both hands and shaken him, and had punched him in the lower back, at which point defendant could hear his ribs "popping." During cross-examination, defendant further testified that Detective Worthen had forced a gun

down defendant's throat, injuring his teeth. Defendant testified that Detective Worthen's threat to hurt defendant was not made conditional on defendant's confession.[12]

According to defendant, Detective Worthen left the room and Detectives St. John and Melleker returned, recommencing questioning. When defendant said nothing, Detective Worthen returned and remained near the door until defendant indicated he was willing to answer questions. Detective Worthen remained in the doorway for the first part of the interview. On more than one occasion, when defendant became evasive, Detective Worthen began to move inside the room. Defendant was in fear for his life when he decided to answer the questions, and answered them against his will during the entire two-hour interview. Defendant engaged in friendly conversation with the detectives in an attempt to pacify them. Several times during the course of the interview, defendant requested to speak to his attorney. Eventually, defendant terminated the interview, although he still felt himself to be in physical danger.

Defendant further testified that during the interview, he was asked several questions concerning his alleged rape of Julianne P., for which he faced formal charges that were approaching trial. According to defendant, Attorney Mark Gottesman, who represented defendant in that case and whom defendant had retained in the present two cases, attempted to contact defendant at 10:45 that evening, but was informed that defendant was in transit.

According to defendant, that evening, following completion of his booking, he asked to be examined by a physician, indicating to the jail guard that he had suffered injuries to his ribs and was having trouble breathing. The following day, defendant was examined by a physician who filed a report describing defendant's complaints. The physician's report indicated that defendant had stated that his lower ribs hurt and a rib had popped after he was hit in that area by Detective Worthen.

At the conclusion of the hearing, the prosecution conceded that any of defendant's statements made during the interview pertaining to the Julianne P. case were inadmissible. The trial court agreed and ordered the references to that incident redacted from the tape and transcript to be presented to the jury. The trial court, while noting that the tape demonstrated that defendant had paused prior to assenting to talk to the detectives, determined that

---

[12]In addition defendant testified that, on the occasion of his earlier arrest on July 31, prior to interrogating defendant, Detective Worthen had punched defendant three or four times in the rib cage. That conduct prompted defendant to talk to the detective. The interrogation lasted 16 hours, on 2 separate days, and ended when defendant requested an attorney.

defendant's subsequent waiver of his right to have counsel present during the interview was valid and voluntary. The trial court based its determination upon the relative credibility of Detective Worthen and defendant, and upon the absence in the tape or transcript of any reference by defendant to the injuries that he allegedly had received prior to the interview.

### (1) *Fifth Amendment privilege against self-incrimination*

■ Defendant contends that the statements were obtained in violation of his Fifth Amendment privilege against self-incrimination. ■ The standards enunciated in *Miranda* were "designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under 'inherently coercive' circumstances." (*People* v. *Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992].) Statements obtained by the police in violation of *Miranda* are inadmissible to establish guilt. (*Ibid.*) ■ "[S]ubsequent to the adoption of article I, section 28, subdivision (d) of the California Constitution, we apply federal standards in reviewing a defendant's claim that his or her statements were elicited in violation of *Miranda*." (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 129; *People* v. *Sims, supra,* 5 Cal.4th 405, 440.)

■ Under the familiar standards of *Miranda,* " 'a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent.' [Citation.] 'Once having invoked these rights, the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." ' [Citations.]" (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 128; see *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378]; *Miranda* v. *Arizona, supra,* 384 U.S. 436, 444-445, 473-474 [86 S.Ct. 1602, 1612-1613, 1627-1628]; see also *McNeil* v. *Wisconsin* (1991) 501 U.S. 171, 176-177 [111 S.Ct. 2204, 2207-2209, 115 L.Ed.2d 158]; *Arizona* v. *Roberson* (1988) 486 U.S. 675, 680-682 [108 S.Ct. 2093, 2097-2098, 100 L.Ed.2d 704].) "If, subsequently, assuming there is no break in custody, the police initiate a meeting in the absence of counsel, the suspect's statements are presumed involuntary and are inadmissible as substantive evidence at trial, even if the suspect executes a waiver and the statements would be considered voluntary under traditional standards. [Citations.]" (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 128.)

■ "The initiation of further dialogue by the accused, however, does not in itself justify reinterrogation. (*Oregon* v. *Bradshaw* (1983) 462 U.S.

1039, 1044 [103 S.Ct. 2830, 2834, 77 L.Ed.2d 405].) '[E]ven if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.' (*Ibid.*)" (*People* v. *Sims, supra,* 5 Cal.4th 405, 440.) Therefore, it is clear that a conversation may be resumed in the absence of counsel only if the "accused himself initiates further communication, exchanges, or conversations with the police" (*Edwards* v. *Arizona, supra,* 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1885]) and the circumstances indicate that the accused has made a knowing and intelligent waiver of the right to an attorney. (*Oregon* v. *Bradshaw* (1983) 462 U.S. 1039, 1044-1045 [103 S.Ct. 2830, 2834-2835, 77 L.Ed.2d 405].)

■ The scope of our review of constitutional claims of this nature is well established. When the facts are disputed, we must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 128.) We independently must determine from the undisputed facts, and those properly found by the trial court, whether the challenged statements were illegally obtained. (*Ibid.*; *People* v. *Johnson* (1993) 6 Cal.4th 1, 25 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People* v. *Mattson* (1990) 50 Cal.3d 826, 857-858 [268 Cal.Rptr. 802, 789 P.2d 983]; *People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610].)

■ In the present case, defendant's query as to "what was going on" would not in itself have been sufficient to establish his reinitiation of contact. (*Oregon* v. *Bradshaw, supra,* 462 U.S. 1039, 1042 [103 S.Ct. 2830, 2833]; *People* v. *Sims, supra,* 5 Cal.4th 405, 440.) According to Detective Worthen, however, defendant went further and on his own initiative expressed his willingness to speak with the detectives. The record of the subsequent interview confirms that, at its commencement, defendant expressed a willingness to speak following readvisement of his rights pursuant to *Miranda.* Therefore, with respect to whether defendant's reinitiation of communication and knowing and voluntary waiver were established, the determination turns upon whether Detective Worthen's version or defendant's version of their meeting was the more credible one.

The trial court's resolution of the disputed facts and inferences pertaining to the contact between the two witnesses, and that court's evaluation of their credibility, is substantially supported by the evidence adduced at the hearing. Detective Worthen's account was plausible and was confirmed in various respects by that of Detective St. John, who spoke both with Worthen and defendant prior to and following their encounter.

By contrast, defendant's testimony was inconsistent in a number of particulars, including as to whether Detective Worthen approached him prior to or following defendant's attempts to contact his attorney, whether the door to the interrogation room was open or closed when Detective Worthen approached him, and whether Detective Worthen was present during the interview. Defendant also appeared to embellish his recollection of asserted instances of Detective Worthen's threats or violent conduct, after defendant had had an opportunity to reflect upon the circumstances of their encounter. Defendant, having mentioned only verbal threats during the initial portion of his testimony, five days later described being physically assaulted, and still later during cross-examination stated he had been attacked and injured with a gun. Belatedly, defendant also reported an earlier attack by Detective Worthen that he claimed had induced him to participate in the initial interview commencing on July 31. As described above, that interview lasted several hours on that date and seven to ten hours on the following date until defendant requested an attorney.

Moreover, defendant's credibility was impaired by the tape-recorded interview itself. Although defendant testified that, having just been punched in the ribs and injured in the mouth with a gun, he was in fear during the entire interview, the tapes of that interview reveal that he laughed and had friendly conversation with his interviewers. Defendant testified that he requested an attorney as many as four times during the interview, but the tape and transcript reveal no such requests. Nor do the tapes and transcriptions of the previous interview suggest that any prior attack had occurred.

In view of the testimony presented, the trial court's determinations that defendant had initiated the renewed questioning, and that his express waiver was knowing and voluntary, were supported by substantial evidence. Accordingly, we sustain the trial court's finding that defendant waived his Fifth Amendment privilege against self-incrimination.

(2) *Sixth Amendment right to counsel*

 Defendant contends that the statements were obtained in violation of his Sixth Amendment right to an attorney under *Massiah* v. *United States* (1964) 377 U.S. 201, 205 [84 S.Ct. 1199, 1202-1203, 12 L.Ed.2d 246], which provides that, once the right to counsel has attached, a subsequent waiver during a police-initiated interview is ineffective. Because an accused has a Sixth Amendment right to counsel only with respect to formal charges brought, however, *Massiah* requires the suppression of only those incriminating statements made concerning such charges. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1233-1234 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Hovey*

(1988) 44 Cal.3d 543, 561 [244 Cal.Rptr. 121, 749 P.2d 776]; see *In re Wilson* (1992) 3 Cal.4th 945, 950-951 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) Even after an accused has counsel with regard to a particular charged offense, he or she may be questioned by police following *Miranda* advisements with respect to any uncharged offense. (*McNeil* v. *Wisconsin, supra*, 501 U.S. 171, 175-177 [111 S.Ct. 2204, 2207-2209].) Incriminating statements pertaining to those uncharged offenses, as to which the Sixth Amendment right has not yet attached, are admissible at a subsequent trial of those offenses. (*Maine* v. *Moulton* (1985) 474 U.S. 159, 180, fn. 16 [106 S.Ct. 477, 489, 88 L.Ed.2d 481]; *People* v. *Sully, supra*, 53 Cal.3d 1195, 1234.)

 Defendant contends that the statements he made without benefit of counsel, concerning the offenses for which he had not yet formally been charged (the murders of Shari Miller and Tracey Campbell), materially interfered with his right to representation with respect to the formally charged offense (the rape of Julianne P.). In addressing the issue, both defendant and the People implicitly or explicitly rely upon language in *People* v. *Sully, supra*, 53 Cal.3d 1195, which stated that such interference with the right to representation regarding the charged offense might occur where the charged and uncharged offenses are " 'so inextricably enmeshed that factually and conceptually it was virtually impossible to distinguish the events.' " (*Id.* at p. 1234.) The circumstances of the earlier rape and those of the present murders clearly do not meet those criteria. As our more recent decisions make clear, defendant's Sixth Amendment right to counsel had not yet attached in the present, uncharged murders, and the circumstance that defendant previously had been charged and incarcerated and counsel appointed in the wholly unrelated rape does not compel a contrary conclusion. (*People* v. *Webb* (1993) 6 Cal.4th 494, 527 [24 Cal.Rptr.2d 779, 862 P.2d 779]; *People* v. *Wader* (1993) 5 Cal.4th 610, 635-636 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People* v. *Clair* (1992) 2 Cal.4th 629, 657-658 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

Moreover, even assuming that the trial court erred in admitting defendant's statements, and further assuming that, considered as admissions, these were subject to the same standard of review for prejudice applicable to confessions (*Arizona* v. *Fulminante* (1991) 499 U.S. 279, 306-310 [111 S.Ct. 1246, 1262-1265, 113 L.Ed.2d 302] [federal constitutional "trial error" such as admission of involuntary confession subject to harmless error analysis of *Chapman* v. *California* (1967) 386 U.S. 18 (87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065)]; *People* v. *Cahill* (1993) 5 Cal.4th 478, 509-510 [20 Cal.Rptr.2d 582, 853 P.2d 1037] [California Constitution does not require stricter standard]; see *People* v. *Sims, supra*, 5 Cal.4th 405, 447), the admission of this evidence was not prejudicial. The substance of defendant's

account simply confirmed the statements he had given at the interviews following his arrest on July 31. Although defendant informed the officers of a few new details of his contacts with Shari, such as that she had arranged (but subsequently failed) to meet defendant at the Meat Market bar on the evening of the same day she visited defendant at his apartment (in his account, occurring during the last part of June), the new information he provided was not itself incriminating. Although defendant provided a few additional details of his meeting with Tracey's family, and reported dropping off Tracey at a coffee shop on Venice Boulevard rather than on the corner as he previously had reported, defendant did not materially alter the substance of his previous account, and the information he provided was not inculpatory. Although the officers, by advising defendant that they could place defendant and Shari in the same desert location in which Tracey's body had been discovered, did elicit defendant's statement that "I can't explain it to you," nonetheless, when one officer asked defendant directly whether he had killed Shari or Tracey, defendant responded "No sir." There is no reasonable possibility that the verdict would have been more favorable to defendant had these statements not been admitted. (*Chapman* v. *California, supra,* 386 U.S. 18, 34 [87 S.Ct. 824, 832-833].)

2. *Denial of motion for severance of the two murder counts*

 Defendant contends that the trial court improperly denied his motion to sever defendant's trial on the count alleging the murder of Tracey Campbell from the count alleging the murder of Shari Miller. In particular, he contends that in making its determination that the evidence would have been cross-admissible in separate trials because of the existence of a common modus operandi, the trial court erred in relying upon the circumstance that Shari Miller was murdered in the desert. Defendant asserts that the common features of each murder were not sufficiently unique to establish a common modus operandi. He also contends that the trial court erred in failing to consider the ensuing prejudice to defendant.[13]

Section 954 provides that "[a]n accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be

[13]Proposition 115, adopted in June 1990, contained several new constitutional and statutory provisions on the subjects of joinder and severance. (See Cal. Const., art. I, § 30, subd. (a); § 954.1.) Defendant was tried prior to the effective date of Proposition 115, and accordingly we apply the law predating Proposition 115 in our review of defendant's claims regarding severance. (*People* v. *Arias* (1996) 13 Cal.4th 92, 126, fn. 7 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

tried separately or divided into two or more groups and each of said groups tried separately." Because both offenses involved murder and thus belonged to the same class of crimes, the statutory requirements for joinder were satisfied. Therefore, defendant can predicate error in denying the motion to sever only upon a clear showing of potential prejudice. (*People* v. *Osband* (1996) 13 Cal.4th 622, 666 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v. *Sandoval* (1992) 4 Cal.4th 155, 172-173 [14 Cal.Rptr.2d 342, 841 P.2d 862], affd. *sub nom. Victor* v. *Nebraska* (1994) 511 U.S. 1 [114 S.Ct. 1239, 127 L.Ed.2d 583].)

■ In reviewing this claim, we apply the familiar standard of review providing that the trial court's ruling may be reversed only if the court has abused its discretion. (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 720 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People* v. *Davis* (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119]; see *People* v. *Osband, supra,* 13 Cal.4th 622, 666; *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1].) An abuse of discretion may be found when the trial court's ruling " 'falls outside the bounds of reason.' " (*People* v. *Osband, supra,* 13 Cal.4th 622, 666.)

■ " 'The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.] [¶] 'The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]" (*People* v. *Sandoval, supra,* 4 Cal.4th 155, 172-173; *People* v. *Mayfield, supra,* 14 Cal.4th 668, 721; *People* v. *Memro* (1995) 11 Cal.4th 786, 849-850 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People* v. *Davis, supra,* 10 Cal.4th 463, 507-508; *People* v. *Mason* (1991) 52 Cal.3d 909, 933-934 [277 Cal.Rptr. 166, 802 P.2d 950]; *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 452-454 [204 Cal.Rptr. 700, 683 P.2d 699].)

Furthermore, we have observed that the criteria enumerated in *Sandoval* are not equally significant. "[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each

of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171-172 [222 Cal.Rptr. 184, 711 P.2d 480]; see *People* v. *Mayfield, supra,* 14 Cal.4th 668, 721.) Cross-admissibility suffices to negate prejudice, but it is not essential for that purpose. Although " 'we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice.' " (*People* v. *Sandoval, supra,* 4 Cal.4th 155, 173.)

 In the present case, the prosecutor urged, and the trial court found, that evidence of each incident would have been cross-admissible in a separate trial of the charge relating to the other incident because the incidents disclosed a distinctive modus operandi tending to establish the killer's identity. Pursuant to Evidence Code section 1101, subdivision (b), evidence that a defendant has committed an offense, although inadmissible to demonstrate a defendant's *disposition* to commit crimes, may be received to establish, among other things, identity, intent, motive, or plan. To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed both crimes. (*People* v. *Miller* (1990) 50 Cal.3d 954, 988-989 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Bean* (1988) 46 Cal.3d 919, 937 [251 Cal.Rptr. 467, 760 P.2d 996]; see *People* v. *Memro, supra,* 11 Cal.4th 786, 851; *People* v. *Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

 The trial court found, based upon the record of the preliminary hearing as well as the evidence presented at the hearing on the motion to suppress, that, in common, the victims were young White females who died as a result of ligature strangulation, were tied up, were killed approximately within nine days of each other, were acquainted with defendant, were induced to accompany him as a result of their belief that defendant would photograph them in furtherance of their professional modeling ambitions, and prior to and near the time of their deaths had accompanied defendant to a particular remote, fairly inaccessible desert area that he previously had visited. The trial court further determined that the proximity in time of the two murders, the victims' prior relationships with defendant, the nature of their inducement to accompany defendant, and the desert location where they both were present at or near the time of death, were significantly distinctive and common marks which, considered together with the more general common characteristics, demonstrated numerous and significant similarities in the two homicides sufficient to establish a common modus operandi and raise a strong inference that it was defendant who had committed each offense.

Defendant contends that the trial court erred in relying upon the circumstance that both victims were killed in the desert, because there was no evidence that Shari actually was killed in the desert. The evidence considered by the trial court demonstrated that Shari was present with defendant in that remote area of the desert during a period near the time of her death. The trial court did not state that it relied upon the circumstance that both victims were *killed* at that location but rather, that at or near the time of death, both had been with defendant at that location.

Defendant asserts that the identifying factors employed by the trial court were similar to those in *People* v. *Bean, supra*, 46 Cal.3d 919, in which this court held that the common factors that purported to establish a modus operandi were insufficient. In that case, we concluded that the circumstances that both victims were females of the same age who were killed within three days of each other, in the same general vicinity and consistently with the same general scheme to burglarize their residences, were insufficiently distinctive to permit a finding of a common modus operandi. We noted that in one offense two assailants entered a couple's residence through a window, attacked the victim with a ball peen hammer, and took substantial property, whereas in the other, a single assailant gained entry through the door and took a purse, causing the victim to die of a heart attack. (*Id.* at pp. 937-938.)

In the present case, the circumstances that defendant was acquainted with each victim, had utilized the career and monetary ambitions of each to induce her to accompany him, and had taken each victim to the same remote desert location during a period at or preceding the commission of each murder, when considered together with the other similar but less unusual or singular features of each case, present considerably more distinctive common features than those before the court in *Bean.* The trial court correctly ruled that the evidence of both murders was cross-admissible. Contrary to defendant's additional assertion, the trial court did not subsequently fail to consider the potential prejudice to defendant from a joint trial despite that finding, but merely stated it would not dwell at length on the issue of prejudice, because the prejudice to defendant that would arise from joinder was outweighed by considerations of probative value.

Having concluded the trial court correctly determined the issue of cross-admissibility, we need not analyze the other factors described above. (See *People* v. *Mayfield, supra*, 14 Cal.4th 668, 721.) Nonetheless, we observe that even *had* defendant demonstrated that the evidence would not have been cross-admissible, he has failed to establish prejudice. He has not shown that one of the offenses was significantly more likely to inflame the jury against defendant, since the murders were similar in nature and equally gruesome.

Defendant has not shown that evidence of guilt was significantly stronger in one case, creating the danger that that case would be used to bolster the weaker case, because the prosecutor's evidence was nearly equal in strength as to both offenses. (See *ibid.*)

The present case is one in which the joinder itself gave rise to the special circumstance allegation (multiple murder, § 190.2, subd. (a)(3)), requiring that a higher degree of scrutiny be given the issue of joinder. (*Williams* v. *Superior Court, supra,* 36 Cal.3d 441, 454; cf. *People* v. *Sandoval, supra,* 4 Cal.4th 155, 173.) It is apparent that the trial court heard extensive argument by counsel on the issue and scrutinized the evidence very closely. Our review has not disclosed any abuse of discretion by the trial court in denying defendant's motion to sever. Nor has defendant demonstrated that prejudice actually resulted from the joinder of the charges at trial. (*People* v. *Memro, supra,* 11 Cal.4th 786, 851; *People* v. *Hill* (1995) 34 Cal.App.4th 727, 735 [41 Cal.Rptr.2d 39].)

### 3. *Excusal for cause of prospective jurors*

Defendant contends that he was denied his Sixth Amendment right to a fair and impartial jury because, following the prosecutor's challenge for cause and defense objection, the trial court excused two prospective jurors, Carolyn Stewart and Glen McCanlies, on the basis of their statements indicating they would be unable to apply the death penalty law. Whether the contention is, as in the present case, that the trial court erred in excluding prospective jurors who exhibited an anti-death bias, or erred in failing to exclude prospective jurors who exhibited a pro-death bias, the same standard has been held to apply. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 121; *People* v. *Pride* (1992) 3 Cal.4th 195, 227-228 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) A juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would "prevent or substantially impair" the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Morgan* v. *Illinois* (1992) 504 U.S. 719, 728 [112 S.Ct. 2222, 2229, 119 L.Ed.2d 492]; *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]; see *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776]; *People* v. *Crittenden, supra,* 9 Cal.4th 83, 120-121; *People* v. *Payton* (1992) 3 Cal.4th 1050, 1062-1063 [13 Cal.Rptr.2d 526, 839 P.2d 1035]; *People* v. *Mincey, supra,* 2 Cal.4th 408, 456.) "More specifically, the determinant is 'whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*'" (*People* v. *Hill* (1992) 3 Cal.4th 959, 1003 [13

Cal.Rptr.2d 475, 839 P.2d 984], original italics.) If the prospective juror's responses to voir dire questions are conflicting or equivocal, the trial court's determination of the juror's true state of mind is binding upon the reviewing court. (*People* v. *Mayfield, supra,* 14 Cal.4th 668, 727; *People* v. *Cummings, supra,* 4 Cal.4th 1233, 1279; *People* v. *Hill, supra,* 3 Cal.4th 959, 1004; *People* v. *Mincey, supra,* 2 Cal.4th 408, 456-457.)

 In the present case, prospective juror Stewart, asked by the court during voir dire examination whether she was in favor of, opposed to, or neutral regarding the death penalty, responded that it would be very hard to take someone else's life in her own hands. Asked whether she automatically would vote against a verdict of death regardless of the evidence, she responded that she was not sure, but was even less in favor of that penalty than at the time she had completed the juror questionnaire. Asked whether, if she concluded that the circumstances warranted the death penalty, she could return to the courtroom, look defendant in the eye and indicate her vote in favor of the death penalty, she said, "I rather doubt it." Asked to explain why, she indicated she did not feel that she had a right to take another person's life. Asked to conceive of any case in which she could envision voting for death, she explained that there might be an offense "so obnoxious" that she could bring herself to do it, perhaps if a child were involved, but could not envision any other type of case. When asked whether she could inform defendant that she had voted for a verdict of death, she indicated "Perhaps, yes."

Questioned by defense counsel how she would vote on the death penalty as a member of the electorate, prospective juror Stewart "would probably say no." Further queried whether she was not "automatically, absolutely in every case opposed" but was "mostly opposed," she responded affirmatively and indicated that perhaps there were situations in which she could render a death verdict. She stated she would attempt to follow the court's instructions and believed in the law, but would not know until the decision had to be made whether she could render a death verdict.

When asked by the prosecutor whether she could look defendant in the eye and sentence him to die in the gas chamber, prospective juror Stewart responded, "I really don't know," and stated that she found it very difficult to accept responsibility for the decision to render a death verdict. She indicated that previously she had justified the death penalty as a deterrent but no longer was certain the penalty was a deterrent, and prior to hearing any evidence would be more inclined to vote for life in prison without the possibility of parole. She indicated she would not vote for a verdict other than guilty of first degree murder just in order to avoid facing the question of

the death penalty, but did not know whether she could impose the death penalty in the present case.

Prospective juror McCanlies indicated in the juror questionnaire, and informed the court, that he was opposed to the death penalty. Questioned by the court as to how strong his feelings were, McCanlies stated he could conceive of imposing the penalty only if that would bring the victim back to life. He stated that his principles were that executing a human being is never justified under any circumstances, regardless of the evidence. McCanlies indicated he would be unable to return to the courtroom and inform defendant that McCanlies had voted for death under any circumstances unless "something like espionage" were involved.

When asked by defense counsel to conceive of circumstances in which he could render a death verdict, McCanlies suggested he could do so in the case of a death commandant, "grinding out victims by the thousands on a monthly basis," or where a hired killer performed premeditated mass murder of schoolchildren. He acknowledged that there are circumstances in which a person is so dangerous to society that he or she has to be removed. When questioned whether he could listen to the evidence and consider the death penalty, McCanlies indicated that he did not know. He indicated he would listen to the judge's instructions and follow the law, also stating he would "to the very last minute resist" imposing the death penalty.

We are satisfied that the trial court did not err in granting the prosecutor's challenges for cause to these two prospective jurors. Both jurors expressed views indicative of an unalterable preference against the death penalty. Accordingly, their statements that they would follow the law would not "rehabilitate" them. (*Morgan* v. *Illinois*, *supra*, 504 U.S. 719, 734-736 [112 S.Ct. 2222, 2232-2234].)

Although both jurors indicated they could impose the death penalty in specified, particularly extreme cases, their hypothetical examples presented more egregious facts than those involved in the present case. (See e.g., *People* v. *Cummings*, *supra*, 4 Cal.4th 1233, 1280-1281 [for-cause excusal proper when juror could impose death penalty in "awfully horrendous" case but "probably" would vote automatically for life imprisonment]; *People* v. *Payton*, *supra*, 3 Cal.4th 1050, 1063 [for-cause excusal proper when juror would vote automatically for life imprisonment but allowed for death penalty " 'in the most aggravated case you can imagine' "].) Their examples were not analogous to the circumstances of the murders at issue in the proceedings before them. (See *People* v. *Hill*, *supra*, 3 Cal.4th 959, 1003.)

Even though to some extent the responses of both prospective jurors, and Stewart's responses in particular, were conflicting and ambiguous, as indicated above the trial court's determinations as to the jurors' true state of

mind, based upon factors such as their demeanor, is binding upon this court. Their statements justified a finding that each would vote automatically against the death penalty regardless of the evidence in this case. The trial court correctly determined that each juror's views would prevent or substantially impair the performance of his or her duties as defined by his or her oath as a juror and the instructions given by the court. (*Wainwright* v. *Witt*, *supra*, 469 U.S. 412, 424 [105 S.Ct. 844, 852].)

### 4. *Denial of motion to exclude witnesses during opening statements*

Defendant contends that the trial court erred in denying his motion to exclude from the courtroom, during the opening statements of counsel, three witnesses who were scheduled to testify on behalf of the prosecution— Mara Lyn and David Miller (Shari's mother and brother) and Lida Jane McCabe (Tracey's mother). At the time of trial, section 1102.6 provided, in pertinent part: "(a) The victim shall be entitled to be present and seated at the trial. If the court finds that the presence of the victim would pose a substantial risk of influencing or affecting the content of any testimony, the court shall exclude the victim from the trial entirely or in part so as to effect the purposes of this section. [¶] (b) Upon the court's granting of the victim's request, the defendant may object to the order of the victim's testimony, in which case the victim shall testify first, subject to exclusion if the foundation or corpus delicti is not later established by the testimony of other prosecuting witnesses. [¶] (c) Upon the request of either party or upon the court's own motion, the victim shall be excluded from any hearing on a motion pursuant to this section. [¶] . . . [¶] (e) As used in this section, 'victim' means (1) the alleged victim of the offense and one member of the victim's immediate family and (2) in the event that the victim is unable to attend the trial, up to two members of the victim's immediate family who are actual or potential witnesses."

As an initial matter, defendant contends that the trial court erred in failing to grant defendant's request to exclude these three witnesses (who clearly were within the statutory definition of victims) from the hearing held to decide whether they should be excluded from counsel's opening statements. The trial court found, however, that the hearing on the motion was conducted outside the hearing of these individuals, that they were conversing among themselves during the hearing, and that they were unaware of the substance of the hearing. It appears that the trial court complied with former section 1102.6, subdivision (c), because these witnesses essentially were excluded from the hearing on defendant's motion.

Defendant next contends that the trial court erred in denying his motion to exclude these witnesses during the opening statements themselves. The

applicable version of the statute requires the exclusion of a victim from the trial or a portion thereof if the presence of that victim "would pose a substantial risk of influencing or affecting the content of any testimony." Assuming that defendant's interpretation is correct and he was entitled to exclude these victims from opening statements pursuant to the statute, the trial court did not err. Defendant's mere assertion that the victims *could or would be* influenced by the opening statements was insufficient to establish that the victims' presence posed "a substantial risk of influencing or affecting the content of any testimony."

Moreover, denial of the motion was not prejudicial. According to defendant, because David Miller previously had not testified at the preliminary hearing, his presence during the opening statements enabled him to tailor his testimony (that he had not located among the personal effects contained in Shari's vehicle the items of clothing Shari had worn in the photographs taken in the desert) to render it consistent with the prosecutor's opening statement suggesting that defendant photographed Shari wearing certain clothing, killed her, and disposed of that clothing. Nothing prevented defendant from inquiring during his cross-examination at trial whether Miller had so tailored his testimony. In addition, Miller merely testified that he had not recovered two items worn by Shari in the photographs. Defendant challenged Miller's credibility by suggesting other explanations for his failure to locate those items of clothing, eliciting Miller's testimony that he had not attempted to locate those items in particular and had not obtained an inventory of the items from the police.

Defendant also suggests that Mrs. McCabe altered her testimony to conform to the account given in the prosecutor's opening statement. Defendant points out that at the preliminary hearing, Mrs. McCabe testified that she used her own keys to open the apartment the day Tracey disappeared, but at the trial she testified she did not have the keys that day, and therefore she and Todd had been forced to "jimmy" the window in order to enter the apartment. Defendant also points out that at the preliminary hearing Mrs. McCabe testified that only family members were present when McCabe questioned defendant about the disappearance of Tracey, but at trial she testified that Bill Scognamillo also was present. In both instances, however, other witnesses at trial who were not present during the opening statement corroborated Mrs. McCabe's testimony at trial.

5. *Admission of evidence previously ordered suppressed*

 Defendant contends that the trial court erred in admitting evidence the court previously had ordered suppressed. As explained above, at the

hearing on the motion to suppress evidence that was seized on August 16, the court determined that the search was broader than that authorized by the terms of the warrant of that date, and ordered suppressed certain items seized at defendant's apartment, including a 1984 copy of Faces International bearing Olga Talbot's name on the mailing label.

At trial, Todd Heidrick testified that when Tracey visited defendant's apartment on July 11 and mentioned her aspiration to become a model, defendant showed her that magazine, telling her that he knew someone connected with that publication and advising her to obtain a flattering photograph of herself to submit to the magazine. When the prosecutor produced a 1985 copy of Faces International in order to inquire of Heidrick whether that was the type of magazine defendant had shown Tracey, defense counsel objected on the basis that the 1985 magazine was not the one actually shown the victim by defendant, and further advised the court that he never had asked that the 1984 copy of the magazine be suppressed. Accordingly, the prosecutor, substituting the 1984 copy, inquired of Heidrick whether he recognized it, and Heidrick responded that he had seen it at defendant's apartment.

When the prosecutor subsequently sought to admit into evidence both copies of the magazine, the defense objected that the magazine was irrelevant and not probative. The court admitted into evidence the 1984 copy of the magazine. During closing argument, the prosecutor emphasized defendant's statements to Tracey and showed the jury a copy of the magazine.

It is evident that defendant waived any error committed by the trial court in admitting evidence of the 1984 copy of the magazine despite its previous order suppressing that evidence. Defendant requested substitution of the 1984 copy for the 1985 copy offered by the prosecutor, assuring the court that defendant had not asked that this evidence be suppressed, and subsequently objected to the admission of the magazine only on unrelated grounds. (Evid. Code, § 353; see *People* v. *Champion* (1995) 9 Cal.4th 879, 914 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People* v. *Wader, supra,* 5 Cal.4th 610, 635-636; *People* v. *Morris* (1991) 53 Cal.3d 152, 204-205 [279 Cal.Rptr. 720, 807 P.2d 949].)

In addition, any error was not prejudicial. The prosecutor introduced the magazine for the purpose of inquiring of Heidrick whether that was the type of magazine that defendant had shown Tracey during the course of their conversation. The magazine was employed merely to illustrate Heidrick's testimony. Admission of the 1984 copy, even if erroneous, was not prejudicial in view of the witness's description of the contents and nature of the

magazine. (Evid. Code, § 353; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 6. *Exclusion of evidence potentially implicating another individual*

 Defendant contends that the trial court erred in excluding evidence that Shari feared an individual other than defendant. Defendant asserts that in determining that Shari's statements constituted inadmissible hearsay and in excluding this testimony, the trial court deprived defendant of his Fifth Amendment right to due process of law as well as his Sixth Amendment right to present evidence in his defense.

During the prosecutor's examination of Shari's mother she disclosed what she knew of Shari's acquaintances and described her final communications with Shari in the days preceding her disappearance. The defense sought to elicit Mrs. Miller's testimony that Shari had expressed fear of a man she had identified as Ted McGee. The prosecution moved *in limine* to exclude such evidence on the ground that Shari's statements to her mother merely reflected a past mental state of fear, and that evidence of Shari's prior fearful state of mind was not "itself an issue in the action" within the meaning of the hearsay exception recognized in Evidence Code section 1251, subdivision (b).

At the hearing on the prosecutor's motion, Mrs. Miller testified that Shari had told her that Shari was "running with a rougher crowd" than previously. A friend of Shari's had told Mrs. Miller that Ted, one of Shari's boyfriends, "carried knives and liked to cut people." Mrs. Miller was aware that Shari had been present at a place at which the police had conducted a "drug raid." Mrs. Miller testified that when Shari visited her on June 23, she told her mother that she previously had been afraid of a man (whose name Mrs. Miller could not recall). Mrs. Miller indicated that Shari had not described a present fear, and had stated that she no longer was afraid of the man. Shari had told her mother that she previously felt someone was "after her." When her mother asked "what for," Shari stated: "Oh, it doesn't matter because I don't think they are anymore." The trial court, determining that the statements were of a previously existing rather than current fear and that Shari's prior state of mind itself was not an issue at the trial, excluded the statements.

The trial court did not err in ruling that the statements were not made admissible by Evidence Code section 1251. That statute provides an exception to the rule that hearsay statements are inadmissible for a statement describing a past mental state or emotion *if* the witness is unavailable, the

witness's state of mind or emotional state itself is an issue in the action, and the evidence is not offered to prove any fact other than such state of mind or emotion. It is apparent that Shari recounted an emotion or state of mind that she had harbored in the past but no longer felt at the time she made the statements. Therefore, the statements were admissible only if Shari's state of mind or emotional state itself was an issue in the action and the statements were not offered to prove any fact other than her state of mind or emotion. It is clear that the defense sought to introduce the statements not solely to prove Shari's fearful state of mind but to suggest a factual basis for that state of mind.

Even assuming the statements were not made inadmissible by the hearsay rule, however, we do not agree that the trial court's exclusion of the statements violated defendant's right to due process of law or deprived him of the opportunity to present evidence in his own defense. We repeatedly have indicated that, to be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. (See *People* v. *Davis, supra,* 10 Cal.4th 463, 501; *People* v. *Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *People* v. *Alcala* (1992) 4 Cal.4th 742, 792-793 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People* v. *Kaurish* (1990) 52 Cal.3d 648, 685 [276 Cal.Rptr. 788, 802 P.2d 278]; *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1017-1018 [254 Cal.Rptr. 586, 766 P.2d 1].) Shari's statements that she *previously* had been in fear of "a man" clearly were insufficient to link someone other than defendant to the actual perpetration of Shari's murder. (See *People* v. *Edelbacher, supra,* 47 Cal.3d 983, 1018.)

Moreover, the trial court's ruling did not constitute a refusal to allow defendant to present a defense, but merely rejected certain evidence concerning the defense. Accordingly, the proper standard of review is that enunciated in *People* v. *Watson, supra,* 46 Cal.2d 818, 836. (*People* v. *Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].) We agree with the Attorney General that any error was not prejudicial. In light of the extremely strong evidence against defendant, it was not reasonably probable that the verdict would have been more favorable to the defense had the trial court admitted evidence of Shari's previously held fear of an unnamed individual.

### 7. Admission of police photographer's testimony

■■■■ Defendant contends that the trial court erroneously admitted the testimony of police photographer Steven Ohanesian, thereby depriving defendant of his constitutional rights to a fair trial and to a reliable verdict. At the time the prosecution sought to introduce the testimony of this witness, defense counsel objected on the ground that the prosecution instead had to present the testimony of an expert on astronomy. The trial court determined that such expert testimony was not required. Thereafter, Ohanesian testified that on July 10, 1987, he had driven to the bowl area in the desert and taken a series of photographs from the same viewpoint as that used to take the photographs of Shari at that location. Ohanesian testified that the photographs he had taken between 11:00 a.m. and 2:00 p.m. most closely matched the shadows and other features of defendant's photographs.

Defendant asserts that this testimony should have been excluded because the prosecutor failed to establish a foundation that the astronomical and weather conditions on July 10, 1987, were nearly identical to those existing on July 4, 1984. Defendant also contends that the prosecutor failed to establish the conditions present and the photographic methods used by defendant on July 4, 1984.

■■■■ It is settled that a trial court has discretion to admit "experimental" evidence. The proponent of such evidence bears the burden of production and proof on the question whether such evidence rests upon an adequate foundation. "Admission of such evidence depends upon proof of the following foundational items: (1) [t]he experiment must be relevant; (2) it must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence; (3) the qualifications of the individual testifying concerning the experimentation must be demonstrated with some particularity; and (4) evidence of the experiment will not consume undue time, confuse the issues, or mislead the jury." (*People* v. *Turner* (1994) 8 Cal.4th 137, 198 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Bonin* (1989) 47 Cal.3d 808, 847 [254 Cal.Rptr. 298, 765 P.2d 460].)

■■■■ The trial court properly determined that these foundational considerations were established in the present case. First, the experimental evidence was relevant because the jury, afforded the opportunity to compare defendant's photographs of Shari with those subsequently taken at the same site at nearly the same time of year, was assisted in determining the approximate time that Shari still was alive in the desert and in determining whether that approximate time was consistent with other evidence tending to

establish the time of her death. The photographic evidence establishing the approximate time of day also was relevant to assess the veracity of defendant's statements concerning the photographs he had taken.

Second, the police photographs were produced under substantially similar conditions as those existing when defendant had taken his photographs. The police photographer stood at the same location as that used by defendant, at approximately the same time of day, and employed similar photographic equipment. Third, Ohanesian's qualifications as a photographer clearly were established. Fourth, Ohanesian's testimony was quite brief and did not confuse or mislead the jury.

In addition, upon request of defense counsel, the trial court instructed the jury that in considering the weight of this testimony, the jury was to consider whether the witness possessed sufficient professional qualifications to conduct the demonstration and to evaluate and describe its results, and whether the demonstration was conducted under circumstances substantially similar to those present at the time defendant took his photographs. Thus, the jury was made aware of the inherent limitations of such evidence.

Defendant has cited no California decision disapproving the admission of comparable demonstration evidence. He relies upon decisions from other jurisdictions, but these are readily distinguished.

In *Jones* v. *Talbot* (1964) 87 Idaho 498 [394 P.2d 316, 319], the court properly held inadmissible certain photographs taken of the site of a collision, because several witnesses had testified that conditions at the site had altered since the time of the collision. In the present case, the only conditions being compared were the positions of shadows upon human subjects at certain times of day from several fixed vantage points at the same time of year. Defendant, by merely observing that the photographs were taken on a different day and may have been taken using different camera filters or other components, has failed to demonstrate how conditions were so far different at the time the police photographer took the photographs as to preclude the admission of this evidence.

In *United States* v. *Tranowski* (7th Cir. 1981) 659 F.2d 750, 752-757, the court held inadmissible the proffered testimony of an astronomer purporting to ascertain from a "sun chart" the specific date on which a photograph had been taken, on the grounds that the chart had not been determined to be accurate and was not generally relied upon by experts, and the technology relied upon had not gained general scientific acceptance. In the present case, by contrast, the photographer merely offered photographs and explained the

experiment in duplicating the appearance of shadows on a subject, using common photographic equipment, in light of the commonly understood phenomenon that the sun casts shadows of a similar length at a particular time of day at a particular time of year. The trial court did not err in admitting the evidence.

### 8. *Admission of Juanita Farren's testimony*

■ Defendant contends the trial court erred in admitting the testimony of Juanita Farren. Farren testified that on August 9, 1984, defendant visited the photography store, spoke to Farren, asked her to step outside the store, indicated he knew that the police were following him and had interviewed Farren, pointed out a nearby unmarked police vehicle to Farren, and inquired what she had told the police about defendant. While in the store, defendant also inspected a strip of negatives, separating and chewing up a particular negative. Farren testified that none of the negatives that defendant inspected that day depicted Shari, whom she recognized.

Defendant contends the evidence was inadmissible under Evidence Code section 350, because it did not have any bearing upon defendant's guilt, and was inadmissible under Evidence Code section 352, because it was substantially more prejudicial than probative. Defendant points out that the police twice previously had searched defendant's apartment and vehicle. He also asserts that as of August 9, he was not being investigated in connection with Shari's death, and Tracey's disappearance was classified simply as a missing person case.

By August 9, the police had discovered in defendant's possession the photographs and negatives of Shari, leading to the identification of Jane Doe No. 60. The police had learned from defendant himself that he had spent time with her in the days preceding her death and had taken photographs of her during that period. The police also had discovered that defendant was the last person to see Tracey, that she had expressed an interest in modeling, and that he had advised her to prepare a photographic portfolio. Defendant's conduct in inspecting the negatives as soon as he received them, and his destroying one of them, closely following his observance of the police vehicle and inquiry of Farren as to what she had told the police, clearly was relevant with regard to the issue of his guilt. This is especially so in the context of other evidence establishing that the negative immediately preceding in sequence the one destroyed by defendant depicted Shari's bare breasts.

Moreover, the probative value of the evidence substantially outweighed any prejudicial effect. Farren, while describing unusual, noteworthy conduct

on the part of defendant, did not give an account of behavior so extreme or bizarre in nature that the passions of the jury would be inflamed against defendant.

9. *Sufficiency of evidence that defendant murdered Shari Miller*

■ Defendant contends that the evidence presented at trial was insufficient as a matter of law to prove beyond a reasonable doubt that he murdered Shari. ■ The standard of review is well established. The appellate court " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence—* that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' [Citation.]" (*People* v. *Cuevas* (1995) 12 Cal.4th 252, 260-261 [48 Cal.Rptr.2d 135, 906 P.2d 1290], original italics; *People* v. *Mayfield, supra,* 14 Cal.4th at p. 767; *People* v. *Stanley* (1995) 10 Cal.4th 764, 792-793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) The standard of review is the same in cases in which the People rely primarily upon circumstantial evidence. (*People* v. *Stanley, supra,* at pp. 792-793; *People* v. *Bean, supra,* 46 Cal.3d 919, 932.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' [Citations.]" (*People* v. *Stanley, supra,* 10 Cal.4th 764, 792-793; *People* v. *Bean, supra,* 46 Cal.3d 919, 932-933; see *People* v. *Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)

■ The jury's determination is supported by substantial evidence. The evidence established that Shari possessed certain items of jewelry and a watch, moccasins with long leather laces, a snail print blouse, and a double-bladed knife. Shari was acquainted with defendant and had plans to model clothing for him. On June 29, Shari received a cut on her arm, requiring sutures. On June 30, Shari telephoned defendant and arranged to meet him. On July 1, Shari told her friend Carolyn Bury about the anticipated job, that, Shari reported, did not involve any nude modeling. On the morning of July

2, Shari told her friend Marcia Peltier about the anticipated job, and made a notation on a list of things to do to meet "Bill Bradford" at the Meat Market that evening. On July 2 or 3, while working as a painter and, in the process, getting paint on her person, clothing, and wristwatch, Shari told Kurt Androsky about the anticipated modeling job. That evening, Shari introduced Androsky to the photographer. During this period, Shari saw Schylee O'Hare, also telling her that she was attempting to contact defendant in order to work as a model. On July 3 or 4, Evans Haas saw Shari at defendant's apartment the same day that Haas and defendant visited the motorcycle shop that, according to its owner, was closed July 4. At approximately 5:00 p.m. on July 3 or 4, Todd Heidrick met Shari, who was being driven in defendant's vehicle. On the evening of July 3, Shari visited Oliver De La Torre and, prior to her departure in the early morning hours of July 4, voiced her apprehensions at having to meet a particular person at a bar. Shari's body was discovered early on July 6.

Defendant asserts that numerous witnesses testified inconsistently with regard to Shari's and defendant's whereabouts during the period preceding her death, and testified in a manner inconsistent with the prosecution's theory that defendant killed Shari in the desert on July 4. Although several witnesses were unable to testify as to the exact dates on which they had seen Shari, it is not difficult to deduce from their estimates, considered in relation to one another, the actual dates on which they observed Shari prior to her disappearance. The circumstance that, as defendant observes, the testimony of Olga Talbot and that of her son were at variance with the statements of other witnesses regarding the whereabouts of Shari and defendant on the pertinent dates, in no way precludes the jury's finding of guilt. These witnesses were impeached with preliminary hearing testimony more consistent with that of the other witnesses at trial or other evidence, and in any case the jury was free to disregard portions of their testimony. It is clear that a rational trier of fact, assigning greater credibility to particular witnesses, could have decided that the evidence demonstrated defendant and Shari met sometime on July 4, and that she did not leave his company alive.

Defendant also asserts that the evidence does not establish that defendant's photographs of Shari in the desert were taken near the time of her death. On the contrary, the evidence, including Shari's statements to others and the physical evidence, including the sutured wound on her arm and flecks of paint on her person and apparel, amply demonstrates that the anticipated photographic modeling session had not occurred prior to July 4, but occurred within a day or days of Shari's final contacts with the above described witnesses. That evidence in turn is consistent with the evidence of defendant's apparent intention to visit the desert bowl area on July 4, as well

as the evidence of defendant's disappearance from his residence during that period.

Defendant asserts that no physical evidence connected him to Shari other than his possession of her bracelet, earrings, and chain, for which he had provided an innocent explanation. On the contrary, her paint-flecked wristwatch, double-bladed knife, and a leather strap similar to that on her laced moccasins also were found in his possession. Defendant possessed photographs of Shari taken in a particularly remote and secluded area of the desert near Lancaster, an area that he previously had visited. Defendant's photographs of Shari included a close-up of her bare breasts; the negative of that photograph immediately preceded in sequence the one destroyed by defendant, and subsequently her body was discovered with the nipples removed. In a location very near the area in which Shari was photographed by defendant, her snail print blouse was discovered tied to the head of Tracey, the other victim, whom Shari never had met and with whom defendant also was acquainted. Traces of what possibly was blood were found inside defendant's vehicle. Shari's automobile was discovered parked two blocks from defendant's residence. A rational jury clearly could have determined that defendant murdered Shari Miller.

10. *Failure to permit defendant to testify*

 Defendant contends that he was denied his constitutional right to testify on his own behalf. He asserts that his counsel rendered ineffective assistance by notifying the trial court out of defendant's presence that counsel did not intend to call defendant to the stand despite his express desire to testify, and that the trial court erred, upon learning of this conflict, by failing either to advise defendant of his right to testify or obtain his waiver of that right.

The record reflects that, on November 10, 1987, following the conclusion of the prosecutor's case, the defense requested a hearing outside the presence of the prosecutors. The prosecutors and a witness departed, and the reporter's transcript and notes of the ensuing proceedings were ordered placed under seal. Although the record does not indicate that defendant also left the courtroom during the hearing, a settled statement prepared in 1994 by appellate defense counsel (after the documents placed under seal could not be located) indicates that defendant was not present.[14]

According to the settled statement, defense counsel informed the court that it was their intention to rest without calling any witnesses and without

---

[14]The pertinent minute order, which bears the notation: "(Parties and counsel checked if present)," reflects a check mark by defendant's name, and also states: "Trial resumes from

calling defendant to testify. Defense counsel advised the court that defendant previously had indicated that he wanted to testify, although he had changed his mind several times. Defendant had told defense counsel he wanted to testify so that he could tell the jury that he had not committed the murders, that he loved Shari, and that Detective Worthen had beaten him severely before defendant made his statement on August 16, 1994. The trial court told defense counsel that they could rest without mentioning defendant's desire to testify and that if defendant did not raise the issue on his own, the court would not raise it with him.

A defendant in a criminal case has the right to testify in his or her own behalf. (*People* v. *Frierson* (1985) 39 Cal.3d 803, 813 [218 Cal.Rptr. 73, 705 P.2d 396]; *People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710].) The defendant may exercise the right to testify over the objection of, and contrary to the advice of, defense counsel. (*People* v. *Lucas* (1995) 12 Cal.4th 415, 444 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 282 [247 Cal.Rptr. 1, 753 P.2d 1052].) "When the decision is whether to testify [citation] or whether to present a defense at the guilt phase of a capital trial [citation] it is only in case of an express conflict arising between the defendant and counsel that the defendant's desires must prevail. In the latter situation, there is no duty to admonish and secure an on the record waiver unless the conflict comes to the court's attention. [Citation.]" (*In re Horton* (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335]; *People* v. *Guzman* (1988) 45 Cal.3d 915, 935-936 [248 Cal.Rptr. 467, 755 P.2d 917]; see *People* v. *Frierson, supra,* 39 Cal.3d 803, 818, fn. 8.)

In the present case, the settled statement indicates that at some point defendant told his counsel of his desire to testify, but at another point indicated he did not wish to do so, and that defendant changed his mind several times. The trial court, apparently concluding that an express conflict between counsel and defendant did not then exist, informed counsel that it would await any further expression from defendant as to his intent. Thereafter, the defense immediately rested and defendant made no comment. It does not appear that an express conflict between counsel and defendant had emerged. (*In re Horton, supra,* 54 Cal.3d 82, 95; *People* v. *Guzman, supra,*

November 5, 1987, with all jurors, counsel and defendant present as heretofore." The reporter's transcript does not indicate defendant's departure or his absence.

The trial court's order accepting the proposed settled statement prepared by appellate defense counsel states that because counsel for one party was not present at the hearing, there was no dispute concerning the proposed settlement, and although the court, having no independent recollection of the hearing, could not vouch for the accuracy of the proposed statement, neither did it have any basis for questioning the recollection of counsel or the accuracy of any representation set forth in the proposed statement.

45 Cal.3d 915, 935-936.) Accordingly, the trial court was not obligated expressly to advise defendant of his right to testify, or to obtain his personal waiver of that right. (45 Cal.3d at pp. 935-936.)

Nor, contrary to defendant's assertion, does it appear that defendant's trial counsel attempted to prevent defendant from learning of or exercising his right to testify by advising the court outside the presence of defendant of counsel's intent not to call any witnesses, including defendant.[15] Although defendant attributes to defense counsel an intent secretly to apprise the court of defendant's desire to testify in order to enlist the court's assistance in preventing defendant from exercising that right, by omitting to inform him of that right, defense counsel's comments to the court at the hearing do not support that interpretation. The trial court's response, contrary to defendant's contention, does not suggest it had joined defense counsel in a "conspiracy of silence" in order to avoid affording defendant the opportunity to openly declare a conflict with his attorneys over the issue. Rather, the court's response reflects its belief that, in view of defendant's previous conduct, defendant would not hesitate to so inform the court if he once again entertained the desire to testify.

### 11. *Alleged prosecutorial misconduct*

Defendant contends that the prosecutors in this case committed prejudicial misconduct following jury selection, during the presentation of evidence, and during closing argument to the jury at the guilt phase. "In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury. [Citations.]" (*People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) The defendant generally need not show that the prosecutor acted in bad faith or with appreciation of the wrongfulness of his or her conduct, because the prosecutor's conduct is evaluated in accordance with an objective standard. (*Ibid.*; *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].) "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People* v. *Price, supra,* 1 Cal.4th 324, 447; *People* v. *Davis, supra,* 10 Cal.4th 463, 531-532; *People* v. *Berryman, supra,* 6 Cal.4th 1048, 1072.)

---

[15]Such an asserted attempt by counsel would have been inconsistent with counsel's conduct during other phases of the proceedings for which a transcript exists. For example, prior to commencement of the penalty phase, when defendant sought to represent himself and speak on his own behalf, counsel stated: "I've indicated to my client, if he insists on taking the witness stand, I'm ethically obliged to put him on the witness stand. . . ."

### a. *Concealment of information regarding a juror*

 Defendant contends that the prosecutors committed misconduct in failing timely to inform the defense after the prosecutor learned that an alternate juror had not accurately described his prior criminal record during juror voir dire. On July 14, 1987, during voir dire, prospective juror Jack Stafford stated that he had been arrested and convicted of disorderly conduct approximately 20 years earlier. On August 10, 1987, trial commenced. On August 24, 1987, the prosecutors sought to excuse Stafford, who had been selected as an alternate juror. They explained to the court that Prosecutor Ferraro had sought a computer check of the criminal records of several jurors, and that a computer printout, dated August 3, 1987, revealed that Stafford had suffered a conviction of misdemeanor battery and disorderly conduct in May 1984. Prosecutor Ferraro explained that she had not had a chance to inspect the printout until the week of August 17, 1987. The defense urged that Prosecutor Ferraro's lack of personal knowledge did not mitigate the failure of the district attorney's office to notify the defense upon receipt of the printout on August 3, 1987. The court accepted the prosecutor's explanation that she had not learned of the recent charge until that time and had not deliberately concealed the information from the defense, and the court granted the motion to dismiss the alternate juror.

The trial court did not err in granting the motion. The record does not disclose that either the prosecutors or their staff acted deliberately in failing to notify the defense once they had obtained the computer printout. Moreover, no prejudice has been established. Had both parties been cognizant of Juror Stafford's recent record prior to completion of voir dire, the prosecutors undoubtedly would have sought and obtained his excusal, just as they did at this early stage of trial. The record reflects that although several jurors were excused and replaced by alternates during the course of the lengthy trial, the pool of alternates was not exhausted by the completion of the trial. Nothing suggests that, had Alternate Juror Stafford not been excused, it was reasonably probable that the outcome would have been more favorable to defendant.

### b. *Introduction of evidence held inadmissible*

Defendant urges that the prosecutors committed misconduct in introducing evidence of a magazine that the trial court previously had ruled inadmissible. As explained earlier, prior to trial the court ordered suppressed a 1984 copy of Faces International that had Olga Talbot's name on the mailing label. At trial, during the examination of Todd Heidrick, the prosecutors produced a 1985 copy of Faces International, questioning Heidrick whether defendant

had shown Tracey that type of magazine. Defense counsel objected, stating they never had requested that the 1984 magazine be suppressed. Accordingly, the prosecutors substituted the 1984 magazine, and subsequently the court admitted into evidence that copy of the magazine despite defendant's objection that it was irrelevant and not probative.

As previously explained, defendant waived any error with regard to the admission into evidence of the magazine previously ordered suppressed. (See *People* v. *Champion, supra,* 9 Cal.4th 879, 914.) Even assuming the prosecutors committed misconduct in introducing the magazine in accordance with the wishes of defense counsel, however, an admonition to the jury would have cured any harm (*People* v. *Price, supra,* 1 Cal.4th 324, 460), and as explained earlier, admission of the magazine could not possibly have prejudiced defendant in light of the witness's description of its nature and use by defendant and the circumstance that the 1985 version otherwise would have been admitted into evidence. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

c. *Revelation to the jury that defendant was in custody*

Defendant contends that the prosecutors committed misconduct by revealing to the jury that defendant was in custody during the trial. In the course of the direct examination of Olga Talbot, Prosecutor Ferraro attempted to reveal Talbot's partisanship toward defendant and motive to lie by establishing their continuing friendship. Accordingly, the prosecutor asked whether Talbot remained friends with and still visited defendant, when Talbot last had seen defendant, and whether they spoke by telephone. The prosecutor then inquired whether Talbot had given defendant anything during the past month, and Talbot retorted: "Like what can I give him, writing paper?" The defense moved for a mistrial on the basis that the prosecutor was attempting to elicit information apprising the jury that defendant then was in custody. Following argument by counsel, the trial court found that the witness had not made any express statement from which the jury necessarily would infer that defendant was in custody, and also held that testimony tending to show defendant's custodial status should be excluded because it was substantially more prejudicial than probative.

In a slightly different context, we previously have commented upon the effect of reminders of a defendant's custodial status. It is established that a court may not require a defendant to attend trial wearing jail clothing, because such a requirement would impair the presumption that a defendant is innocent unless and until proved guilty beyond a reasonable doubt. (*People* v. *Taylor* (1982) 31 Cal.3d 488, 494 [183 Cal.Rptr. 64, 645 P.2d 115]; *In re*

*Avena* (1996) 12 Cal.4th 694, 731 [49 Cal.Rptr.2d 413, 909 P.2d 1017].) "The Supreme Court has observed that the defendant's jail clothing is a constant reminder to the jury that the defendant is in custody, and tends to undercut the presumption of innocence by creating an unacceptable risk that the jury will impermissibly consider this factor. [Citation.]" (*People* v. *Taylor, supra,* 31 Cal.3d 488, 494.) It may be inferred that other information, having the same tendency to remind the jury that a defendant is in custody, might have a similar effect.

 The information received by the jurors at this juncture in the present case, however, could not possibly have had that effect. The prosecutor did not refer expressly to the circumstance that defendant was in custody in questioning Talbot concerning her continuing ties to defendant, and, as the trial court found, the single, spontaneous comment made by Talbot did not necessarily raise the inference that defendant was in fact in custody. Even if it had, however, an isolated comment that a defendant is in custody simply does not create the potential for the impairment of the presumption of innocence that might arise were such information *repeatedly* conveyed to the jury. In addition, we observe that in certain circumstances a jury inevitably will learn a defendant is in custody for the current charged offense, for example where the jury is presented with the testimony of a jailhouse informant. (See, e.g., *People* v. *Alcala* (1984) 36 Cal.3d 604, 617, 623 [205 Cal.Rptr. 775, 685 P.2d 1126].) The prosecutor did not commit misconduct in examining the witness as to the nature of her continuing contact with defendant, and no possible prejudice could have arisen from her unpredicted response.

### d. *Display of evidence not previously ruled admissible*

Defendant contends that the prosecutor committed misconduct in momentarily displaying a Jovan perfume bottle containing human hair and removing hair from an envelope, despite the circumstance that the trial court had not ruled that evidence admissible. The record reflects that earlier a hearing was held to determine whether this evidence, which did not match the hair of either victim, was admissible. After argument by counsel, the trial court deferred its ruling. During examination of Detective Rockwood with regard to his search of defendant's apartment, Prosecutor Ferraro produced the hair samples. Defense counsel objected and moved for a mistrial. The prosecutor asserted that the evidence previously had been ruled admissible, but after examining the daily reporter's transcript, the trial court determined it had not previously ruled on the admissibility of the evidence, and then proceeded to rule that the evidence was inadmissible because it was substantially more prejudicial than probative. Subsequently, the trial court instructed the jury

"that the hair was not relevant, and you're to strike from your mind any reference to that which was made, and you're not to consider it any further."

It does not appear from the record, and the trial court did not find, that the prosecutor intentionally presented the evidence having known that the trial court earlier had deferred ruling on the admissibility of the evidence. Recognizing that in order to establish misconduct a defendant need not demonstrate a prosecutor's bad faith, however (*People* v. *Price, supra,* 1 Cal.4th 324, 447), we observe that even if the prosecutor committed misconduct in exhibiting this evidence, the jury's apprehension of the evidence and references thereto was fleeting, and it specifically was informed by the trial court that it must disregard that evidence. This admonition would have cured the harm caused by any misconduct. (See *People* v. *Berryman, supra,* 6 Cal.4th 1048, 1072; *People* v. *Price, supra,* 1 Cal.4th 324, 447.)

### e. *Intimidation and incitement of defendant*

Defendant contends that conduct by a prosecutor and a detective during the trial, consisting of "staring down" defendant, intentionally was done to intimidate, provoke, or induce defendant to "blow up" before the jury, and therefore constituted the use by the prosecution of deceptive or reprehensible methods to attempt to persuade either the court or the jury. As the parties have observed, the record reveals that defense counsel advised the trial court that Prosecutor Conn and Detective Worthen repeatedly "would stare in such a fashion and use facial expressions in such a fashion which in (defense counsel's) opinion is intended to bait Mr. Bradford." When the prosecutor countered that defendant had been making rude gestures of his own, defense counsel responded that "oftentimes his remarks are being provoked—not his remarks, his gestures are being provoked" by prosecutors and police officers. The prosecutors pointed out that defendant regularly had mouthed the phrase "fuck you" to both prosecutors, had given "the finger" to Prosecutor Conn on a daily basis and to Prosecutor Ferraro in excess of 20 times, and had the previous day asked Prosecutor Ferraro whether she was wearing "falsies" that day. Defense counsel indicated they had remonstrated with defendant not to behave in such a manner and also had informed the prosecutors that Detective Worthen was staring at their client. The trial court, noting that it had not observed defendant's bad conduct and only had observed Detective Worthen glancing from time to time in defendant's direction, did not order any sanction, but suggested the prosecutors consider the "appropriate course of action" and that the defense warn their client not to continue such behavior.

Although the parties have not noted it, the record further reveals related incidents as the trial progressed. Several weeks later, following Prosecutor

Ferraro's complaint that defendant had called her a "bitch" when she stood behind him, the trial court admonished defendant not to make remarks to the prosecutors, investigating officers, or witnesses. One day later, the court indicated it had been apprised by court personnel that for the past several weeks several law enforcement witnesses, primarily Detective Rockwood, had been observed staring at defendant, causing him to become agitated in lockup, creating a potential security problem. Prosecutor Ferraro advised the court that she would speak to the police about that problem, and that Rockwood was not scheduled to return as a witness.

It thus appears that, although counsel for both sides attempted to prevent recurrence of this antagonistic behavior between defendant and law enforcement witnesses, those attempts were not altogether successful. Nonetheless, the trial court advised counsel for both sides, as well as defendant, not to engage further in this behavior, and received assurances from counsel that the matter would be addressed. The record does not reveal exactly where the later conduct of the officers occurred, or that it continued beyond this juncture, and nothing in the record suggests that any of the objectionable behavior was observable to or noticed by members of the jury. Any misconduct by the prosecution was not prejudicial. (*People* v. *Arias*, *supra*, 13 Cal.4th 92, 161; *People* v. *Price*, *supra*, 1 Cal.4th 324, 447; see *People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1076, fn. 6.)

> f. *Conduct during closing argument*
>
> (1) *Griffin error*

 Defendant contends that during closing argument the prosecutor made numerous comments emphasizing defendant's failure to testify and shifting the burden of proof to defendant to establish his innocence. During that argument, Prosecutor Conn advised the jury that the defense did not have a burden to call any witnesses in the case, and that the prosecution had the burden of proof and the obligation to present sufficient evidence to establish defendant's guilt. The prosecutor then noted that during the course of the trial, the defense had not called a single witness, nor produced a single piece of evidence pointing to defendant's innocence. Following objection on the grounds that the defense was not obliged to prove defendant's innocence and that the prosecution had, in essence, commented upon defendant's failure to testify, the trial court advised the prosecution to "clear it up." The prosecutor reiterated to the jury that the prosecution had the burden of proof to call sufficient witnesses to prove defendant's guilt and that the defense had no obligation to call any witnesses.

Subsequently the prosecutor, in arguing that the victims had been killed for pleasure, noted "there is no evidence to the contrary." In commenting on

a stain that possibly was blood, found on a mat inside the trunk of defendant's vehicle, the prosecutor pointed out to the jury that "no evidence has been introduced by [the defense] on that issue." The prosecutor also observed that the defense did not call an expert witness to testify contrary to the conclusions reached by the coroner with regard to the time frame of Shari Miller's death, although defendant "certainly is free to call his own witness to testify to those facts." In discussing the time period during which Tracey Campbell had been killed, the prosecutor noted that defendant "presented no alibi witnesses for that time period," nor "photographs to prove where he was."

In *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses. (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1229 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1051 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; *People* v. *Kelly* (1990) 51 Cal.3d 931, 967 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1236 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Morris* (1988) 46 Cal.3d 1, 35 [249 Cal.Rptr. 119, 756 P.2d 843].) Nonetheless, as defendant observes, we have held that a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand. (*People* v. *Johnson, supra*, 3 Cal.4th 1183, 1229; *People* v. *Mitcham, supra*, 1 Cal.4th 1027, 1051; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 757-758, & fns. 19-20 [175 Cal.Rptr. 738, 631 P.2d 446].)

In the present case, there were brief comments by the prosecution during closing argument noting the absence of evidence contradicting what was produced by the prosecution on several points, and the failure of the defense to introduce material evidence or any alibi witnesses. These comments, however, cannot fairly be interpreted as referring to defendant's failure to testify. Neither the general comment directed to the lack of defense evidence or testimony, nor the more particularized comments regarding the possibly bloodstained mat, the coroner's opinion, or the absence of alibi for a particular time period, would have required defendant to take the stand. Contrary to defendant's assertion, the prosecutor's comment that "there is no evidence to the contrary," in arguing the victims had been killed for pleasure, does not constitute *Griffin* error within the meaning of our decision in

*People* v. *Murtishaw, supra,* 29 Cal.3d 733, 757-758, and footnotes 19-20, and similar cases. The prosecutor did not allude to the lack of refutation or denial by the sole remaining witness, defendant, but rather to the lack of *evidence*, which might have been presented in the form of physical evidence or testimony other than that of defendant. In any event, "indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error. [Citations.]" (*People* v. *Hovey, supra,* 44 Cal.3d 543, 572.)

Nor did the prosecutor's comments impermissibly shift the burden of proof to defendant. At the outset, and following advisement by the trial court, Prosecutor Conn reiterated that the prosecution had the burden of proof by sufficient evidence to establish defendant's guilt, and that defendant had no duty or burden to produce any evidence. (See *People* v. *Ratliff* (1986) 41 Cal.3d 675, 691 [224 Cal.Rptr. 705, 715 P.2d 665].) A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.

### (2) *Miscellaneous argument*

· Defendant contends that during closing argument, the prosecution made various comments that misstated the evidence, relied upon speculation, or asserted personal beliefs. Defendant contends that his objections were sustained but without sanction of the prosecution or admonition to the jury. With one exception, defendant has not attempted to describe these instances or provided specific citation to authority, but merely has provided references to the record. We are not obligated to perform those tasks ourselves. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1116, fn. 20 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Gidney* (1937) 10 Cal.2d 138, 142-143 [73 P.2d 1186].)

In any event, the record reflects that in most instances alluded to by defendant, either the prosecution was advised to and did reform its argument, or the jury was admonished to disregard the argument. After the prosecution slightly misstated a witness's testimony regarding Olga Talbot's statements about evidence found in the lockers at defendant's apartment building, the prosecution was advised to, and did, restate the evidence, reading aloud the testimony from the reporter's transcript. After the prosecution made a speculative comment concerning defendant's statement to the police regarding Shari's efforts to obtain a job, the jury was advised to disregard the comment. After the prosecution speculated that the manner in

which Shari held her arms in the photograph of her breasts was "unnatural," the prosecution, upon the court's advisement, informed the jury it could draw its own inferences from the photographs. When the prosecution later made a reference to the circumstance that the victim's arms might have been criss-crossed, the court sustained the objection, and the prosecution then simply invited the jury to compare that photograph with another.

In other instances referred to by defendant, the comments by the prosecutor simply were too insignificant to warrant any admonition. The prosecutor commented that he personally did not believe it was necessary for police photographer Ohanesian to conduct his photographic demonstration in the presence of the jury and the court. The prosecutor made a reference to what a police investigator "normally" would testify. In each instance, the court simply sustained the objections—nothing more was required. We conclude that defendant has not demonstrated prosecutorial misconduct, or any failure on the part of the trial court to address the objections raised by the defense.

(3) *Argument that defendant robbed Shari Miller*

Defendant contends that the prosecutor improperly argued that defendant robbed Shari, despite the circumstance he had not been charged with, and there was no evidence of, robbery. During the course of his closing argument, Prosecutor Conn reminded the jury that Shari's killer took her jewelry and her watch, and that these items were found in defendant's possession. The prosecutor then said, "We know that the killer had taken her watch, had taken her jewelry, would rob her of her property." The defense immediately objected on the basis that the comment was a misstatement of the evidence and that there was no evidence of robbery. The court noted the objection. Prosecutor Conn continued that, "We know that the killer would take her property," and noted that defendant had her jewelry, watch, and knife in his possession.

Although the prosecutor may have been technically incorrect in commenting that the killer "would rob" Shari of her property, given the state of the evidence, the defense did not request any admonition to the jury. In any event, the circumstance that no evidence of robbery had been produced was emphasized to the jury by defense counsel, and the prosecutor implicitly endorsed that comment by immediately recharacterizing his description as a theft of the property, rather than a robbery. The prosecutor's statement did not amount to misconduct, and the jury could not possibly have been misled to defendant's prejudice by this single comment. (*People* v. *Price, supra,* 1 Cal.4th 324, 447, 460.)

### (4) *Characterization of the law of circumstantial evidence*

Defendant contends that the prosecutor committed misconduct by misstating the law concerning circumstantial evidence. In closing argument, Prosecutor Conn stated: "I've spoken about what we must prove, and that is all that we must prove, . . . that he committed the crime. [¶] In deciding whether he committed the crimes, you are to look at the circumstantial evidence that—or in reaching that conclusion that he is guilty of the crimes, you are to rely upon those pieces of circumstantial evidence that you think is [*sic*] essential for that determination. [¶] What I mean by that is this: jurors may rely upon other pieces of circumstantial evidence. [¶] You don't have to agree on what piece of circumstantial evidence convinces yourself that he is guilty of the crime, as opposed to another juror. [¶] There is nothing wrong with disagreeing, nothing wrong with one juror saying, well, I really believe this witness. [¶] I'm convinced of this fact, this piece of circumstantial evidence, or a different juror disagreeing with that juror. [¶] In the final analysis the only question is in your own mind is has [*sic*] the prosecution proven the case beyond a reasonable doubt."

The defense objected on the basis that the prosecutor had misstated the law. At a later recess in the proceedings, defense counsel explained that the prosecutor "has misstated [CALJIC No. ] 4.71.5, in what the title of the instruction, as the court is aware, is proof must show specific act within the time alleged. [¶] The prosecutor has told the jury that they need not agree upon the relevant dates and time of the acts alleged, which is specifically contrary to this court's instruction . . . which indicates that the commission of the specific acts must be agreed upon by the jury and when they occur . . . the prosecutor has told the jury they don't have to agree among themselves as to what occurred."

The trial court advised the prosecutor: "[CALJIC No.] 4.71.5 does indicate that the jurors have to unanimously agree upon the commission of the specific act constituting each crime within the period alleged . . . I think your argument may be leaving them with the impression that they do not have to agree upon the underlying facts, they only have to agree upon the question of—the question of guilt. And I think that that's contrary to some extent to 4.71.5, specifically, paragraphs four and—four and five." The court cautioned Prosecutor Conn to "clear that up." The prosecutor subsequently informed the jury he needed to clear up several points, including that, "In regard to the circumstantial evidence, it is the jury who determines which pieces of circumstantial evidence he [*sic*] relies upon in reaching its conclusion. [¶] But whatever pieces of circumstantial evidence you rely upon in reaching your conclusion, bear in mind that the facts un[der]lying those

circumstances, those pieces of circumstantial evidence, must be proved beyond a reasonable doubt."

The prosecutor did not misstate the law concerning circumstantial evidence. ▮▮▮ We previously have concluded that the requirement of jury unanimity in criminal cases is intended primarily to ensure that jurors agree upon a particular act when evidence of more than one possible act constituting a charged criminal offense is introduced; it "does not extend to the minute details of how a single, agreed-upon act was committed. [Citation.]" (*People* v. *Mickle* (1991) 54 Cal.3d 140, 178 [284 Cal.Rptr. 511, 814 P.2d 290].) It appears that the prosecutor was attempting to convey that point in his argument described above.

Nonetheless, it also appears that both the court and defense counsel construed the prosecutor's remarks as contrary to the unanimity instruction that *is* required when a defendant is charged *in a single count* with a crime occurring between certain dates and the evidence establishes several acts that might constitute that offense. (See *People* v. *Jones* (1990) 51 Cal.3d 294, 321-322 [270 Cal.Rptr. 611, 792 P.2d 643]; *People* v. *Diedrich* (1982) 31 Cal.3d 263, 280 [182 Cal.Rptr. 354, 643 P.2d 971].) In the present case, the information alleged, in count 1, that defendant murdered Shari Miller on or between July 3 and July 6, 1984, and in count 2, that defendant murdered Tracey Campbell on or between July 12 and August 11, 1984. Obviously, the prosecution did not produce evidence of more than one act as to each count. Therefore, the court was not required to instruct the jury pursuant to CALJIC No. 4.71.5, and the prosecutor was not required to avoid arguing that the jury did not have to agree unanimously as to which precise act was committed by defendant with reference to a particular count.

Perhaps in an excess of caution, the court nevertheless instructed the jury pursuant to an amended instruction, combining CALJIC Nos. 4.71 and 4.71.5, that in order to return a verdict of guilty, it was required to find unanimously that defendant committed the murder within the dates specified in the information as to that count.[16] The prosecutor's argument was not contrary to that instruction and did not constitute misconduct.

---

[16] The instruction given by the trial court provided: "Defendant is charged in Count I with the murder of Shari Miller, on or between July 3, 1984 and July 6, 1984. [¶] Defendant is charged in Count II with the murder of Tracey Campbell, on or between July 12, 1984 and August 11, 1984. [¶] When, as in this case, it is alleged that the crime charged was committed 'on and between' certain dates, the proof must show that the crime was committed on or between those dates. [¶] In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act constituting each crime within the time period alleged. [¶] And, in order to find the defendant guilty, the jury must unanimously agree upon the commission of the same specific act constituting each

### (5) Cumulative error

Finally, defendant contends that cumulative error that occurred due to the prosecutors' alleged misconduct, as well as the trial court's failure to sanction the prosecutors and admonish the jury, was prejudicial to defendant. We do not find cumulative error requiring reversal of the judgment. (See *People* v. *Clark* (1993) 5 Cal.4th 950, 1017 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

### 12. *Jury instructions*

#### a. *Instruction on second degree murder*

 Defendant contends that the trial court erred in instructing the jury on the lesser included offense of second degree murder. In his reply brief, defendant also urges that the trial court's delay in raising the matter of instructions on second degree murder until after the defense had rested prevented him from taking into account that theory in deciding whether to present evidence or to testify in his own defense.

During the conference on jury instructions that occurred after both the prosecution and the defense rested, but prior to closing argument, the prosecution urged that instructions on second degree murder be given, while defense counsel requested that such instructions not be given. The trial court determined that, pursuant to *People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311], the instructions should be given. The trial court thereafter instructed the jury pursuant to CALJIC No. 8.30 (definition of second degree murder), CALJIC No. 8.70 (duty to determine degree of murder), CALJIC Nos. 8.71 (1979 rev.) and 17.11 (doubt as to degree compels second degree murder verdict), CALJIC No. 8.74 (1976 rev.) (unanimity requirement as to degree of murder), and CALJIC No. 8.75 (1982 new) (order of consideration of degree of murder).

 It is well established that the trial court has a sua sponte duty to instruct the jury on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 827 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1232-1233 [249 Cal.Rptr. 71, 756 P.2d 795].) Second degree murder is a lesser included offense of first degree murder. (*People* v. *Cooper*, *supra*, 53 Cal.3d 771, 827;

---

crime within the time period alleged. [¶] It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

*People* v. *Wickersham, supra,* 32 Cal.3d 307, 326.) Nonetheless, even when the law imposes upon the trial court a sua sponte duty to instruct the jury, as it does with regard to lesser included offenses, that duty is not triggered " 'when there is no evidence that the offense was less than that charged.' [Citation.]" (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 952-953 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

Instruction as to second degree murder is proper notwithstanding a defendant's objection that such instruction is inconsistent with his or her theory of the case, as long as the record contains substantial evidence from which a jury reasonably could conclude that the defendant was not guilty of first degree murder but only of second degree murder. (See *People* v. *Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531].) ▮ Defendant contends that the record in the present case contains no evidence that the killing occurred without premeditation or deliberation. The record contains substantial evidence from which the jury reasonably could find that defendant killed either or both victims without premeditation or deliberation. Although defendant's initiation of the offenses by luring the victims to the same isolated location exhibits considerable premeditation and deliberation, the nature of the murders themselves would not preclude a finding that defendant acted upon impulse. The circumstance that the manner of killing, ligature strangulation, might be somewhat more time-consuming than other methods, for example firing a weapon, does not obviate the conclusion that defendant might not have premeditated or deliberated before killing the victims.

Moreover, it appears that defense counsel's objection was motivated by a deliberate decision to " 'utilize an all-or-nothing tactical strategy,' " in the hope that the jury might decide against guilt if it had any doubts regarding whether a particular murder was the result of impulse or instead of deliberation or premeditation. (*People* v. *Cooper, supra,* 53 Cal.3d 771, 827; *People* v. *Bunyard, supra,* 45 Cal.3d 1189, 1234-1236.) ▮ In discussing the importance of instruction as to lesser included offenses, we previously have admonished that the jury should not be confronted with an "all or nothing" choice when it may believe that the accused is guilty only of a lesser included offense. We have observed that, if given no opportunity to convict of the lesser offense, the jury wrongly may convict the defendant of the greater offense, even though it believes an element of that offense is missing, rather than acquit the defendant entirely. (*People* v. *Webster* (1991) 54 Cal.3d 411, 444, fn. 17 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 352 [216 Cal.Rptr. 455, 702 P.2d 613]; *People* v. *Wickersham, supra,* 32 Cal.3d 307, 324-325.) ▮ It appears that, in deciding to instruct as to second degree murder, the trial court properly heeded that admonition.

Finally, we reject the suggestion that the trial court unfairly "surprised" defendant by raising the issue of instruction as to second degree murder after the defense had rested. There was no apparent request by the defense for an earlier ruling on the matter of proposed instructions. Defense counsel throughout the proceedings would have been well aware of the possibility that such instructions might be given in light of the requirements of existing case law, and in any event could have requested permission to reopen their case in order to present evidence consistent with that instruction.

### b. *Instruction on circumstantial evidence (CALJIC No. 2.01)*

Defendant contends that the trial court erred in giving the standard version of CALJIC No. 2.01 and in declining to give his pinpoint instruction regarding circumstantial evidence. Defendant asserts that the standard instruction misled the jury by stating, in pertinent part, that, "A finding of guilt as to any crime cannot be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime but (2) cannot be reconciled with any other rational conclusion . . . [¶] If . . . one interpretation [of the evidence] appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable." Defendant suggests that the foregoing language undermined the constitutional requirement of proof beyond a reasonable doubt, because it directed the jurors to accept an interpretation of the evidence supporting guilt as long as such an interpretation appeared reasonable and consistent.[17]

This court repeatedly has rejected similar claims. The challenged instruction specified that "circumstantial evidence is sufficient to prove guilt only if it 'cannot be reconciled with any other rational conclusion.' The words 'rational' and 'reasonable' in context [of the instruction] must be read in conjunction with the instruction on reasonable doubt (CALJIC No. 2.90). [Citation.] That instruction informs the jurors that in the event they harbor a reasonable doubt concerning guilt, they are required to acquit. . . . [¶] . . .

---

[17]Defendant acknowledges that in *People* v. *Jennings* (1991) 53 Cal.3d 334, 386 [279 Cal.Rptr. 780, 807 P.2d 1009], we rejected the claim that the quoted language informs the jury that it may find a defendant guilty if he or she reasonably *appears* to be guilty, even when the jury still entertains a reasonable doubt as to the defendant's guilt. As we stated in *Jennings*, "[t]he plain meaning of [this instruction] merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt." *(Ibid.; People* v. *Medina* (1995) 11 Cal.4th 694, 764 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Thus, the jury properly can find the prosecution's theory as to the interpretation of the circumstantial evidence 'reasonable' and alternate theories favorable to the defense 'unreasonable,' within the meaning of these instructions, only if the jury is convinced beyond a reasonable doubt of the accuracy of the prosecution's theory. [Citation.]" (*People* v. *Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Ray* (1996) 13 Cal.4th 313, 348 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People* v. *Davis*, *supra*, 10 Cal.4th 463, 521.) We reject the claim made in defendant's reply brief that the jury might not consider CALJIC No. 2.01 in light of CALJIC No. 2.90 due to the separation in presentation of the two instructions. The trial court did not err in instructing the jury pursuant to CALJIC No. 2.01.

Nor did the trial court err in declining to instruct the jury according to the proposed modification to CALJIC No. 2.01 sought by defendant. That modification provided: "To convict a defendant on circumstantial evidence alone, the proved circumstances must exclude to a moral certainty every other theory but the single one of guilt." As discussed above, the standard instruction, considered together with the other instructions, accurately and adequately conveyed to the jury that its findings with regard to circumstantial evidence must be beyond a reasonable doubt. In addition, the modification sought by defendant at trial would have introduced into CALJIC No. 2.01 the concept of "moral certainty" that the United States Supreme Court specifically criticized in *Victor* v. *Nebraska*, *supra*, 511 U.S. 1, 14-17 [114 S.Ct. 1239, 1247-1249] (affirming *People* v. *Sandoval*, *supra*, 4 Cal.4th 155), finding that concept " 'ambiguous in the abstract' " and determining that it added nothing of value to the instruction. (*People* v. *Freeman* (1994) 8 Cal.4th 450, 501-503 [34 Cal.Rptr.2d 558, 882 P.2d 249].) It is clear that such a modification was not constitutionally required, nor would it have been in any other respect an improvement upon the standard version of CALJIC No. 2.01.

13. *Alleged juror misconduct*

a. *Sleeping juror*

Defendant contends that, despite the trial court's awareness that a juror had fallen asleep and also had slept during the previous day, it failed to conduct an inquiry in order to determine whether the juror ought to be discharged. During the defense cross-examination of Detective Worthen regarding the interview he conducted with defendant on July 31, the prosecution objected on the basis that defense counsel failed to refer to the pertinent portions of the transcription of that interview. Defense counsel responded that he was attempting to save time by not referring to each page

of transcript, and the trial court announced: "I'll overrule the objection. [¶] We have a juror that's asleep." Defense counsel responded: "That's why I'm trying to make this go fast. The juror was asleep all day yesterday, also." The court responded: "I know."

■ As we recently observed, "[a] trial court may discharge a juror who 'becomes ill, or upon other good cause shown to the court is found to be unable to perform his [or her] duty, . . .' (§ 1089, 5th par.) Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged. [Citation.] We have recently explained, however, that the mere suggestion of juror 'inattention' does not require a formal hearing disrupting the trial of a case. [Citation.]" (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 821 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

" 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.' " (*People* v. *Osband, supra,* 13 Cal.4th 622, 675-676.) A hearing is required only where the court possesses information which, if proved to be true, would constitute "good cause" to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case. (*Ibid.*)

In *People* v. *Espinoza, supra,* 3 Cal.4th 806, 821, we concluded that defense counsel's speculation that a juror might have been sleeping was insufficient to apprise the trial court that good cause might exist to discharge the juror, and therefore did not obligate the court to conduct any further inquiry. In *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1233-1234 [9 Cal.Rptr.2d 628, 831 P.2d 1210], we concluded that the trial court's "self-directed inquiry," which involved observing several jurors closely to determine whether they were asleep, and determining that none was dozing, was sufficient, and that a more formal hearing was not required under the circumstances.

■ In the present case, by contrast, the court observed that a juror currently was asleep. Although the court's subsequent comment, "I know," is somewhat ambiguous because it may have been directed either to defense counsel's remark that he was attempting to hasten the examination or to defense counsel's remark that the juror had been asleep during the previous day, it appears likely that the court also recognized the juror had been asleep at that time as well. Nonetheless, the record reveals no more than that the

juror had fallen asleep on the day in question and appears to have been asleep one day earlier; it does not appear that the juror continued to fall asleep or had been asleep for a longer period of time.

We have observed that "[a]lthough implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. In fact, not a single case has been brought to our attention which granted a new trial on that ground. Many of the reported cases involve contradicted allegations that one or more jurors slept through part of a trial. Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial. (*People* v. *Lee Yick* (1922) 189 Cal. 599, 609-610 [209 P. 538]; *People* v. *Ung Sing* (1915) 171 Cal. 83, 88-89 [151 P. 1145]; *Callegari* v. *Maurer* (1935) 4 Cal.App.2d 178, 184 [40 P.2d 883]; *People* v. *Roselle* (1912) 20 Cal.App. 420, 423-424 [129 P. 477]; . . .)" (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 411 [185 Cal.Rptr. 654, 650 P.2d 1171].)

Although the duty to *inquire* as to juror misconduct is activated by a lower threshold of proof, in the present case the absence of any reference in the record to the juror's inattentiveness over a more substantial period indicates that the trial court did not abuse its discretion in failing to conduct an inquiry. (Cf. *People* v. *Johnson, supra,* 6 Cal.4th 1, 21-22 [trial court properly excused juror when ample evidence established that juror actually had fallen asleep during trial on one or more occasions, and juror also had failed to disclose prior arrests during voir dire].) The trial court demonstrated its continual scrutiny of the attentiveness and attitude of the jurors on this and numerous other occasions during trial. In view of the trial court's previous admonitions to both parties to accelerate the extremely slow pace of the proceedings, it is apparent the trial court reasonably determined that a further interruption in the proceedings to address the matter was not justified by the conduct thus far exhibited by the juror. Defense counsel's observation concerning the juror, made without a concomitant assertion of juror misconduct or request for a hearing on the subject (cf. *People* v. *Davis, supra,* 10 Cal.4th 463, 546-548), further indicates that the juror's conduct had not warranted such a hearing. We conclude the trial court did not abuse its discretion by not conducting an inquiry.

b. *Hostile jurors*

Defendant contends that the trial court erred both in failing to make an adequate inquiry and in failing to discharge the jurors, once it

learned that several jurors had indicated prejudice toward defendant. On December 3, 1987, during the third day of deliberations, the trial court received a note from the jury foreperson, Kimiko Bonner, stating: "We do have big problems. We must to talk to judge. We took a vote and we would not be able to go on any longer. (8-3-1 stand.)" The trial court conferred with counsel, advising them that it did not believe the jurors had had sufficient time to review the evidence, and did not know what type of vote the jurors had taken.

Accordingly, the court summoned the jury and interviewed the foreperson. Bonner informed the court: "We do have a few hostile jurors in the group. And some other—a few other juror[s] expressed they can't go on as long as those few hostile jurors are on the panel." When the trial court asked Foreperson Bonner to explain, she advised that a conflict had arisen between a few jurors, and "some jurors express a prejudice remark . . . [a]gainst this case and defendant. So therefore I personally feel we don't think we should go on because some of the juror[s] already express fate of defendant, even—not even discuss the entire evidence." Bonner further advised the court that she did not think it would be possible to reach a verdict unless the hostile jurors were replaced. Bonner explained that the vote taken was not to determine innocence or guilt, but to determine whether, because of their personal differences, the jury could deliberate further. Eight jurors had indicated they could deliberate further, three had indicated that they could not deliberate further, and one juror had abstained.

After further consultation with counsel, the trial court again summoned the jurors and inquired how much evidence they had reviewed. Foreperson Bonner reported that the jurors had reviewed only 25 to 30 percent of the evidence during their three days of deliberations, at which point a few jurors "made a very prejudiced remark" and the controversy commenced. When asked whether those jurors were willing to participate in further deliberations, she indicated that they were "more than willing" to participate. The trial court then individually questioned each juror: "Do you feel this jury can engage in further deliberations?" Seven jurors answered affirmatively, three jurors answered negatively, one juror indicated she could continue to deliberate if two new jurors were substituted in, and Foreperson Bonner was not polled.

Outside the presence of the jury, the prosecutor urged the trial court to reread the instructions concerning the jury's duty to deliberate, and to advise the jury to continue its deliberations. The defense urged, on the other hand, that the presence of the prejudiced jurors had contaminated the deliberation process and that either the jury as a whole, or individual jurors, should be

discharged. The trial court again summoned the jury and reread CALJIC No. 17.40 (each juror must render his or her individual opinion after considering and discussing the evidence) and No. 17.41 (4th ed. 1979 bound vol.) (it is "rarely productive" for a juror to state his or her opinion at the outset; jurors are not partisans but judges). The trial court advised the jury to put aside any hard feelings and continue to deliberate.

Defense counsel moved for a mistrial on the basis of juror misconduct. The trial court denied the motion. The jury recommenced deliberations without further incident and deliberated during the remainder of that day and for 10 additional court days prior to rendering a verdict.

As indicated above, pursuant to section 1089 the trial court may discharge a juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his [or her] duty," and once put on notice that good cause to discharge a juror may exist, the court has a duty to make whatever inquiry reasonably is necessary to determine whether the juror should be discharged. (*People* v. *Espinoza, supra*, 3 Cal.4th 806, 821.) As we observed in *People* v. *Gates* (1987) 43 Cal.3d 1168 [240 Cal.Rptr. 666, 743 P.2d 301], to establish juror misconduct, the facts must establish " 'an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality.' " (*Id.* at p. 1199; *People* v. *Johnson, supra*, 6 Cal.4th 1, 21.)

The decision whether to investigate the possibility of juror bias, incompetence, or misconduct, as well as the ultimate decision whether to retain or discharge a juror, rests within the sound discretion of the trial court. (*People* v. *Osband, supra*, 13 Cal.4th 622, 675-676.) If any substantial evidence exists to support the trial court's exercise of its discretion pursuant to section 1089, the court's action will be upheld on appeal. (See *People* v. *Price, supra*, 1 Cal.4th 324, 400.)

In the present case, having learned that the jury had reached an apparent impasse, the trial court conducted an inquiry. The court discovered that the disagreement arose because of comments made by two strongly opinionated jurors that had caused several other jurors to conclude they could not deliberate further with those jurors—and not because of any deadlock with regard to the substantive issue of defendant's guilt. The court then reinstructed the jurors, emphasizing their duties as jurors, including the entitlement of each party to the individual opinion of each juror based upon a consideration and discussion of the evidence, and the appropriate manner in which to approach their task, including the inadvisability of declaring an opinion at the outset.

The trial court did not abuse its discretion in determining that no juror misconduct had occurred warranting discharge of the entire jury or of individual jurors. The record reflects that several jurors, apparently having failed to heed the admonition in CALJIC No. 17.41 (4th ed. 1979 bound vol.) the first time it was read, had in fact stated their opinions or their intended vote very early in the deliberations, in an emphatic manner that offended or upset certain other jurors. That conduct, identified in the instruction as "rarely productive," although inadvisable, nevertheless did not constitute misconduct. The language of the instruction is derived from an early decision by this court upholding a jury instruction advising that "it would be better that they refrain from emphatic declarations of opinion and hold their minds 'in a state of abeyance,' so that they might 'fully and freely interchange views with each other,' it being 'for the interests of the State and the benefit of the defendant, that a verdict should be returned.' " (*People* v. *Selby* (1926) 198 Cal. 426, 439 [245 P. 426].) This instruction, while strongly suggestive in its terms, is not mandatory. (See *People* v. *Neely* (1979) 95 Cal.App.3d 1011, 1018 [157 Cal.Rptr. 531].)

The emphatic statements made by certain jurors early in their deliberations did not disclose any improper conduct on their part. The jurors, after receiving reinstruction and an explanation of their duties, continued to deliberate during the remainder of that day and for an additional 10 court days following this incident, requesting on a number of occasions to see the exhibits or hear a read-back of testimony, without giving any indication they were having personal differences or were unable to review the evidence together as a deliberative body. The record does not in any way demonstrate an inability on the part of the jurors to perform their functions. (*People* v. *Gates, supra,* 43 Cal.3d 1168, 1199.)

B. *Penalty Phase*

1. *Failure to impanel a new jury*

■ Defendant contends that the trial court erred in denying his motion to impanel a new jury at the commencement of the penalty phase or, in the alternative, to voir dire the existing jury in order to determine whether good cause existed to discharge the jury. Defense counsel's motion was based upon the above-related circumstances brought to the trial court's attention on December 3, 1987, regarding the jury's initial difficulty deliberating together due to the remarks and outspoken opinions of several jurors.

The trial court denied the motion in a lengthy explanation observing that although one or two jurors forcefully had stated their views early in the

deliberations, leaving other jurors with the impression that the one or two jurors regarded any further deliberations as an unnecessary exercise, the court upon learning of the jury's difficulty had reread pertinent instructions, had further admonished the jurors, and had obtained the jurors' commitment to resume deliberations. The jurors had deliberated over the next 10 court days, in the course of that time requesting to view a large number of exhibits and to listen to the rereading of a substantial portion of the testimony. At no time after December 3 did the foreperson indicate further problems in the deliberations of the jury. In view of these factors, the trial court determined that it did not appear the jury had demonstrated an inability to function properly or an unwillingness to consider the evidence, and that in fact the jury had engaged in a deliberative process. The court indicated that during the penalty phase it would remind the jurors of their earlier commitment to keep an open mind concerning the alternate punishments until all evidence bearing on the issue had been heard, and that it would inquire of the jurors as to their ability to honor that commitment.

At the outset of the penalty phase, prior to the presentation of evidence, the trial court reminded the jurors that they previously had indicated they would keep an open mind, regardless of any ideas or preconceptions they had, and that they would listen to the evidence, statements, and arguments of both parties. The trial court then individually inquired, and received the affirmative response of each juror that he or she could keep an open mind with respect to the question of penalty.

The trial court's decision not to impanel a second jury for the penalty phase of the trial or to re-voir dire the jury is subject to reversal only upon an abuse of discretion. (*People* v. *Lucas, supra,* 12 Cal.4th 415, 482; *People* v. *Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Section 190.4, subdivision (c), states: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes." This statute " 'reflects the long-standing legislative preference for a single jury to determine both guilt and penalty.' " (*People* v. *Lucas, supra,* 12 Cal.4th 415, 483; *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 572 [286 Cal.Rptr. 628, 817 P.2d 893]; *People* v. *Gates, supra,* 43 Cal.3d 1168, 1199.)

More than the speculation or desire of defense counsel is necessary to establish good cause to discharge the jury. (*People* v. *Rowland, supra,* 4 Cal.4th 238, 268; *People* v. *Pride, supra,* 3 Cal.4th 195, 252-253; *People* v.

*Fauber* (1992) 2 Cal.4th 792, 846 [9 Cal.Rptr.2d 24, 831 P.2d 249].) As we observed in *Gates*, "[t]here is no direct authority on the meaning of 'good cause' in this context. There are, however, cases involving the question of good cause for discharge of a juror under sections 1123 and 1089. As to the latter statutes, the facts must 'show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality.' [Citation.]" (*People* v. *Gates, supra,* 43 Cal.3d 1168, 1199.) Moreover, a showing of good cause is a prerequisite to granting the motion to discharge the jury *or* to reopen voir dire. The trial court is not obliged to reopen voir dire based upon mere speculation that good cause to discharge the jury thereby may be discovered. (*Ibid.*)

We have held that a trial court did not abuse its discretion in refusing to impanel a new jury when, during voir dire, the court had advised the prospective jurors that the defense would present evidence in mitigation at the penalty phase, but thereafter the defense decided not to present evidence in mitigation at that phase. (*People* v. *Lucas, supra,* 12 Cal.4th 415, 483-484.) Similarly, we have held that the trial court did not abuse its discretion in declining to impanel a new jury simply because defense strategies at the guilt phase and the penalty phase were different. (*People* v. *Pride, supra,* 3 Cal.4th 195, 252; *People* v. *Taylor* (1990) 52 Cal.3d 719, 737-738 [276 Cal.Rptr. 391, 801 P.2d 1142].) Nor does the trial court abuse its discretion in declining to impanel a new jury based upon the assertion that the jury at the penalty phase might be prejudiced by having heard the evidence of the capital crimes. (*People* v. *Pride, supra,* 3 Cal.4th 195, 252; see *People* v. *Balderas, supra,* 41 Cal.3d 144, 204.)

In a number of cases, we also have rejected substantially similar arguments for reopening the voir dire of the jury before the penalty phase. (*People* v. *Taylor, supra,* 52 Cal.3d 719, 738 [trial court did not err in denying defendant's request to re-voir dire the jury based upon contemplated deviation between defense strategy at guilt and penalty phases]; *People* v. *Malone* (1988) 47 Cal.3d 1, 27-28 [252 Cal.Rptr. 525, 762 P.2d 1249] [defendant's assertions of possible juror bias, based upon inflammatory nature of guilt phase evidence and jury's promptness in rendering verdict, held insufficient to impose duty of inquiry upon court]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1028-1029 [248 Cal.Rptr. 568, 755 P.2d 1017] [trial court did not err in denying defendant's request to reopen voir dire where counsel could point to no facts furnishing good cause and only the speculation that the jury, having found defendant guilty, no longer could be impartial]; see *People* v. *Melton* (1988) 44 Cal.3d 713, 748-750 [244 Cal.Rptr. 867, 750 P.2d 741].) Similarly, in *Gates*, we concluded that the defense motions, based upon generalized assertions of prejudice, general publicity

about crimes, and criticism of the judicial system, afforded no ground to discharge or reopen the voir dire of the jury. (*People* v. *Gates, supra,* 43 Cal.3d 1168, 1198-1199.)

In the present case, as defendant has pointed out, the defense motions were directed at more specific conduct of the jurors that occurred near the outset of their deliberations. As the trial court carefully determined, and as we previously have concluded, however, no misconduct was shown to have occurred. Thus, defendant has not pointed to any facts furnishing good cause in support of his motion—only to speculation that the sitting jury, having found defendant guilty, no longer could be impartial or thereby had demonstrated its lack of impartiality. (*People* v. *Ainsworth, supra,* 45 Cal.3d 984, 1028-1029.) The trial court did not abuse its discretion in deciding that good cause had not been shown and in denying the motion to impanel a new jury or to voir dire the existing jury.

### 2. *Defendant's absence from hearings*

Defendant contends that his absence from certain court proceedings on several occasions defeated his constitutional right to a fair trial. Defendant was absent on the following occasions.

On November 10, 1987, as described above, defendant apparently was not present during an ex parte hearing at which defense counsel discussed with the trial court their intention to rest without calling defendant to testify. The trial court advised that it would await any request by defendant to testify in his own behalf.

On January 5, 1988, prior to the commencement of the penalty phase, the trial court alerted the parties that one juror temporarily was absent due to a death in her family, and discussed the available options of postponing the trial or substituting an alternate juror. During that hearing, the trial court noted that defendant was not present in court. Later that day, after requesting an ex parte hearing, defense counsel informed the trial court that defendant did not wish to present evidence in mitigation, but that defense counsel would present evidence in mitigation despite defendant's wishes. Defense counsel also advised the court that defendant's decision to grow a beard was a sign that his mental instability was increasing.

On January 14, 1988, outside defendant's presence, the court, stating without contradiction that defendant had waived his appearance, held a hearing on a defense motion to exclude evidence of the rape of Julianne P. The parties discussed attempts to locate portions of the court file in that case.

On January 19, 1988, following opening statements by counsel, the prosecutors called Julianne P. to testify. Prior to her testimony, defense counsel, stating that defendant had expressed concerns over "his ability to conduct himself," informed the court that defendant had requested to be excused during the prosecution's case. The trial court permitted his excusal following in-court identification by each witness, and specifically and extensively advised defendant of his right to be present during all phases of the proceedings, of the potential consequences of his absence, and that he would not have the right to raise the issue on appeal. Defendant specifically waived his right to be present and to appeal any error arising from his absence. Following Julianne P.'s appearance and identification of defendant, he absented himself from the courtroom for the remainder of her testimony. On January 20, 1988, similarly, the prosecutor called Tamara H., and after she identified defendant, he exited from the courtroom. Defendant subsequently expressed a desire to be present at trial and was present during the testimony of Mark W. and the remaining witnesses.

On January 25, 1988, court proceedings commenced at 11:00 a.m., the trial court informing the parties that a juror had taken ill and that the presentation of evidence would be continued to the following day. After a brief discussion concerning submission of jury instructions, the court adjourned proceedings at 11:05 a.m. On January 26, 1988, court proceedings commenced at 2:00 p.m. and the prosecutors and defense counsel conferred with the trial court regarding proposed penalty phase jury instructions. Court adjourned at 3:40 p.m.

After a one-day hiatus, during which the defense, apparently with defendant present, met ex parte with the court, the prosecution and the defense presented further argument concerning the jury instructions on January 28, 1988, in defendant's absence. The trial court issued its proposed rulings on the jury instructions.

On February 1, 1988, defense counsel requested a hearing outside the presence of defendant, at which they informed the court that defendant again was seeking to represent himself. Counsel informed the court that defendant did not wish any witnesses to testify on his behalf and wished to testify before the jury that he wanted to be executed. Defense counsel alerted the court that they believed defendant was incompetent to proceed. The trial court denied the defense requests for a continuance and for a hearing on competency. In subsequent ex parte hearings, the court queried defendant directly concerning his request to represent himself.

■ It is established that a defendant has a federal constitutional right, emanating from the confrontation clause of the Sixth Amendment and the

due process clause of the Fourteenth Amendment, to be present at any stage of the criminal proceedings "that is critical to its outcome if his presence would contribute to the fairness of the procedure." (*Kentucky* v. *Stincer* (1987) 482 U.S. 730, 745 [107 S.Ct. 2658, 2667, 96 L.Ed.2d 631] [no constitutional violation when defendant was absent from competency hearing]; *United States* v. *Gagnon* (1985) 470 U.S. 522, 526-527 [105 S.Ct. 1482, 1484-1485, 84 L.Ed.2d 486] [no constitutional violation when defendant was absent from judge's discussion with juror].) In addition, a defendant has the right to be personally present at critical proceedings, pursuant to the state Constitution (Cal. Const., art. I, § 15; *People* v. *Johnson, supra,* 6 Cal.4th 1, 18), as well as pursuant to statute (§§ 977, 1043).

This court repeatedly has held that a defendant is not entitled to be personally present either in chambers or at bench discussions that occur outside of the jury's presence on questions of law or other matters as to which the defendant's presence does not bear a " ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1080 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Horton* (1995) 11 Cal.4th 1068, 1120-1121 [47 Cal.Rptr.2d 516, 906 P.2d 478]; *People* v. *Johnson, supra,* 6 Cal.4th 1, 18; *People* v. *Medina* (1990) 51 Cal.3d 870, 902-903 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1116 [269 Cal.Rptr. 530, 790 P.2d 1327].) Sections 977 and 1043 do not require the defendant's presence, or a written waiver, unless that standard has been met. (*People* v. *Cooper, supra,* 53 Cal.3d 771, 825; *People* v. *Medina, supra,* 51 Cal.3d 870, 902; *People* v. *Holloway, supra,* 50 Cal.3d 1098, 1116; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 359-360 [233 Cal.Rptr. 368, 729 P.2d 802].)

Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial. (*People* v. *Holloway, supra,* 50 Cal.3d 1098, 1116; *People* v. *Garrison* (1989) 47 Cal.3d 746, 783 [254 Cal.Rptr. 257, 765 P.2d 419].) ▮ Defendant clearly has not met his burden of establishing prejudice in the present case.

Defendant notes his absences from various in-chambers conferences, but fails to observe that he specifically had waived his presence when the court discussed jury instructions and certain other questions of law. In any event, it is apparent that the matters discussed did not bear a substantial relation to "the fullness of his opportunity to defend against the charge." (*People* v. *Cooper, supra,* 53 Cal.3d 771, 825; *People* v. *Medina, supra,* 51 Cal.3d 870, 902-903.) In those instances in which counsel advised the court of defendant's desire to proceed in propria persona, the settled statement reveals that defense counsel requested that such hearings be held outside the presence of

defendant in order to protect and secure his rights, despite his efforts to prevent his attorneys from acting in his best interests. Moreover, defendant was permitted to act in propria persona on several occasions until he relinquished that role. Defendant has not shown how his attendance at such hearings would have assisted the defense or otherwise altered the outcome of his trial, and therefore has not demonstrated prejudice. (*People* v. *Horton, supra,* 11 Cal.4th 1068, 1121; *People* v. *Medina, supra,* 51 Cal.3d 870, 902-903.)

Defendant notes his absences during the testimony of several witnesses, but fails to observe that he expressly had requested to be absent during their testimony, and that defendant and his counsel specifically were concerned that his adverse behavior would be detrimental to his case, should he be required to remain in court. (See *People* v. *Holloway, supra,* 50 Cal.3d 1098, 1116.) As explained above, he fully was advised of his rights and the possible consequences of his absence, and validly waived his presence during this portion of the penalty phase. (*People* v. *Jackson* (1996) 13 Cal.4th 1164, 1209-1212 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Accordingly, no violation of defendant's Federal Constitutional occurred. (*Id.* at p. 1210.) Nor, given defendant's threatened disruption, did any statutory violation occur. (*Id.* at pp. 1210-1211.) Moreover, defendant has failed to explain how his attendance during the testimony of these witnesses would have altered the outcome of his trial and, accordingly, has not demonstrated any prejudice. (*Id.* at pp. 1211-1212.)

### 3. *The prosecution's notice of evidence in aggravation*

 Defendant contends that the prosecution failed to provide him with timely notice of the evidence of aggravating circumstances to be presented at the penalty phase and that he thereby was denied his rights to due process of law, a fair trial, and a reliable penalty determination pursuant to the federal Constitution. (U.S. Const., 5th, 8th, & 14th Amends.) In particular, defendant contends that the prosecution's notice concerning the incident involving Ellen F., who was to testify to the facts underlying one of defendant's prior criminal activities, did not meet the requirements of section 190.3, and that the trial court erred in declining to grant the defense a continuance to investigate the evidence concerning this incident.

 Section 190.3 provides in relevant part that the prosecution may present evidence in aggravation only if it has given the defendant "notice of the evidence to be introduced . . . within a reasonable period of time as determined by the court, prior to trial." To be timely, the notice must be given "before the cause is called to trial or as soon thereafter as the

prosecution learns the evidence exists." (*People* v. *Pride, supra,* 3 Cal.4th 195, 258.) To be sufficient as to content, the notice must afford the defendant " 'a reasonable opportunity' to prepare a defense to the allegations." (*People* v. *Arias, supra,* 13 Cal.4th 92, 166.) Actual notice may be provided not only by the statutory notice, but by supplemental information such as police reports. (*People* v. *Pride, supra,* 3 Cal.4th 195, 258-259; *People* v. *Jennings, supra,* 53 Cal.3d 334, 391.)

In the present case, considerably prior to the time the cause was called for trial, the prosecutors on July 3, 1986, filed a notice describing several categories of aggravating evidence that they intended to introduce at the penalty phase. That notice included the following: "There appears to be evidence of a sexual and physical assault committed by the defendant in the State of Florida about seven years ago. I am attempting to obtain more information about this incident from the sheriff's department, and should be able to provide you with the details and copies of any police reports by next week."

On January 11, 1988, at the penalty phase of the trial, defendant orally and by written motion asserted that the notice provided as to this incident was insufficient, and moved for a one-week continuance in order to investigate the incident. At the hearing, the defense noted that the defense investigator had interviewed Ellen F. on December 29, 1987. Defense counsel, noting that one of the supplemental reports from the Valparaiso, Florida, Police Department described the incident, asserted that the medical evidence did not appear to support the victim's statement and hence defendant found it necessary to consult a physician. The prosecutor stated without contradiction that defense counsel earlier had acknowledged that he "was in receipt of the reports concerning Ellen F." Defense counsel then described the information they already had received, including the July 1986 notice, police reports, the physician's report, a report from the victim, and "a report from Al Prizio [*sic*], Florida."

The trial court found that the original notice was "wanting," but that the original lack of specificity had been cured by the circumstance that reports had been sent to the defense specifying the assault in question, providing the dates, names, and specific information, followed by an opportunity for the defense investigator to interview the victim, and that certain information had been provided "fairly soon" after the July 1986 notice. The trial court concluded that defendant had suffered no prejudice, and denied the motions.

The trial court correctly found that the insufficiency of the original notice had been cured by the materials subsequently provided by the prosecution

after it obtained those additional materials, and that a continuance was unnecessary. (See *People* v. *Daniels* (1991) 52 Cal.3d 815, 879-880 [277 Cal.Rptr. 122, 802 P.2d 906].) Defendant has not demonstrated how his defense was "actually hampered" by the manner in which notice was given. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 958 [4 Cal.Rptr.2d 765, 824 P.2d 571].) The record reflects that as of September 3, 1986, the defense knew that the incident involved a sexual assault incorporating strangulation and an attempt to cut off the victim's nipples; that as of January 13, 1987, the defense additionally knew that the incident occurred in Florida approximately seven years earlier; and that as of February 17, 1987, several months prior to commencement of the guilt phase of defendant's trial, the defense knew that the incident related to Ellen F. and, in order to seek the court's authorization for funds to travel to Florida to interview this witness, had sought and received a preliminary indication from the trial court that the evidence would be admissible at the penalty phase, and prior to the defense motion on January 11, 1988, had received all available materials and had interviewed Ellen F. This witness was not called upon to testify until February 2, 1988. Moreover, there is no reasonable possibility that defendant suffered any prejudice from the manner in which the prosecution provided notice of this evidence in aggravation. (See *People* v. *Pinholster*, *supra*, 1 Cal.4th 865, 958.)

### 4. *Failure to investigate the nature of defendant's medication*

■ Defendant contends that the trial court, having been alerted to the circumstance that defendant was taking medication, deprived him of due process of law by failing to conduct an adequate inquiry to determine whether it was being administered involuntarily, or what side effects defendant was experiencing.

Prior to the appearance of any witnesses at the penalty phase, defendant indicated to the trial court that he wished to represent himself. During the court's extensive examination as to whether defendant fully understood all the potentially adverse consequences of such a decision, the prosecutor alerted the court that defendant then was being medicated with a drug that might affect his ability to represent himself. Upon inquiry by the court, defendant stated that he was taking "Sinequan, a psychotic [*sic*]," that he had been taking the medication since the time of the pretrial motions in the case, and that he anticipated he would continue to receive the medication during the course of the penalty phase. When the trial court inquired whether, in view of defendant's daily experience with the medication during the course of the trial, he believed it would have any effect upon his ability to represent

himself, defendant responded in the negative.[18] Defense counsel observed that in the course of their representation of defendant, they had not noticed any perceptual difficulties or disorientation on the part of defendant, that he had no disability as a result of the medication that would cause him to be unable to function as his own counsel, and that he clearly understood the proceedings and actively had participated and assisted in his own defense.

In *Riggins* v. *Nevada* (1992) 504 U.S. 127 [112 S.Ct. 1810, 118 L.Ed.2d 479], relied upon by defendant, the high court granted certiorari to decide "whether forced administration of antipsychotic medication during trial violated rights guaranteed by the Sixth and Fourteenth Amendments." (*Id.* at pp. 132-133 [112 S.Ct. at p. 1814].) The court held that a potential deprivation of due process of law occurs when a defendant involuntarily is prescribed such medication during criminal proceedings, and that once the defendant moves to terminate the administration of antipsychotic medication, the state becomes obligated to establish that the medication is needed and medically appropriate. (*Id.* at pp. 134-135 [112 S.Ct. at pp. 1814-1815].)

In the present case, defendant did not move to terminate the administration of medication, or otherwise assert that he was being medicated involuntarily. Defendant may not raise for the first time on appeal the claim that he was denied due process of law because drugs were administered to him to control his mental condition during the proceedings. (*People* v. *Jones* (1997) 15 Cal.4th 119, 152-153 [61 Cal.Rptr.2d 386, 931 P.2d 960].)

We also reject defendant's contention that, in light of *Riggins*, the trial court upon becoming aware that defendant was being medicated was required sua sponte to determine whether or not he was receiving medication voluntarily, and whether or not that medication had exposed defendant to side effects. That case clearly limited its holding, which imposed upon the trial court a duty to inquire, to the situation in which a defendant has *moved* to terminate the involuntary administration of medication. (*Riggins* v. *Nevada*, *supra*, 504 U.S. 127, 135 [112 S.Ct. 1810, 1815]; *People* v. *Jones*, *supra*, 15 Cal.4th 119, 155-156.)

In the present case, defendant did not make any such motion. Additionally, nothing in the record suggests that the administration of defendant's medication was involuntary. (*Riggins* v. *Nevada*, *supra*, 504 U.S. 127, 135 [112 S.Ct. 1810, 1815]; *People* v. *Jones*, *supra*, 15 Cal.4th 119, 152-154.)

---

[18]In view of our holding that the trial court was not required to inquire whether defendant was being involuntarily medicated, we decline the request of both defendant and the Attorney General to take judicial notice pursuant to Evidence Code section 452, subdivision (h), of several entries in the Physician's Desk Reference regarding the categorization and properties of Sinequan.

During the hearing to determine defendant's competence to act as his own counsel, moreover, the court received information from both defendant and his counsel that, based upon many months' experience with the treatment, defendant's ability to function and to present a defense had not been impaired by the medication. Defendant was not denied due process of law under *Riggins* v. *Nevada, supra,* 504 U.S. 127, 135-138 [112 S.Ct. 1810, 1815-1817], and he has not established that the voluntary administration of medication rendered him incompetent to stand trial. (*People* v. *Jones, supra,* 15 Cal.4th 119, 155-156.)

### 5. *Defendant's court appearance in jail clothing*

Defendant contends that the trial court erred in compelling him to wear county jail clothing rather than civilian apparel. The record does not support this claim. On January 20, 1988, defendant appeared at trial in county jail clothing. The trial court noted that fact, observing that it had advised the deputy to take steps to have defendant dressed in civilian apparel, but that defendant had stated his desire to appear in court in county jail clothing. The court, noting that at all prior court appearances defendant had been dressed in civilian clothing, inquired of defendant whether he realized he still could change into civilian clothing, whether he desired to appear in county jail clothes, and whether he realized the jury might draw adverse inferences from his appearance in jail attire. Defendant informed the court that he wished to appear in jail attire and realized that the jury might draw such inferences. On this occasion, defendant appeared in court only for a few moments until the witness, Tamara H., identified him, and then, pursuant to his request, was escorted from the courtroom for the remainder of the day.

On January 21, 1988, the occasion about which defendant complains, defendant again appeared in county jail clothing. The court repeated its inquiry whether defendant wished to appear in jail attire rather than civilian clothing. Defendant replied: "My civilian clothes have been stolen from the county jail, haven't been released yet. I'll wear whatever. . . . This will be sufficient right here." Defendant wore jail clothing for the duration of the penalty phase.

As we observed, *ante,* page 1335, a court may not require a defendant to wear jail clothing during trial. (*People* v. *Taylor, supra,* 31 Cal.3d 488, 494.) The wearing of jail clothing, serving constantly to remind the jury that the defendant is in custody, tends to undermine the presumption of innocence by creating an unacceptable risk that the jury impermissibly will consider that circumstance in rendering its verdict. (*Ibid.*)

As an initial matter, it is clear from the record that defendant was not compelled to wear county jail attire, but expressed his desire to do so, even after having been advised of his right not to be compelled to wear such clothing. Having expressly been informed that the jury might draw adverse inferences from his wearing of this attire, defendant nonetheless waived that right. His remark that his civilian clothing had been stolen does not alter the circumstance that the previous day the court had offered to take steps to secure civilian clothing, and that on that day and the following day, defendant had indicated his desire to attend trial dressed in county jail attire. Thus, defendant's stated preference to appear in jail clothing defeats his claim that he was compelled to do so by the trial court, and in any event he is not free to raise the issue on appeal. (*Estelle* v. *Williams* (1976) 425 U.S. 501, 507-508 [96 S.Ct. 1691, 1694-1695, 48 L.Ed.2d 126]; see *People* v. *Pride*, *supra*, 3 Cal.4th 195, 253-254.)

Moreover, even if we were to assume that error occurred, defendant has not demonstrated any possibility of prejudice. As explained above, the rule that a defendant may not be compelled to attend trial in jail or prison garb is premised upon the notion that doing so might subvert the presumption that an accused is innocent until proved guilty. In the present case, defendant's guilt of both murders already had been determined at the guilt phase of the trial, and at the time defendant appeared in county jail clothing, the jury was confronted with the remaining issue of the appropriate penalty. Because the presumption of innocence already had been rebutted and defendant had been found guilty beyond a reasonable doubt, there was no reasonable possibility that the jury would base its penalty decision on the factor of defendant's attire. (See *People* v. *Rodrigues*, *supra*, 8 Cal.4th 1060, 1179 [no prejudice when, at penalty phase, juror inadvertently observed defendant transported in custody with handcuffs]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 179-180 [5 Cal.Rptr.2d 796, 825 P.2d 781] [mere viewing of defendants handcuffed during jury view of crime scene did not result in an inherently unfair penalty phase trial].)

6. *Defendant's self-representation*

Defendant asserts that the trial court erred both in initially denying, and in subsequently twice granting, his motion for self-representation during the penalty phase. Pursuant to the Sixth Amendment of the federal Constitution, a defendant has the right to conduct his or her own defense, providing he or she knowingly and intelligently waives the right to counsel (*Faretta* v. *California* (1975) 422 U.S. 806, 835-836 [95 S.Ct. 2525, 2541-2542, 45 L.Ed.2d 562] (*Faretta*)), and "is able and willing to abide by the rules of procedure and courtroom protocol." (*McKaskle* v. *Wiggins*

(1984) 465 U.S. 168, 173 [104 S.Ct. 944, 948, 79 L.Ed.2d 122].) To find a valid waiver, the court must determine "whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." (*Godinez* v. *Moran* (1993) 509 U.S. 389, 401, fn. 12 [113 S.Ct. 2680, 2687, 125 L.Ed.2d 321], italics omitted.)

In *Faretta*, the court held that a defendant who chooses self-representation must do so "competently and intelligently," but also made it clear that the defendant's "technical legal knowledge" is "not relevant" to the determination whether he or she is competent to waive the right to counsel, and that, although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored." (*Faretta, supra,* 422 U.S. 806, 834 [95 S.Ct. 2525, 2541].) Thus, "a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation." (*Godinez* v. *Moran, supra,* 509 U.S. 389, 400 [113 S.Ct. 2680, 2687], fn. and italics omitted.)

 The standard for competency to waive the constitutional right to the assistance of counsel has been equated with that for competency to stand trial: whether the defendant has a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,' " and has " 'a rational as well as factual understanding of the proceedings against him.' " (*Godinez* v. *Moran, supra,* 509 U.S. 389, 396, 397-402 [113 S.Ct. 2680, 2685-2688]; see *Dusky* v. *United States* (1960) 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (*per curiam*).) The state constitutionally may presume that a defendant is competent and require him or her to shoulder the burden of proving his or her incompetence by a preponderance of the evidence. (*Cooper* v. *Oklahoma* (1996) ___ U.S. ___, ___ [116 S.Ct. 1373, 1377, 134 L.Ed.2d 498, 515]; *Medina* v. *California* (1992) 505 U.S. 437, 449 [112 S.Ct. 2572, 2579, 120 L.Ed.2d 353]; *People* v. *Medina, supra,* 51 Cal.3d 870, 885.)

 The right to self-representation recognized in *Faretta* is not limited to the conduct of a defense during the guilt phase of the trial, but extends to the penalty phase in a capital case. (*People* v. *Clark* (1990) 50 Cal.3d 583, 617-618 [268 Cal.Rptr. 399, 789 P.2d 127]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1222-1224 [259 Cal.Rptr. 669, 774 P.2d 698].) "Notwithstanding the state's significant interest in a reliable penalty determination, a determination best made by a fully informed sentencer, a defendant's fundamental constitutional right to control his defense governs. [Citation.] The defendant has the right to present no defense and to take the stand and both confess guilt and request imposition of the death penalty. [Citations.] It follows that the state's interest in ensuring a reliable penalty determination

may not be urged as a basis for denying a capital defendant his fundamental right to control his defense by representing himself at all stages of the trial." (*People* v. *Clark, supra,* 50 Cal.3d 583, 617-618, fn. omitted.)

As we repeatedly have held, although in a criminal trial a defendant has a federal constitutional, unconditional right of self-representation, in order to invoke that right, he or she must make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial. (*People* v. *Marshall* (1996) 13 Cal.4th 799, 827 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People* v. *Horton, supra,* 11 Cal.4th 1068, 1107; *People* v. *Clark* (1992) 3 Cal.4th 41, 98 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People* v. *Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187].) When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion. (*People* v. *Mayfield, supra,* 14 Cal.4th 668, 809; *People* v. *Hardy, supra,* 2 Cal.4th 86, 193-194.)

For purposes of assessing the timeliness of a motion for self-representation, the guilt and penalty phases in a capital prosecution are considered part of a unitary trial. Therefore, a motion made between trial of the two phases is untimely, and is subject to the court's discretion. (*People* v. *Mayfield, supra,* 14 Cal.4th 668, 810; *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1006-1007 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People* v. *Hardy, supra,* 2 Cal.4th 86, 193-194.) As is apparent in the present case, defendant did not assert his *Faretta* rights in a timely manner at any point in the proceedings.

As we have observed, an untimely motion is addressed to the sound discretion of the trial court, which should consider such factors as the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay that reasonably might be expected to follow the granting of such a motion. (*People* v. *Marshall, supra,* 13 Cal.4th 799, 827; *People* v. *Kirkpatrick, supra,* 7 Cal.4th 988, 1006-1007; *People* v. *Clark, supra,* 3 Cal.4th 41, 98-99; *People* v. *Windham, supra,* 19 Cal.3d 121, 128.)

### a. *Denial of December 28, 1987, motion for self-representation*

Defendant asserts that he unequivocally asserted his right to proceed in propria persona, and that in denying his request the court violated his right to self-representation. Following the guilty verdict rendered by the jury and prior to the commencement of the penalty phase, defendant on December 28, 1987, moved to discharge his appointed counsel and represent himself. Because the judge (Judge Boland) who presided at trial was on

vacation, the motion was heard by another judge (Judge Munoz). When that judge questioned defendant as to his reasons for wanting to represent himself, defendant stated he did not wish to have his family members or friends called to testify and did not wish to present any defense. The court denied the motion for self-representation.

Defendant did not assert that defense counsel had rendered ineffective assistance or that their relationships with defendant had so deteriorated that they could not provide defendant with effective representation at the penalty phase. (See *People* v. *Mayfield, supra*, 14 Cal.4th 668, 795.) As the trial court recognized, the granting of the motion would cause unnecessary disruption and delay, given the length and the stage of the proceedings, and defendant's request to represent himself appeared to be motivated in part by an effort to create reversible error in the proceedings. The trial court's reluctance to grant such a motion at this phase of the proceedings in a capital trial was reasonable, given the lack of opportunity on the part of the judge temporarily presiding to review the prior course of the trial or the conduct of defendant over the previous months. The court adequately considered the factors described above (*People* v. *Marshall, supra*, 13 Cal.4th 799, 827-828; *People* v. *Windham, supra*, 19 Cal.3d 121, 128), and did not abuse its discretion in denying the motion. In any event, defendant cannot show prejudice, because defendant's renewed motion for self-representation shortly was granted.

### b. *Grant of January 12, 1988, motion for self-representation*

#### (1) *Propriety of granting the motion*

Defendant asserts that the trial court erred on January 12, 1988, in granting his requests to discharge appointed counsel and represent himself with the assistance of advisory counsel, because his mental condition "had degenerated into incompetency." On January 5, 1988, upon the return of Judge Boland from vacation, defense counsel alerted the court to defendant's prior motion for self-representation, to the circumstance that following the denial of that motion, defendant had directed counsel not to present a defense at the penalty phase, and to defendant's decision to grow a beard— viewed by counsel as a sign of defendant's mental deterioration. On January 12, 1988, prior to the presentation of any evidence, defendant renewed his request to represent himself and discharge his appointed counsel, in order to ensure that no penalty phase evidence would be presented on his behalf. Defense counsel noted their obligation to present mitigating evidence and stated their view that defendant was insane. The trial court observed that defendant appeared to be competent and advised that it would conduct an inquiry pursuant to *Faretta*.

During that inquiry, defendant indicated he was ready to proceed without delay. Because the prosecutor earlier had advised that defendant's medication status should be scrutinized, the court inquired and received defendant's assurance that the medication was not affecting him any more at that time than it had during the earlier phase of the trial. The trial court expressly found that defendant was mentally competent and had knowingly, understandingly, and intelligently waived his right to counsel. The court granted his request for self-representation, and also granted his request to appoint former counsel as advisory counsel.

Defendant contends that in granting the motion, the trial court failed to weigh the factors described in *People* v. *Windham, supra,* 19 Cal.3d 121, 128. We have stated, however, that if a defendant's request is granted, the defendant may not be heard to complain on appeal that his or her motion should not have been granted. (*People* v. *Clark, supra,* 3 Cal.4th 41, 109; see *People* v. *Bloom, supra,* 48 Cal.3d 1194, 1219-1220.) Because the trial court granted the motion at defendant's insistence, he may not assign as error the trial court's failure to weigh the *Windham* factors. (*People* v. *Clark, supra,* 3 Cal.4th 41, 109.)

### (2) *Limitation on role of advisory counsel*

Defendant asserts that the trial court erred in restricting the role of advisory counsel, thereby effectively preventing defendant from conducting his own defense and ultimately forcing him to forgo his right to self-representation. The record reflects that appointed counsel had filed various defense motions prior to the time defendant sought and obtained self-representation and the appointment of former counsel as advisory counsel. Thereafter, the trial court reviewed those pending defense motions. When the court inquired of defendant concerning the various motions, advisory counsel, having prepared them, repeatedly offered to explain the motions. On each occasion the trial court advised that, because defendant had requested to represent himself, he personally would have to respond to the court's questions.

Subsequently, during the trial court's inquiry of defendant, following the prosecution's objection that defendant essentially was repeating whatever advisory counsel told him to say, advisory counsel suggested that they be allowed to argue the legal motions and that defendant be allowed to examine the witnesses and make the opening statement and closing argument. The trial court, again having inquired and received defendant's assurance that he wished to continue to represent himself, declined advisory counsel's suggestion and admonished the defense that defendant could not simply repeat whatever advisory counsel told him.

At a hearing held pursuant to Evidence Code section 402 to determine the admissibility of defendant's 1984 no-contest plea to one count of rape, the prosecution commenced the examination of its first witness, Meredith Rust, a deputy district attorney, concerning her prior advisement to defendant of the consequences of his no-contest plea to that count. (At this point, the court file pertaining to that plea apparently had been lost.) When advisory counsel interjected, the trial court continued to admonish the defense that only defendant could question the witness or explain his objections, and also denied several requests by advisory counsel to be relieved, on the basis that only defendant could make that request. Later the same day, when advisory counsel moved to be relieved as counsel, the court again inquired of defendant whether he wished to continue representing himself. This time defendant asked the court to reappoint counsel and stated that he no longer wished to represent himself.

 A criminal defendant does not have a right to simultaneous self-representation and representation by counsel. (*People* v. *Clark, supra,* 3 Cal.4th 41, 97; see *People* v. *Frierson* (1991) 53 Cal.3d 730, 741 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1162 [259 Cal.Rptr. 701, 774 P.2d 730].) "[N]one of the 'hybrid' forms of representation, whether labeled 'cocounsel,' 'advisory counsel,' or 'standby counsel,' is in any sense constitutionally guaranteed." (*People* v. *Bloom, supra,* 48 Cal.3d 1194, 1218.)

We have observed that the powers and responsibilities attendant upon the representation of a person criminally accused never should be conferred jointly and equally on the accused and the attorney. "Rather, in all cases of shared or divided representation, either the accused or the attorney must be in charge. Stated otherwise, at all times the record should be clear that the accused is either self-represented or represented by counsel; the accused cannot be both at once." (*People* v. *Bloom, supra,* 48 Cal.3d 1194, 1219; *People* v. *Kirkpatrick, supra,* 7 Cal.4th 988, 1003.)

When a defendant chooses self-representation, he or she retains primary control over the conduct of the case, and consequently the role of advisory counsel is limited. (*People* v. *Clark, supra,* 3 Cal.4th 41, 112; *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1164, fn. 14; see *People* v. *Bloom, supra,* 48 Cal.3d 1194, 1218-1219, 1226.) The court retains authority to exercise its judgment regarding the extent to which such advisory counsel may participate. (See *People* v. *Stansbury* (1993) 4 Cal.4th 1017, 1044 [17 Cal.Rptr.2d 174, 846 P.2d 756], revd. on other grounds *sub nom. Stansbury* v. *California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293]); *People* v. *Clark, supra,* 3 Cal.4th 41, 115; cf. *People* v. *Marshall, supra,* 13 Cal.4th 799, 827-828 [participation of a professionally represented defendant in the

presentation of the case is a matter within the sound discretion of the trial judge]; *People* v. *Kirkpatrick, supra,* 7 Cal.4th 988, 1003; *People* v. *Miranda* (1987) 44 Cal.3d 57, 75-76 [241 Cal.Rptr. 594, 744 P.2d 1127].) In addition, as described above, a defendant's right to conduct his or her own defense is subject to the proviso that he or she must abide by the rules of procedure and courtroom protocol. (*McKaskle* v. *Wiggins, supra,* 465 U.S. 168, 173 [104 S.Ct. 944, 948].)

In the present case, the trial court authorized former appointed defense counsel to perform a limited role as advisory counsel, and at all times sought to have counsel remain within the limits of that role rather than permit counsel to act in a primary role by making objections and arguments, or by instructing defendant exactly what to say next. Having granted defendant's requests for self-representation and for advisory counsel, the court was not obliged to accede to the defense's requests both for self-representation and for whatever degree of participation in the proceedings it desired for advisory counsel. The court was well within its discretion in refusing to permit defendant both to represent himself and to have the benefit of professional representation.

Moreover, defendant was not prejudiced by the trial court's action. Defendant sought and was granted the opportunity to represent himself on January 12, 1988, and requested to cease self-representation and to renew his representation by appointed counsel on January 13, 1988. During that time, defendant made several arguments concerning the written motions previously filed by his former defense counsel. The sole witness during that period was a deputy district attorney, who, as noted above, testified at a hearing held pursuant to Evidence Code section 402 that defendant had received advisements of, and waived, his constitutional rights when he entered his 1984 plea of no contest. During her testimony, defendant interposed numerous objections on the grounds of hearsay, nonresponsiveness, and lack of foundation. When defendant discontinued his self-representation and resumed representation by appointed counsel, defense counsel performed an extensive cross-examination of this witness. As discussed in greater detail below, the evidence pertaining to defendant's conviction for this offense was inadmissible as a prior conviction, but its admission constituted harmless error because this evidence was admissible as violent criminal activity and Julianne P.'s testimony amply established that the underlying criminal activity had occurred.

c. *Grant of February 1, 1988, motion for self-representation*

On February 1, 1988, prior to the testimony of the final three prosecution witnesses, outside the presence of the prosecutors, defendant again moved to

discharge his appointed counsel and represent himself. Defense counsel explained that defendant had informed his attorneys that he (i) did not wish to present any defense, (ii) desired (after some vacillation) to testify, (iii) would testify for the prosecution if defense counsel presented the testimony of defendant's mother, who had come to court to testify, and (iv) intended to be totally disruptive and testify in a manner designed to guarantee a death verdict. According to defense counsel, defendant had threatened both defense counsel with bodily injury and desired to sabotage his defense. It was their belief that he was "doing this in a post-conviction setting for a tactically better position."

The court directed the prosecutors to return and again asked defendant whether he understood his right to be represented by counsel, whether he understood his duties as counsel (including making arguments and examining witnesses), whether he could proceed without any continuance, whether he realized any examination or argument must take place while defendant was seated at counsel's table, whether he realized the jury might draw adverse inferences from his self-representation, and whether he realized that his lack of technical expertise and vocabulary would be detrimental, that neither the court nor the prosecutors would assist him with anything related to preparing a defense, that his custodial status would impede his ability to locate and subpoena witnesses, that he would be precluded from raising on appeal issues arising from inadequacy of counsel, and that if subsequently defense counsel were reappointed, they might encounter difficulty in representing defendant due to their lack of familiarity with what had transpired in the case. In his response to each of the trial court's inquiries, defendant indicated that he understood. Asked to consider all these consequences in total, defendant stated he wished to represent himself. The trial court granted defendant's motion for self-representation, appointing former defense counsel as "standby counsel."[19]

The prosecution proceeded to present the testimony of its final three witnesses, as described above. Immediately following the jury's rendering of its verdict fixing the punishment at death, defendant sought and was granted reappointment of counsel, who represented him during the remainder of the proceedings.

 Defendant again contends that in granting the motion for self-representation, the trial court failed to weigh the factors described in *People v. Windham, supra,* 19 Cal.3d 121, 128. As indicated above, because the trial court granted the motion at defendant's insistence, defendant may not be heard to complain on appeal that that the trial court failed to weigh the

---

[19]The trial court at this point declined to appoint advisory counsel.

*Windham* factors. (*People* v. *Clark, supra,* 3 Cal.4th 41, 109.) We also reject the contention that the trial court's failure to conduct an inquiry pursuant to *Windham* or otherwise state its reasons for granting defendant's motion precluded preparation of a record adequate for appellate review. Defendant urges that the trial court was required to state its reasons for granting the motion for self-representation, and that the existing record is inadequate for our review of the ruling, due to the loss of transcripts of various in camera proceedings, discussed below. We have reviewed the settled statement concerning these proceedings, and conclude that the absence of the original transcripts of these proceedings does not render the existing record inadequate for the purpose of our review of the ruling, nor does it warrant imposing a requirement (contrary to our precedents) of an expression of reasons for granting a defendant's motion for self-representation.

Defendant contends the trial court improperly granted his motion because defendant at the time had made it clear that, in effect, he wished to commit suicide. First, the record does not establish that at the time the trial court considered the motion for self-representation, defendant's intent to seek the death penalty was clear. Defendant, during his prior period of self-representation, had argued the various motions previously filed by his appointed attorneys. Even after the trial court granted his motion to represent himself, defendant on February 1, 1988, advised the court that he might call his mother as a witness in mitigation and, accordingly, asked that she be excluded from the courtroom. Defendant briefly cross-examined Cindy F. as to her marital status, eliciting her testimony that she had remarried without obtaining a divorce from defendant and without learning whether he had obtained a divorce. Defendant waited until after the prosecution rested on February 2, 1988, to inform the court that he did not intend to present any evidence in mitigation. Following the jury's verdict fixing the punishment at death, defendant immediately sought reappointment of defense counsel.

Second, we have held that a trial court that permits a defendant to represent himself or herself, even *with* knowledge that the defendant intends to seek the death penalty, does not violate the public policy against state-assisted suicide. (*People* v. *Bloom, supra,* 48 Cal.3d 1194, 1222-1224.) Even when a defendant who is representing himself or herself openly states that he or she will seek the death penalty and refuses to introduce evidence in mitigation or argue to the jury, the trial court is not obligated to revoke the defendant's self-representation and appoint counsel to conduct the defense. (*Ibid.*)

We have rejected similar arguments that the Eighth Amendment interest in a reliable penalty determination overcomes the defendant's Sixth Amendment interest in self-representation. Although a defendant has no right to

waive the statutory automatic appeal from a judgment imposing the death penalty (*People* v. *Massie* (1985) 40 Cal.3d 620, 624 [221 Cal.Rptr. 140, 709 P.2d 1309]), or otherwise seek the state's assistance in committing suicide, it does not follow that a defendant's right of self-representation must be circumscribed in order to thwart his or her decision not to present mitigating evidence at the penalty phase of the trial. (*People* v. *Stansbury, supra,* 4 Cal.4th 1017, 1062-1063.)

In *People* v. *Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925], we indicated that defense counsel should present evidence in mitigation over the objection of the defendant, but we subsequently disapproved that decision to the extent it suggested that the failure to present mitigating evidence in and of itself is sufficient to render a death judgment unreliable, holding instead that the failure to present mitigating evidence at the penalty phase does not make the proceeding unreliable in constitutional terms. (*People* v. *Diaz* (1992) 3 Cal.4th 495, 566 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 811 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Deere* (1991) 53 Cal.3d 705, 716-717 [280 Cal.Rptr. 424, 808 P.2d 1181]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1030 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Bloom, supra,* 48 Cal.3d 1194, 1228, fn. 9.) ▮ We have stated that "a verdict is constitutionally reliable 'when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present.' " (*People* v. *Diaz, supra,* 3 Cal.4th 495, 566.) Under those conditions, despite a defendant's avowed intent not to present available evidence in mitigation, the state's interest in ensuring a reliable and fair penalty determination has been met. (*People* v. *Stansbury, supra,* 4 Cal.4th 1017, 1062-1063; *People* v. *Clark, supra,* 3 Cal.4th 41, 109; see *People* v. *Howard* (1992) 1 Cal.4th 1132, 1185-1186 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) ▮ Accordingly, the trial court did not err in permitting defendant to represent himself, even if it understood that his intent was not to present any mitigating evidence.

Defendant also contends that the trial court erred in failing to recognize that defendant's motions for self-representation actually constituted motions to substitute counsel, requiring that the court inquire and afford him an opportunity to explain his reasons for requesting such substitution. (See *People* v. *Bean, supra,* 46 Cal.3d 919, 947-948; *People* v. *Marsden* (1970) 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44].) The court fully inquired of defendant with regard to his reasons for preferring self-representation. Defendant himself requested advisory counsel. His preference for self-representation reflected his desire to more fully control the proceedings rather than a

wish to acquire new counsel. Defendant's motions clearly were made for the purpose of obtaining self-representation, and the trial court was not required to make further inquiry. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 854-855 [251 Cal.Rptr. 227, 760 P.2d 423].)

Defendant contends that the trial court erred in failing to conduct a hearing into his competency to waive counsel or to act as his own attorney, at the time he sought self-representation. As we have explained, the standard for competency in either case is whether the defendant possessed " 'a rational as well as factual understanding of the proceedings against him' " (*Godinez* v. *Moran, supra,* 509 U.S. 389, 396, 401-402 [113 S.Ct. 2680, 2685, 2687-2688]), and a state constitutionally may presume that a defendant is competent and require him or her to prove incompetence by a preponderance of the evidence. (*Cooper* v. *Oklahoma, supra,* ___ U.S. ___, ___ [116 S.Ct. 1373, 1377, 134 L.Ed.2d 498, 515]; *People* v. *Medina, supra,* 51 Cal.3d 870, 885.) Although a court is required to conduct a hearing in the event a reasonable doubt arises as to a defendant's competence (§§ 1367, 1368), the record in the present case does not indicate that a reasonable doubt existed as to defendant's ability to understand the proceedings against him. His changing preferences with regard to the extent of his own participation in the proceedings, and the extent to which a defense would be presented, did not create a reasonable doubt as to his competence to proceed. Nor did his eventual choice not to present a defense establish reasonable doubt as to his competence.

### 7. *Admission of evidence of rape conviction*

#### a. *Admission as a prior conviction*

■ Defendant next contends that the trial court erred in admitting evidence of his conviction for rape pursuant to section 190.3, factor (c), which provides for the admission of "any prior felony conviction" as a circumstance in aggravation. During the penalty phase of defendant's trial, the prosecution introduced court records documenting that defendant had suffered a conviction for the rape of Julianne P. The records included the reporter's transcript of the proceedings at which defendant had entered a plea of no contest to that offense. In addition, the prosecutors called Julianne P., who described the incident in detail.

Defendant is correct that the trial court improperly admitted the evidence pursuant to section 190.3, factor (c). Although the rape, occurring on April 10, 1983, preceded the present offenses, defendant on August 23, 1984, entered his plea of no contest to the rape charge, following his commission of the two murders. The law is well settled that for purposes of that subdivision, "prior felony conviction[s]" are limited to those convictions

entered prior to the commission of the subject offense or offenses. (*People* v. *Ray, supra,* 13 Cal.4th 313, 349; *People* v. *Kelly* (1992) 1 Cal.4th 495, 549-550 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People* v. *Balderas, supra,* 41 Cal.3d 144, 201-203.) This limitation arises because the basis for the prior-conviction circumstance in aggravation is that "an offender undeterred by his prior brushes with the law deserves more severe criminal treatment." (41 Cal.3d at p. 201, italics omitted.)

Nonetheless, no prejudice occurred. The evidence of the conviction for rape was admissible pursuant to section 190.3, factor (b), as proof of defendant's participation in the violent criminal activity underlying the rape conviction. (*People* v. *Kelly, supra,* 1 Cal.4th 495, 550; *People* v. *Webster, supra,* 54 Cal.3d 411, 454; see *People* v. *Morales* (1989) 48 Cal.3d 527, 567 [257 Cal.Rptr. 64, 770 P.2d 244].) The prosecutor's argument and the jury instructions describing the evidence as admissible pursuant to factor (c) do not establish prejudice. (*People* v. *Webster, supra,* 54 Cal.3d 411, 454.)

Even had the prosecutors relied solely upon evidence of the conviction, that evidence would have been admissible pursuant to section 190.3, factor (b). As this court recently has concluded: " '[T]he prosecution may rely upon a prior *conviction* of a crime involving the use or threat of force or violence to establish the presence of criminal activity involving the use or threat of force or violence for purposes of [satisfying] factor (b).' " (*People* v. *Jackson, supra,* 13 Cal.4th 1164, 1234, original italics.) Moreover, the jury in the present case heard credible testimony from the rape victim recounting the circumstances of the underlying crime. We often have held that such evidence is sufficient to establish a circumstance in aggravation described in factor (b). (*People* v. *Kelly, supra,* 1 Cal.4th 495, 550; *People* v. *Webster, supra,* 54 Cal.3d 411, 454; *People* v. *Morales, supra,* 48 Cal.3d 527, 567.)

### b. *Admission of Alford plea as evidence of a prior conviction*

Defendant also contends that the trial court erred in admitting defendant's conviction for rape pursuant to section 190.3, factor (c) (prior felony convictions), because the conviction followed a plea of no contest (§ 1016), which does not constitute an express admission of guilt but only a consent to be punished as if guilty. (*North Carolina* v. *Alford* (1970) 400 U.S. 25, 35-36, fn. 8 [91 S.Ct. 160, 167, 27 L.Ed.2d 162]; *People* v. *West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409].) As explained above, the court erred in admitting the conviction resulting from this plea as a prior conviction under section 190.3, factor (c), but the error was harmless because the evidence was admissible as evidence of violent criminal activity under factor (b).

Defendant's entry of a plea of no contest does not alter that circumstance. As we have recognized, section 1016 explicitly provides that the legal effect

of a no-contest plea to a crime punishable as a felony is the same for all purposes as a plea of guilty. (E.g., *People* v. *Belmontes* (1988) 45 Cal.3d 744, 809 [248 Cal.Rptr. 126, 755 P.2d 310]; see *People* v. *Lewis* (1990) 50 Cal.3d 262, 279 [266 Cal.Rptr. 834, 786 P.2d 892].) Therefore, evidence of defendant's conviction of rape based upon a no-contest plea properly was utilized as evidence to establish defendant's violent criminal activity.

### 8. *Admission of rape incident as evidence of prior violent activity*

 Defendant originally was charged in case No. A804290 with 11 different counts in connection with the incident that occurred on April 10, 1983. The charged offenses were two counts of forcible rape, two counts of sexual battery, two counts of penetration with a foreign object, and five counts of oral copulation. As a condition of defendant's plea of no contest on August 23, 1984, to one count of forcible rape, the prosecution dismissed the remaining ten counts. At the penalty phase defendant unsuccessfully sought to exclude all evidence pertaining to the incidents underlying the dismissed counts.

### a. *Implied acquittal*

Defendant contends that the doctrine of implied acquittal precluded the prosecution from introducing for the jury's consideration any aspect of the Julianne P. incident. Section 190.3 provides that "in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted." Pursuant to the doctrine of implied acquittal, a defendant's conviction of a lesser degree or lesser included offense of that charged constitutes an implied acquittal of the greater offense. Nonetheless, a dismissal, whether or not pursuant to a plea agreement, is not the equivalent of, and does not constitute, an acquittal pursuant to section 190.3. (*People* v. *Garceau* (1993) 6 Cal.4th 140, 199 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Pride, supra*, 3 Cal.4th 195, 257; *People* v. *Heishman* (1988) 45 Cal.3d 147, 193 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Melton, supra*, 44 Cal.3d 713, 755.)

### b. *Collateral estoppel or double jeopardy*

Defendant contends that evidence of the incidents underlying the dismissed counts was barred under the doctrine of collateral estoppel, preventing relitigation of an issue decided at a prior proceeding. We repeatedly have rejected this claim, noting that the presentation of evidence of past criminal conduct does not place a defendant in jeopardy for past offenses. (*People* v. *Danielson* (1992) 3 Cal.4th 691, 720 [13 Cal.Rptr.2d 1, 838 P.2d 729]; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Defendant argues that, in light of the avowed need for greater reliability in

the penalty determination in a capital case, our decisions are erroneous. We decline defendant's invitation to overrule these decisions.

c. *Dual use of rape evidence pursuant to section 190.3, factors (b) and (c)*

Defendant also contends that by permitting the prosecutor both to introduce the testimony of the rape victim pursuant to section 190.3, factor (b), and to establish the fact of the conviction pursuant to factor (c), the trial court erroneously permitted dual use of the rape evidence. As we previously have recognized, the evidence was improperly admitted under factor (c), although not for the reason presently advocated by defendant. (See *People v. Kelly, supra,* 1 Cal.4th 495, 549 [use both of conviction and underlying circumstances is admissible under factors (b) and (c), because each factor serves a separate purpose]; *People v. Price, supra,* 1 Cal.4th 324, 472.) We already have concluded, however, that no prejudice resulted from the introduction of this evidence under factor (c).

9. *Admission of evidence of unadjudicated offenses beyond the period of limitations*

Defendant contends that admission of evidence of 11 unadjudicated offenses, for which the applicable statute of limitations had expired, violated his right to due process of law, equal protection of the laws, and the need for greater reliability in capital sentencing matters. The prosecution introduced Ellen F.'s testimony and asked the jury to consider whether defendant had committed assault by means of force likely to produce great bodily injury, occurring on September 20, 1980. The prosecution introduced Cindy F.'s testimony and asked the jury to consider whether defendant had committed spousal rape, assault by means of force likely to produce great bodily injury, battery with serious bodily injury, spousal abuse, child abuse, false imprisonment, and battery, occurring prior to June 1978. The prosecution also introduced Cheryl V.'s testimony and asked the jury to consider whether defendant had committed attempted oral copulation, false imprisonment, and battery, occurring in May 1972. The applicable statutes of limitations were of three years or less.

Defendant recognizes that this court repeatedly has affirmed that California law imposes no time limitation upon the introduction of evidence of violent crimes, and the jury may consider such acts occurring at any stage of a defendant's life. (*People v. Heishman, supra,* 45 Cal.3d 147, 192; *People v. Balderas, supra,* 41 Cal.3d 144, 202; see *People v. DeSantis, supra,* 2 Cal.4th 1198, 1252; *People v. Jones* (1991) 53 Cal.3d 1115, 1152 [282 Cal.Rptr. 465, 811 P.2d 757].) We specifically have rejected defendant's further claim that the United States Supreme Court, in stressing the special need under the

Eighth Amendment for reliability in the determination whether the death penalty is appropriate, has dictated a different conclusion. (*People* v. *Johnson, supra*, 3 Cal.4th 1183, 1244.) We also previously have denied the claim that the admission of time-barred offenses violates due process or equal protection principles. (*People* v. *Johnson, supra*, 6 Cal.4th 1, 51-52; *People* v. *Medina, supra*, 51 Cal.3d 870, 906-907.)

### 10. *Admission of nonstatutory aggravating evidence*

Defendant contends the trial court erred in admitting evidence of nonviolent activity presented in the course of the evidence of prior violent criminal activity, thus permitting the introduction of nonstatutory aggravating factors. Defendant points out that Julianne P.'s testimony describing the incident that occurred on April 10, 1983, included the information that defendant masturbated and may have reached an orgasm, that defendant ordered her to wear various items of lingerie, telling her that he wanted her to look like a "whore," that defendant had her cut off her pubic hair so that she would have a "teenage look," that defendant refused to let her drink a beer after learning she was thirsty, and that defendant ordered her to urinate into a bottle. Tamara H.'s and Mark W.'s testimony concerning the events in June 1984 included the information that defendant told them he was on a "drug run" and had drugs taped to the bottom of his vehicle, that defendant had an "eery [*sic*] look in his eye," that after he drove them to San Diego they had difficulty getting him to leave, and that they changed motel rooms because they were afraid defendant might return. Ellen F.'s testimony included the information that she discovered defendant beating her dog with a stick with nails in it, and that defendant was very intoxicated at the time.

It is well established that the prosecution may not present evidence in aggravation other than that pertaining to the statutory factors enumerated in section 190.3. (*People* v. *Avena* (1996) 13 Cal.4th 394, 438-439 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People* v. *Stanley, supra*, 10 Cal.4th 764, 823; *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-775 [215 Cal.Rptr. 1, 700 P.2d 782].) The statute lists as an aggravating factor "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).)

We have observed that the issue of other violent criminal activity encompasses not only the existence of such activity but also all the pertinent circumstances of that activity. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 985 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Karis* (1988) 46 Cal.3d 612, 640 [250 Cal.Rptr. 659, 758 P.2d 1189].) The prosecution, in presenting

the above-described evidence of prior violent activity, was not obliged to omit evidence pertaining to particular acts committed during the course of the incidents that in themselves were not violent. In each incident, an explanation of defendant's conduct preceding or following a particular forceful or violent act clearly assisted the jury's understanding of the inception of and continuation of the express and implied threats to the victims. The trial court did not err in admitting this evidence.

### 11. *Alleged prosecutorial misconduct*

 Defendant contends that the prosecutor committed misconduct in closing argument to the jury. He further contends that this misconduct violated his federal constitutional rights to due process of law, a fair trial, and a reliable penalty determination (U.S. Const., 5th, 6th, 8th, & 14th Amends.), requiring reversal of the penalty verdict and judgment of death.

 Defendant, then representing himself, failed to object to any of the statements here challenged. Absent objection, a claim of prosecutorial misconduct in argument is not reviewable on appeal. (*People v. Jones, supra,* 15 Cal.4th 119, 181; *People v. Mayfield, supra,* 14 Cal.4th 668, 801; *People v. Berryman, supra,* 6 Cal.4th 1048, 1072; *People v. Harris* (1989) 47 Cal.3d 1047, 1089 [255 Cal.Rptr. 352, 767 P.2d 619].) That rule applies even though defendant was representing himself. (*People v. Clark, supra,* 50 Cal.3d 583, 618.) Nor, having elected self-representation, may a defendant claim on appeal that he or she received ineffective representation at trial because assertedly objectionable argument was permitted without objection. (See *People v. Clark, supra,* 50 Cal.3d 583, 618; see *People v. Bloom, supra,* 48 Cal.3d 1194, 1226.)

 Nonetheless, even considering defendant's contentions on the merits, we conclude that no misconduct occurred. The first incident of alleged prosecutorial misconduct occurred in the following context. In an opening statement at the penalty phase (at which time defendant still was represented by appointed counsel), defense counsel had alluded to the circumstance that the jury's function was to determine when defendant's death should take place, "in God's time or in a time set by you." Defense counsel also recalled a characterization made by the prosecutor during opening argument at the guilt phase, of defendant's conduct in killing the victims as constituting "lustmord," a German word loosely translated as "bloodlust." Defense counsel urged that there was a difference between justice on the one hand, and revenge "or maybe even bloodlust. . . . [¶] The choice ultimately is yours and anyone of you can stop this machine of death."

During her closing argument at the penalty phase (by which time defendant was representing himself), Prosecutor Ferraro recalled defense counsel's

opening statement concerning whether defendant would die in "God's time" or at a time set by the jury, and, having stated that the defense was implying that the jury was usurping the role of God, she commented that the state had a right to impose the penalty, that it was not arbitrarily applied, and that this was not the time or place to question its validity.

Prosecutor Ferraro also recalled defense counsel's discussion of the difference between justice, and revenge or bloodlust, and defense counsel's implication that if the jury sentenced defendant to death it would be engaging in bloodlust. Prosecutor Ferraro emphasized to the jurors that the only valid reason to execute defendant was that justice so required, that their act in deciding to vote for the death penalty could not be equated with defendant's acts in killing the victims, that the victims, unlike defendant, did not receive any protection of their constitutional rights, and that the situation of the victims should be contrasted with that of defendant's appearance in a courtroom "where we're carpeted, we're all dressed up, everybody tries to speak nicely to each other, we have a gentleman to protect the right of the accused. If things go wrong we have a bailiff who is armed to protect all of us here. [¶] Contrast that with what happened to Shari and Tracey out in the desert. You will see there is a huge difference between murdering someone for pleasure and executing someone because justice demands an execution." Prosecutor Ferraro further noted that defendant's rights had been scrupulously protected and that he would have an opportunity to die with "a lot more dignity" than he gave to either victim.

Defendant asserts that the prosecutor committed misconduct by appealing to the passions of the jury by urging them to consider the victims' sufferings from the victims' perspective. ▆▆▆ Although an appeal to view the sufferings of the victim from the viewpoint of the victim is improper at the guilt stage (*People* v. *Stansbury*, *supra*, 4 Cal.4th 1017, 1057), we have indicated that such argument is permissible at the penalty phase. (See, e.g., *People* v. *Garceau*, *supra*, 6 Cal.4th 140, 205-206.) ▆▆▆ Whereas a prosecutor commits misconduct in making comments calculated to arouse passion or prejudice (*People* v. *Mayfield*, *supra*, 14 Cal.4th 668, 803), the comments in this case were not so calculated. A reasonable juror would have construed the prosecutor's remarks simply as part of a more generalized argument aimed at morally distinguishing the offense of murder from the act of assigning the death penalty as the proper punishment in a court of law.

Defendant asserts that the prosecutor, by alluding to the presence of the bailiff, committed misconduct by inviting the jury to consider defendant's future dangerousness. The prosecutor properly may make argument concerning a defendant's future dangerousness. (*People* v. *Clark*, *supra*, 3 Cal.4th 41, 161.) Moreover, it is obvious that, considered in context, the prosecutor

merely noted that the bailiff was present for the purpose of guarding all participants in the proceedings (including defendant) from harm caused by intruders—one of the many features of the legal process that defendant was undergoing—in order to contrast this situation with that of the victims at the time of their murders.

Defendant contends that Prosecutor Ferraro also committed misconduct by arguing that because the victims were afforded no rights when they were killed, neither should defendant have any right to a fair jury trial prior to his execution. Defendant contends that by stating "justice demands an execution," the prosecutor urged the jury to apply "frontier justice" and appealed to vengeance. It is clear that a reasonable jury would have understood the arguments to emphasize the differences between the penalty to be considered and the offenses that caused it to be considered—and not as urging that defendant had no right to a fair jury trial or that the jury should act out of a sense of "frontier justice."

■ Finally, defendant asserts that Prosecutor Conn committed misconduct by urging the jury to consider "irrelevant and speculative factors" when he asked the jury to evaluate whether, by placing defendant in "a prison population with prison employees and other people who have not committed crimes," they would be giving "a man who has shown a tremendous capacity for violence" "an opportunity to manifest that violence again." As noted above, the prosecutor properly may argue concerning a defendant's future dangerousness. (See *People* v. *Clark, supra,* 3 Cal.4th 41, 161.) It is not misconduct for a prosecutor at the penalty phase to argue that a defendant, if sentenced to prison, might kill another prisoner, when there is factual support for this argument derived from the defendant's record of violence outside of prison. (*People* v. *Taylor, supra,* 52 Cal.3d 719, 750.)

Defendant acknowledges that legal authority exists for that proposition but observes that the record established only defendant's propensity for violence against women, who would not be present in prison with him. The record does not support defendant's assertion. At the penalty phase, Mark W. and Tamara H. testified that, during their ordeal, occurring within several months of the murders, defendant had threatened to kill Mark, had forced him to strip and, using Tamara, repeatedly had forced him to attempt to perform sexual acts. Cindy F. had testified as to defendant's repeated violent acts upon his own son and stepson. Nor is defendant accurate in asserting that he would not encounter females, the primary object of his violence, in prison. We take note, as did the prosecutor in his argument, of the circumstance that a prison may contain both male and female persons, including employees, who might encounter defendant. The prosecutor did not commit misconduct.

## 12. *Consideration of defendant's probation report*

Defendant contends that the trial court improperly considered the probation report in ruling upon his application for modification of the verdict of death. We repeatedly have held that, "in ruling upon an automatic motion for modification of the penalty, the trial court may consider only the evidence before the jury, and that therefore it is error to consider the probation report, a matter not before the jury. [Citations.]" (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 151; see *People* v. *Avena, supra,* 13 Cal.4th 394, 447-448.) "Nonetheless, in the event the trial court has considered the report, we assume the court was not improperly influenced thereby, absent evidence in the record to the contrary. [Citations.]" (9 Cal.4th at p. 151.)

In the present case, the record reflects that, having reviewed the factors in aggravation and mitigation, the trial court then denied the automatic motion for modification. Thereafter, without any recess, the court observed that it had read and considered the probation report, and proceeded to sentence defendant. Although the trial court apparently had read and considered the report prior to the time it ruled on the automatic motion for modification of the penalty, nothing in the record of the court's statement of reasons for denying that motion suggests the court, in ruling on the motion, utilized any matters noted in the probation report that were not contained in the record before the jury. Therefore, no reasonable possibility exists that the trial court's consideration of the probation report affected its decision. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 151-152; see *People* v. *Avena, supra,* 13 Cal.4th 394, 448.)

## 13. *Inadequacy of the record on appeal*

Defendant contends that the record on appeal is inadequate, because the court reporter's notes of several reported proceedings that took place in chambers were lost and related transcripts either were not prepared or, having been prepared, also were lost. The record does contain, however, a settled statement prepared by appellate defense counsel and acceded to by the Attorney General, describing the contents of each of these in-chambers discussions and indicating the legal arguments that were advanced.

Pursuant to section 1181, subdivision 9, a reviewing court is authorized to order a new trial "because of the loss or destruction, in whole or in substantial part" of the court reporter's notes. "The test is whether in light of all the circumstances it appears that the lost portion is 'substantial' in that it affects the ability of the reviewing court to conduct a meaningful review and the ability of the defendant to properly perfect his appeal." (*People* v. *Morales* (1979) 88 Cal.App.3d 259, 267 [151 Cal.Rptr. 610].) " '[W]here other methods of reconstructing the trial record are available, the defendant

must proceed with those alternatives in order to obtain review. [Citations.]' "
(*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 66 [14 Cal.Rptr.2d 133, 841 P.2d
118].)

We find the record in the present case adequate to the task at hand. When
the resolution of a defendant's claims does not depend upon a verbatim
transcription, a settled statement suffices. (*People* v. *Hawthorne, supra,* 4
Cal.4th 43, 66; see *People* v. *Holloway, supra,* 50 Cal.3d 1098, 1116; see
also *People* v. *Pinholster, supra,* 1 Cal.4th 865, 921-922, and cases cited
therein.) The issues raised pertaining to the proceedings in which no court
reporter's record exists do not require a verbatim report of the proceedings
for resolution of these issues. This is not a case in which a large or crucial
portion of the record is missing. (1 Cal.4th at pp. 921-922.) Therefore, we
conclude there has been no violation of defendant's right under the due
process clause to meaningful appellate review. (*Rushen* v. *Spain* (1983) 464
U.S. 114, 120 [104 S.Ct. 453, 456-457, 78 L.Ed.2d 267]; *People* v. *Haw-
thorne, supra,* 4 Cal.4th 43, 66.)

14. *Cumulative error*

Defendant contends that the cumulative effect of asserted errors at and
after the penalty phase of his trial—in particular, the conduct of proceedings
in his absence, the failure to present evidence in mitigation, and the failure to
preserve an adequate record—denied him his federal constitutional rights to
a fair trial and a reliable penalty verdict (U.S. Const., 5th, 8th, & 14th
Amends.), requiring reversal of the judgment as to penalty. We have rejected
nearly all of defendant's assignments of error, and when we have determined
that the trial court erred, we have concluded that the error did not result in
prejudice to defendant. Even considered collectively, the errors were not
significant. Defendant was not denied his federal constitutional right to a fair
trial and a reliable penalty determination. (*People* v. *Mayfield, supra,* 14
Cal.4th 668, 803, 809; *People* v. *Marshall, supra,* 13 Cal.4th 799, 866;
*People* v. *Ray, supra,* 13 Cal.4th 313, 362; *People* v. *Arias, supra,* 13 Cal.4th
92, 194.)

15. *Constitutionality of the death penalty*

a. *Failure to require unanimity as to evidence of aggravating factors*

 Defendant contends that, in light of the Eighth Amendment require-
ment of enhanced reliability in capital cases, section 190.3 is unconstitu-
tional because it does not require a jury to find unanimously that a defendant
has committed other actual or threatened violent criminal activity within the
meaning of section 190.3, factor (b). Defendant also contends that, in view
of the trial court's refusal to give defendant's requested instruction that the

jury unanimously must agree upon which criminal acts have been proved, and in view of the prosecutor's argument, explicitly informing the jury that it need not be unanimous with regard to which criminal acts occurred, application of this assertedly unconstitutional statute was prejudicial.

As we have observed, there is no constitutional requirement that the jury unanimously find true the circumstance or circumstances in aggravation that support its verdict. (*People* v. *Arias, supra,* 13 Cal.4th 92, 190; *People* v. *Crittenden, supra,* 9 Cal.4th 83, 153; *People* v. *Cox* (1991) 53 Cal.3d 618, 692 [280 Cal.Rptr. 692, 809 P.2d 351].) In particular, we repeatedly have concluded that the jury need not unanimously conclude that the defendant committed other crimes before considering those crimes in aggravation. (*People* v. *Sims, supra,* 5 Cal.4th 405, 462; *People* v. *Alcala, supra,* 4 Cal.4th 742, 809; *People* v. *Johnson, supra,* 3 Cal.4th 1183, 1245; *People* v. *DeSantis, supra,* 2 Cal.4th 1198, 1252; *People* v. *Hardy, supra,* 2 Cal.4th 86, 207.) Because jury unanimity is not required before a jury may consider other actual or threatened violent criminal acts pursuant to section 190.3, factor (b), it follows that the trial court did not err in refusing to so instruct the jury, and the prosecutor did not commit misconduct by informing the jury that it need not agree upon which criminal acts defendant had committed in order to consider them as circumstances in aggravation.

b. *Other alleged defects*

Defendant contends the 1978 statute providing for the death penalty lacks procedural safeguards and contains numerous substantive defects. We previously have rejected the majority of such claims and decline defendant's invitation to reconsider our rulings; however, we specify below the nature of the claims in denying them.

1. There is no requirement that section 190.3 define which factors are aggravating and which are mitigating, and the factors need not be labeled exclusively as aggravating or mitigating. (*People* v. *Osband, supra,* 13 Cal.4th 622, 704-706; *People* v. *Crittenden, supra,* 9 Cal.4th 83, 152-153; *People* v. *Espinoza, supra,* 3 Cal.4th 806, 827; *People* v. *Montiel* (1993) 5 Cal.4th 877, 943 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *McPeters, supra,* 2 Cal.4th 1148, 1191.)

2. The court need not require that the jury submit written findings as to which aggravating circumstances it relied upon in imposing the death penalty. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 153; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Fauber, supra,* 2 Cal.4th 792, 859; *People* v. *Kelly, supra,* 51 Cal.3d 931, 970.)

3. The federal Constitution does not require intercase proportionality review. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 50-51 [104 S.Ct. 871, 879-880,

79 L.Ed.2d 29]; *People* v. *Crittenden, supra,* 9 Cal.4th 83, 157; *People* v. *Mincey, supra,* 2 Cal.4th 408, 476.) Nor does our state Constitution require intercase proportionality review in order to ensure due process of law and equal protection of the laws, or to avoid the infliction of cruel or unusual punishment. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 156-157; *People* v. *Mincey, supra,* 2 Cal.4th 408, 476; see *People* v. *Marshall, supra,* 13 Cal.4th 799, 865-866; *People* v. *Payton, supra,* 3 Cal.4th 1050, 1074-1075.) Although a sentence is subject to intracase review, defendant's sentence clearly is not grossly disproportionate to the offenses for which it was imposed. (*People* v. *Mincey, supra,* 2 Cal.4th 408, 476.)

4. A trial court need not instruct the jury that, before it may fix the penalty at death, it must find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 153; *People* v. *Clark, supra,* 3 Cal.4th 41, 170; *People* v. *Livaditis, supra,* 2 Cal.4th 759, 786; see *People* v. *McPeters, supra,* 2 Cal.4th 1148, 1195.)

5. There is no requirement that a trial court instruct the jury that it must conclude beyond a reasonable doubt that death is the appropriate penalty. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 153; *People* v. *Diaz, supra,* 3 Cal.4th 495, 569-570; *People* v. *Clark, supra,* 3 Cal.4th 41, 170; *People* v. *Livaditis, supra,* 2 Cal.4th 759, 786; see *People* v. *McPeters, supra,* 2 Cal.4th 1148, 1195.)

6. The delegation to each district attorney, through his or her authority to decide whether to seek the death penalty, the power effectively to decide which defendants will be eligible to be sentenced to death, does not give rise to an arbitrary and capricious capital punishment system and does not violate the principles underlying due process of law, equal protection of the laws, and the prohibition against cruel or unusual punishment, nor does it transgress the constitutional principle of separation of powers. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 152; *People* v. *Kirkpatrick, supra,* 7 Cal.4th 988, 1024; *People* v. *Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].)

7. It repeatedly has been observed that the statutory factors in aggravation are not vague. (*Tuilaepa* v. *California* (1994) 512 U.S. 967, 975-980 [114 S.Ct. 2630, 2636-2639, 129 L.Ed.2d 750]; *People* v. *Berryman, supra,* 6 Cal.4th 1048, 1096-1097; *People* v. *Cudjo, supra,* 6 Cal.4th 585, 637; *People* v. *Webb, supra,* 6 Cal.4th 494, 535.) Defendant does not provide argument or authority demonstrating that the factors are overbroad.

### III. DISPOSITION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment in all respects save one. I would vacate the sentence of death as unreliable under the Eighth Amendment to the United States Constitution and article I, section 17 of California Constitution because trial counsel introduced none of the available mitigating evidence. (See *People* v. *Avena* (1996) 13 Cal.4th 394, 449-450 [53 Cal.Rptr.2d 301, 916 P.2d 1000] (dis. opn. of Mosk, J.) [implying that any sentence of death should be vacated as unreliable under the Eighth Amendment and article I, section 17 if trial counsel introduced none of the available mitigating evidence]; *People* v. *Lucas* (1995) 12 Cal.4th 415, 501-502 [48 Cal.Rptr.2d 525, 907 P.2d 373] (conc. and dis. opn. of Mosk, J.) [same]; *In re Ross* (1995) 10 Cal.4th 184, 216, fn. 1 [40 Cal.Rptr.2d 544, 892 P.2d 1287] (dis. opn. of Mosk, J.) [same]; *People* v. *Stansbury* (1995) 9 Cal.4th 824, 835 [38 Cal.Rptr.2d 394, 889 P.2d 588] (conc. and dis. opn. of Mosk, J.) [same], reiterating *People* v. *Stansbury* (1993) 4 Cal.4th 1017, 1074 [17 Cal.Rptr.2d 174, 846 P.2d 756] (conc. and dis. opn. of Mosk, J.), revd. *sub nom. Stansbury* v. *California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293] (*per curiam*); *People* v. *Diaz* (1992) 3 Cal.4th 495, 577 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (conc. and dis. opn. of Mosk, J.) [same]; see also *People* v. *Howard* (1992) 1 Cal.4th 1132, 1197 [5 Cal.Rptr.2d 268, 824 P.2d 1315] (conc. and dis. opn. of Mosk, J.) [finding a sentence of death unreliable under the Eighth Amendment and article I, section 17 when trial counsel introduced none of the available mitigating evidence, albeit at the defendant's request]; *People* v. *Sanders* (1990) 51 Cal.3d 471, 531-533 [273 Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.) [same]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1059-1062 [264 Cal.Rptr. 386, 782 P.2d 627] (conc. and dis. opn. of Mosk, J.) [same]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1158-1161 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. and dis. opn. of Mosk, J.) [to similar effect under the Eighth Amendment]; *People* v. *Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925] [same].)

If I had to reach the issue, I would conclude that the trial court erred reversibly when it granted defendant's motion to represent himself at the penalty phase—which was, in effect, a "request to prosecute the case for death" (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1236 [259 Cal.Rptr. 669, 774 P.2d 698] (conc. and dis. opn. of Mosk, J.)).

Appellant's petition for a rehearing was denied September 17, 1997.